UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KARL AHLERS,

                                    Plaintiff,
                                                        9:12-CV-0575
v.                                                      (DNH/TWD)

MIA TOWNSEND,

                                    Defendant.
_____

APPEARANCES:                                        OF COUNSEL:

KARL AHLERS, 61656-305
Plaintiff pro se
CNY PC
PO Box 300
Marcy, NY 13403


HON. ERIC T. SCHNEIDERMAN                            C. HARRIS DAGUE, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This pro se civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been

referred to me for Report and Recommendation by the Honorable David N. Hurd, United States

District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Karl Ahlers

claims that he was deprived of his rights regarding telephone communication by Defendant Mia

Townsend.  (Dkt. No. 5.)  Currently pending before the Court is Defendant's motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 19.)  For the

reasons discussed below, I recommend that Defendant's motion be granted.

## I.    FACTUAL AND PROCEDURAL SUMMARY

Plaintiff, a former prisoner of the State of New York, was civilly committed following his sentence and has been in the custody of the Central New York Psychiatric Center ("CNYPC") since 2009.  (Dkt. No. 5 at 2, 6.)

As a patient at CNYPC, Plaintiff was issued a phone card which could be used to make phone calls from the facility, provided that there were sufficient funds on the account.  (Dkt. No. 5 at 6.)  From February 2012 to late July or August 2012, Plaintiff's phone card account was suspended by CNYPC staff because they believed Plaintiff owed money related to his account.  *Id*. at 8-9.  During this time, Plaintiff alleges that Defendant, the primary therapist on Plaintiff's ward, "repeatedly without explanation nor due process, refused to permit Plaintiff to make and/or delayed permission to telephone Plaintiff's attorneys as well as refusing to permit Plaintiff (without explanation or due process[)], to make collect calls . . . to friends, family, and/or his support group members."  *Id*. at 11-12.

Plaintiff elaborates in his opposition to the motion for summary judgment that between February 2 and July 26, 2012, he requested a slip to speak with an attorney forty-five times.  (Dkt. No. 21 ¶¶ 32-33.)  He was granted twenty-two attorney phone calls, and denied twenty-three.  *Id*.  Of the twenty-four dates on which he requested attorney call slips, on sixteen days he made multiple call requests.  *Id*.  On all but nine days, Plaintiff was granted permission to speak with an attorney at least once.  *Id*.  In addition, Plaintiff claims that all eighteen of the collect calls to family or friends which he requested were denied.  *Id*.

Defendant's role is unclear.  Plaintiff claims that it was Defendant who granted or denied

permission to call attorneys or to make collect calls. (Dkt. No. 5 at 11-12.) Jeffrey Nowicki, the Chief of Mental Health Treatment at CNYPC, declares to the contrary that Defendant Townsend did not have the authority to deny telephone request slips. (Dkt. No. 19-3 ¶ 35.)

Telephone usage is governed at CNYPC by the internal policy numbered 5.1. (Dkt. No. 19-4 at 17-30.) That policy declares that calling card use is a privilege that can be suspended on the basis of treatment, safety, or security issues. *Id*. at 17, 21, 26. The policy states, however, that "[r]esidents will retain their collect call privileges should they lose the ability to participate in the Calling Card Program." *Id*. The policy states that "residents *shall* be permitted to make calls during non-program, non-meal times from 8:00 a.m. until 10:30 p.m." *Id*. at 18, 22, 27 (emphasis added). Residents' phone privileges may be restricted "[o]n rare occasions" if such a restriction is supported by a physician's order and documented in a medical record progress note. *Id*.

Plaintiff first filed this action on April 4, 2012. (Dkt. No. 1.) Although Plaintiff's initial complaint and amended complaint included claims regarding improper behavior on the part of the CNYPC staff with regard to the funds in Plaintiff's phone card account and a Fourth Amendment claim regarding the seizure of his legal paperwork, all claims except those pertaining to Defendant Townsend's alleged restrictions on Plaintiff's telephone use were dismissed with prejudice upon this Court's initial reviews. (Dkt. Nos. 4, 7.) As such, only those facts which pertain to the remaining claims are outlined above. Defendant now moves for summary judgment. (Dkt. No. 19.) Plaintiff has opposed the motion. (Dkt. No. 21.)

## II.    APPLICABLE LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Id*. at 273.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 & n.11 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.    Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion

---

[1]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III.    ANALYSIS

Construing Plaintiff's complaint liberally, Plaintiff has alleged a First Amendment violation regarding telephone contact with family, a First Amendment violation regarding access to courts, and a Fourteenth Amendment due process violation concerning these telephone rights. (Dkt. No. 5.) Defendant argues that Plaintiff has not stated cognizable First Amendment claims and has shown no protected liberty interest for the Fourteenth Amendment claim, and moves for summary judgment on those grounds. (Dkt. No 19-5.) For the reasons below, I recommend that Defendant's motion be granted.

### A.    First Amendment Contact with Family

Construing the complaint liberally, Plaintiff alleges that Defendant Townsend restricted his access to the telephone in violation of his First Amendment rights to contact his family. (Dkt. No. 5 at 11-12.) Defendant argues that Plaintiff has not stated a claim for a First Amendment violation or raised a triable issue of fact. (Dkt. No. 19-5 at 4-5.[2]) For the reasons stated below,

---

[2]    Page numbers in citations to Defendant's memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Defendant is correct.

First, it is necessary to comment on Plaintiff's status as a civilly committed individual. While the majority of § 1983 case law involving telephone access concerns prisoners, Plaintiff has completed his criminal sentence and is no longer a prisoner. Nevertheless, the same analyses for alleged civil rights violations apply here. In *Youngberg v. Romeo*, 457 U.S. 307, 319-24 (1982), the Supreme Court made clear that civilly committed persons retain various constitutional rights, but that these rights must be tempered by the relevant state interest and the (presumably correct) opinions of trained professionals. *See also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

More specifically, for First Amendment claims by civilly committed individuals involving access to telephones, the Second Circuit has affirmed district court rulings which apply the *Turner* standard (originally for prisoners) to the rights of the civilly committed. *See*, *e.g.*, *Yeldon v. Hogan*, No. 9:08-CV-769 (NAM/RFT), 2010 U.S. Dist. LEXIS 23821, at *19-22, 2010 WL 983819, at *6-7 (N.D.N.Y. Feb. 22, 2010[3]), *aff'd*, 400 F. App'x 580 (2d Cir. 2010).[4] The aforementioned standard, from *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), is a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights

_____

[3]    Lexis and Westlaw list different dates for this decision. This Court has used the date from the Lexis version, which refers to the date of the magistrate judge's Report-Recommendation.

[4]    The Court will provide Plaintiff with a copy of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. *Turner*, 482 U.S. at 89-91. The Second Circuit Court of Appeals has not yet addressed the issue of telephone access for the civilly committed in a reported decision.

It is well settled that a prisoner retains the right under the First Amendment to communicate with family and friends. *See Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974); *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975). However, such right is not limitless. *See Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977); *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

While a prisoner has a constitutional right to communicate with the outside world, this right does not include a guarantee of a specific means of communication. Thus, for example, there is no constitutionally guaranteed right of a prisoner to unrestricted use of a telephone. *See Banks v. Argo*, No. 11 Civ. 4222 (LAP), 2012 U.S. Dist. LEXIS 141853, at *14-17, 2012 WL 4471585, at *5-6 (S.D.N.Y. Sept. 25, 2012); *Bellamy v. McMickens*. 692 F. Supp. 205, 214 (S.D.N.Y. 1988). A prisoner's access to family and friends via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal. *See Edwards v. Horn*, No. 10 Civ. 6194 (RJS) (JLC), 2012 U.S. Dist. LEXIS 18424, at *17-18, 2012 WL 473481, at *4 (S.D.N.Y. Feb. 14, 2012) (denial of free telephone calls to prisoner is not

actionable claim); *Henry v. Davis*, No. 10 Civ. 7575 (PAC) (JLC), 2011 U.S. Dist. LEXIS 84100, at *7, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world."). Furthermore, phone restrictions have generally been upheld so long as the individual could still communicate with his family via mail. *Pitsley v. Ricks,* No. 96-CV-0372 (NAM) (DRH), 2000 U.S. Dist. LEXIS 5402, at *18, 2000 WL 362023, at *5 (N.D.N.Y. Mar. 31, 2000). This is treated as an element of the claim, and it is Plaintiff's burden to make a showing that he did not have access to other avenues, such as via mail. *See Riddick v. Arnone*, No. 3:11-cv-631 (SRU), 2012 U.S. Dist. LEXIS 94718, at *16, 2012 WL 2716355, at *6 (D. Conn. July 9, 2012).

Here, neither Plaintiff's complaint nor his memorandum of law refer in any way to a restriction on access to mail. (Dkt. Nos. 5, 21.) There is no evidence from which to draw the inference that Plaintiff was also restricted in his access to mail. The phone restrictions at issue therefore do not constitute a First Amendment violation. As such, I recommend that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's First Amendment claim regarding phone contact with his family and friends.

### B. First Amendment Access to Courts

Construing the complaint liberally, Plaintiff also alleges that Defendant Townsend violated his First Amendment right to access the courts by denying attorney phone calls. (Dkt. No. 5 at 11-12.) Defendant argues that Plaintiff has not stated a claim for or raised a triable issue of fact as to a First Amendment violation for denial of access to courts. (Dkt. No. 19-5 at 5-6.) For the reasons stated below, Defendant is correct.

As with contact with family, a prisoner's access to counsel via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal. *Pino v. Dalsheim*, 558 F. Supp. 673, 675 (S.D.N.Y. 1983) (restrictions on telephone calls permitted where prisoner had other means to communicate with attorney). Here, Plaintiff does not allege that he was denied the opportunity to communicate with his attorney altogether, but rather that his ability to communicate was sometimes delayed and intermittently denied. Conceivably, Plaintiff could have met with his attorney via mail or in person as well. As discussed above, his complaint is silent with regard to these other forms of communication. Plaintiff has thus not stated a First Amendment claim.

Furthermore, to state a claim for deprivation of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey*, 518 U.S. 343, 353 (1996); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994) (Hurd, M.J.). Here, while Plaintiff has alleged a restriction on his ability to contact his attorney by telephone, he has not commented on any underlying action, nor has he shown that he has suffered any legal injury. Accordingly, on these grounds as well, Plaintiff's allegations fail to rise to the level of a First Amendment violation. Therefore, I recommend that the Court grant Defendant's motion and dismiss Plaintiff's First Amendment claim regarding telephone contact with his attorney.

### C. Fourteenth Amendment Due Process

Read liberally, Plaintiff's complaint also alleges that Defendant deprived him of his phone privileges without due process, in violation of the Fourteenth Amendment. (Dkt. No. 5 at 11-12.) Defendant argues that there is no protected liberty or property interest at issue which

could support a § 1983 claim. (Dkt. No. 19-5 at 6-7.) For the reasons stated below, Defendant is correct.

To establish a due process violation, Plaintiff must show (1) that he had a property or liberty interest, and (2) that he was deprived of such interest without due process of law. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569-70 (1972); *McKithen v. Brown*, 626 F.3d 143, 151 (2d Cir. 2010). In considering whether a civilly committed individual's Fourteenth Amendment rights have been violated, courts must "show deference to the judgment exercised by . . . qualified professional[s]," whose decisions are entitled to a presumption of correctness. *Youngberg,* 457 U.S. at 322-23. The rights of such individuals must be balanced with the legitimate State interests, bearing in mind the constraints under which State facilities operate. *Id*. at 321. While "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" (*id*. at 321-22), "the Constitution only requires that the courts make certain that professional judgment in fact was exercised . . . [i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id*. at 321. This district in particular presumes restrictions on liberty interests by medical professionals at CNYPC as correct for the purposes of deciding Fourteenth Amendment claims. *See Yeldon*, 2010 U.S. Dist. LEXIS 23825, at *10, 2010 WL 983819, at *5.

Here, Plaintiff alleges in his complaint that "Defendant Townsend . . . repeatedly and without explanation or due process, refused to permit Plaintiff to make and/or delayed permission to telephone Plaintiff's attorneys as well as refusing to permit plaintiff . . . to make collect calls to friends, family, and/or his support group members." (Dkt. No. 5 at 11-12.)

11

Defendant does not cite, and this Court cannot find, case law specifically addressing telephone restrictions as liberty interests in the context of civilly committed individuals. However, in the analogous context of prisoner liberty interests, "the loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006); *Johnson v. Enu*, No. 08-CV-158 (FJS/DRH), 2011 U.S. Dist. LEXIS 86831, at *34-35, 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian*, No. 09 Civ. 5835 (SHS)(MHD), 2011 U.S. Dist. LEXIS 157207, at *46, 2011 WL 10599973, at *16 (S.D.N.Y. Aug. 31, 2011) ("[L]oss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest."); *Husbands v. McClellan*, 990 F. Supp. 214, 217 (W.D.N.Y. 1998) (holding temporary loss of various privileges—telephone, package, commissary, and recreation—did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate").

Even if there were a protected liberty interest in this case, Defendant Townsend, as a primary therapist, is a medical professional, and her decisions concerning restrictions on Plaintiff's rights are presumed to be correct insofar as she has rendered her professional judgment. *Yeldon*, 2010 U.S. Dist. LEXIS 23825, at *10, 2010 WL 983819, at *5. Plaintiff has not provided any evidence to rebut this presumption, and therefore a due process claim under the Fourteenth Amendment must be dismissed.

### C.     Policy 5.1

Defendant argues that, in absence of the three constitutional rights violations discussed

above, Plaintiff has only alleged conduct which violates CNYPC Policy 5.1. (Dkt. No. 19-5 at 6-7.) Because Plaintiff did not establish the source of his rights explicitly in his complaint, he did not specifically discuss Policy 5.1 prior to his opposition to the pending motion. Defendant moved for summary judgment in part because a violation of Policy 5.1 is not alone sufficient to establish a § 1983 claim. *Id*. Plaintiff admits in opposition to this motion that Defendant Townsend violated his rights under CNYPC Policy 5.1 by restricting his telephone access, but maintains his claim. (Dkt. No. 21 at 6.) For the reasons discussed below, I recommend that Defendant's motion be granted.

Mr. Nowicki declares that the only restrictions on Plaintiff arose from his suspended calling card, which does not affect residents' ability to make collect calls. (Dkt. No. 19-3 ¶¶ 7, 24.) Nevertheless, Plaintiff maintains that Defendant Townsend denied his collect calls. (Dkt. No. 21 ¶¶ 32-33.)

Insofar as Defendant restricted his access to the telephone to contact his attorney or to make collect calls, this conduct is a violation of Policy 5.1, which states that residents who do not have a calling card may still call collect. (Dkt. No. 19-4 at 17, 21, 26.) However, a violation of state procedural requirements does not give rise to § 1983 liability, as such liability only comes from violations of rights secured by the Constitution or the laws of the United States. *LaBoy v. Coughlin*, 822 F.2d 3, 4 (2d. Cir 1987) (per curiam) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Therefore, because I have already determined above that Plaintiff has not established any independent constitutional violation, a violation of Policy 5.1 does not alone give rise to the requisite constitutional harm to support Plaintiff's § 1983 claim. For the foregoing reasons, I recommend that Defendant's motion be granted, and Plaintiff's complaint be dismissed.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 19) be

**GRANTED**, and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Banks v. Argo*, No. 11 Civ.

4222 (LAP), 2012 U.S. Dist. LEXIS 141853, 2012 WL 4471585 (S.D.N.Y. Sept. 25, 2012);

*Edwards v. Horn*, No. 10 Civ. 6194 (RJS) (JLC), 2012 U.S. Dist. LEXIS 18424, 2012 WL

473481 (S.D.N.Y. Feb. 14, 2012); *Henry v. Davis*, No. 10 Civ. 7575 (PAC) (JLC), 2011 U.S.

Dist. LEXIS 84100, 2011 WL 3295986, (S.D.N.Y. Aug. 1, 2011); *Yeldon v. Hogan*, No.

9:08-CV-769 (NAM/RFT), 2010 U.S. Dist. LEXIS 23821, 2010 WL 983819 (N.D.N.Y. Feb. 22,

2010); *Johnson v. Enu*, No. 08-CV-158 (FJS/DRH), 2011 U.S. Dist. LEXIS 86831, 2011 WL

3439179 (N.D.N.Y. July 13, 2011); *Riddick v. Arnone*, No. 3:11-cv-631 (SRU), 2012 U.S. Dist.

LEXIS 94718, 2012 WL 2716355 (D. Conn. July 9, 2012); and *Pitsley v. Ricks*, No. 96-CV-0372

(NAM) (DRH), 2000 U.S. Dist. LEXIS 5402, 2000 WL 362023 (N.D.N.Y. Mar. 31, 2000).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report. Such objections shall be filed with the Clerk of the

Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: July 30, 2014
         Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

14

2012 WL 4471585
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Deshawn BANKS, Plaintiff,

v.

Warden Rose ARGO and Mental Health
Clinician Rosenthal, Defendants.

No. 11 Civ. 4222(LAP).  |  Sept. 25, 2012.

**Opinion**

### *MEMORANDUM AND ORDER*

LORETTA A. PRESKA, Chief Judge.

**\*1** This is one of several actions Deshawn Banks ("Plaintiff"), a prisoner incarcerated at all relevant times in the Segregated Housing Unit (the "SHU") in the George R. Vierno Center at Rikers Island ("GRVC"), has brought *pro se* against various New York State prison officials under 42 U.S.C. § 1983. In this case, Plaintiff sues two employees of GRVC: Warden Rose Argo ("Argo"), warden of GRVC, and Mental Health Clinician Rosenthal ("Rosenthal"), a mental health clinician at GRVC (collectively, "Defendants").

The allegations in Plaintiff's complaint stem from his stay in the SHU. From April 29, 2011, until the drafting of his complaint, dated May 11, 2011, Plaintiff resided in a mental observation box within the SHU, that is, a personal cell wherein Plaintiff is constantly observed through a window by correctional staff. (Compl.¶¶ 1, 3, 6.) Plaintiff alleges that during his detainment in the mental observation box he was denied the following rights: access to law library materials, showers, telephone calls, family correspondence, recreation time, access to a barber, and consultation with an attorney. Plaintiff filed the instant action on May 26, 2011. On December 8, 2011, pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants moved to dismiss the complaint on the grounds that (1) Plaintiff fails to allege the personal involvement of either Defendant in the alleged violations of his rights, (2) Plaintiff fails to state a claim upon which this Court may grant relief, and (3) Plaintiff is not entitled to the relief he seeks. For the reasons that follow, Defendants' motion to dismiss [Dkt. Nos. 10, 13] is GRANTED IN PART and DENIED IN PART. [1]

### I. BACKGROUND

The Court takes as true the following factual allegations in the complaint and draws all reasonable inferences in favor of Plaintiff. *See Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008).

On April 29, 2011, Plaintiff was removed from his general inmate housing location in GRVC and held at the "intake holding pens" after being "treated by medical." (Compl.¶¶ 1, 3, 6.) Plaintiff alleges that while "left in the intake holding pens [he] became very schipopentic [sic], and paranoid relative to his diagnosis by history" and "then begin [sic] to inflict self mutilation across his arm."(*Id.* ¶ 4.)"Upon physically harming himself, plaintiff was escorted from the intake holding pens, and was taken to the clinic within the C–73 building."(*Id.* ¶ 5.)

Later that same day, Plaintiff alleges he was "drafted" to the SHU to serve a sixty-five-day penalty for violating institutional rules. (*Id.* ¶ 7.) Plaintiff was moved to reside in a mental observation box and was assigned to mental health counselor Rosenthal. (*Id.* ¶ 9) Plaintiff claims that the observation box, wherein he was confined twenty-four-hours-a-day, is seven-feet-by-nine-feet. (*Id.* ¶ 8.) He further claims that he was observed by correctional staff from a distance of eleven feet through a four-by-four square foot window. (*Id.*)

**\*2** Plaintiff contends that after consulting with Rosenthal on May 5, 2011, he became "schipopentic [sic], and paranoid, and mad with counselor Rosenthal."(*Id.* ¶ 10.)He then began to inflict additional self harm, including "cutting open a main artery vain [sic] in his upper left arm while being on 'observation.' " (*Id.* ¶ 11.)Plaintiff was then rushed to surgery and upon completion was returned to the mental observation box "without a referral ... by his mental health counselor Rosenthal to have Plaintiff Banks seen by a mental health psych ward doctor." (*Id.* ¶¶ 12–13.)Plaintiff claims being deprived of the following rights while he was confined in the mental observation box: "law library materials, showers, telephone calls, family correspondence, one hour recreation, barbrashop [sic], consulting with attorney." (*Id.* ¶¶ 15–16.)Plaintiff states he filed a grievance with "social service[s] at Rikers Island GRVC SHU box," in which he grieved the "[Department of Correction] policy" and "mental health defective counsel treatment." (*Id.* § IV.) He claims he did not receive a response to his grievance. (*Id.*) Plaintiff seeks five hundred thousand dollars in punitive damages as relief in the instant action. (*Id.* § V.)

## II. DISCUSSION

### A. *Legal Standard*

In assessing a motion to dismiss under Rule 12(b)(6), a court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Goldstein,* 516 F.3d at 56. To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleading that offers "labels and conclusions" or "a formalistic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

In the case of a *pro se* litigant, the Court reads the pleadings leniently and construes them to raise "the strongest arguments that they suggest."*McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citation omitted). This guidance applies with particular force when the plaintiff's civil rights are at issue. See *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *see also Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999). Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations must be "enough to raise a right to relief above the speculative level."*Twombly,* 550 U .S. at 555.

### B. *Analysis*

#### 1. *Substantive Section 1983 Claims*

**\*3** To state a claim under 42 U.S.C. § 1983 a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under the color of state law. See *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *McKithen v. Brown,* 481 F.3d 89, 99 (2d Cir.2007). In addition, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

Plaintiff fails to point to a specific constitutional or federal right that has been violated as a result of his time spent in the mental observation box. Construed liberally, however, Plaintiff's complaint implicates the due process protections of the Fourteenth Amendment to the United States Constitution. Indeed, claims of prison deprivations are typically analyzed in light of the Eighth Amendment's prohibition against cruel and unusual punishment, [2] which applies to the States through the Due Process Clause of the Fourteenth Amendment. *See Wilson v. Seiter,* 501 U.S. 294, 296–97, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

To succeed on the merits of a prison deprivation-or deliberate indifference—claim, a plaintiff must show both objective and subjective violations. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, *objectively,* sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities.... The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a *sufficiently culpable state of mind.*" (emphasis added) (internal quotation marks and citations omitted); *see also Wilson,* 501 U.S. at 298.

As discussed *infra* Part II.B.2, Plaintiff does not sufficiently plead either Defendant's individual participation in the claimed deprivations and thus cannot satisfy section 1983's requirements (or the second prong of the test laid out in *Farmer* requiring that he establish a prison official's sufficiently culpable state of mind). But even assuming Plaintiff adequately pleaded the individual participation of the named Defendants, his claims of being denied showers, a barber, and recreation time would still fail as a matter of law because these alleged deprivations do not meet the "objectively sufficiently serious" prong of *Farmer.*With respect to the claims of being denied access to the law library and an attorney, telephone calls, and family correspondence, the Court will provide Plaintiff an opportunity to amend his complaint. The Court assesses each of Plaintiff's claimed deprivations below.

#### a) *Access to Showers and Barber*

**\*4** Plaintiff appears to allege being denied access to the showers and a barber. (Compl.¶ 16.) But without providing further details Plaintiff's claims fall short of the standard set out in *Farmer* that the claimed deprivation "must result in the denial of the minimal civilized measure of life's necessities."511 U.S. at 298.For example, Plaintiff does not specify how long he was denied the right to shower or claim he had no other means of cleaning himself. As a result, Plaintiff's threadbare allegation must fail.*Cruz v. Jackson,* No. 01 Civ. 3133, 1999 WL 45348, at \*7 (S.D.N.Y. Feb. 5, 1991) ("The caselaw does not support an Eighth Amendment claim based on temporary deprivation of shower privileges, so long as minimal hygienic needs are met.").

But even assuming prison officials denied Plaintiff shower access for the entire time alleged in his complaint—thirteen days-his claim still fails as a matter of law. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ( "[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' "). Similarly, the claimed denial of ordinary access to a barber, as a matter of law, fails to amount to the denial of the minimal civilized measure of life's necessities. *See Black v. Cuomo,* No. 95–2678, 1996 WL 146507, at \*1 (2d Cir. Apr.1, 1996) ("[The] denial of haircuts ... fall [s] short of the degree of seriousness demanded by the Eighth Amendment."). Accordingly, Plaintiff's alleged shower and haircut deprivations do not give rise to a valid section 1983 claim. These claims are therefore dismissed with prejudice.

**b)** *Recreation Time*
Both the Supreme Court and the Court of Appeals have held that the right to exercise is a basic human need protected by the Eighth Amendment. *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). However, Plaintiff's bare allegation that he was denied "one hour recreation," without any supporting facts, falls well short of an actionable section 1983 violation. *See, e.g., Farmer,* 511 U.S. at 534. Indeed, "[s]poradic infringement of the right to exercise does not rise to the level of ... a constitutional deprivation."*Gamble v. City of N.Y.,* No. 04 Civ. 10203, 2009 WL 3097239, at \*5 (S.D.N.Y. Sept.25, 2009); *see also Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) ("Although a prisoner may satisfy the objective component of the Eighth Amendment test by showing that he was denied meaningful exercise for a substantial period of time, temporary denials of exercise may be constitutional."(citations omitted)).

Here, Plaintiff does not specify how long he was denied recreation time. But even assuming he was denied all recreation time for the full thirteen days he spent in the mental observation box, his claim would still fail as a matter of law. *See Davidson,* 968 F.Supp. at 131 (holding that denial of outdoor exercise for fourteen consecutive days for inmate temporarily housed in "keeplock" did not violate the Eighth Amendment). Accordingly, Plaintiff's alleged deprivation of recreation time does not allow for relief under section 1983. This claim is therefore dismissed with prejudice.

**c)** *Attorney and Law Library Access*
**\*5** Plaintiff also claims that while he was confined in the mental observation box he was denied access to an attorney and the law library. (Compl.¶ 16.) It is well-settled that meaningful access to the courts is a fundamental constitutional right. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)."[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."*Id.* at 828.However, the Supreme Court has clarified that a plaintiff who alleges inadequate access to an attorney or a law library must also allege that he suffered an actual injury as a result. *See Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[T]he inmate ... must ... demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."); *see also Bourdon v. Loughren,* 386 F.3d 88, 92–93 (2d Cir.2004).

Here, Plaintiff provides no details as to his claimed denial of access to the GRVC law library and to an attorney. But even assuming he was denied outright access to both, Plaintiff fails to allege that such denials caused him an actual injury by "hinder[ing] his efforts to pursue a legal claim."*Lewis,* 518 U.S. at 351. Nevertheless, because a district court should provide a *pro se* plaintiff the opportunity " 'to amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim,' " *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999)), the Court denies Defendants' motion to dismiss these claims.

Accordingly, the Court grants Plaintiff leave to amend his complaint to detail his claims for denial of access to his prison law library and his attorney. Plaintiff must state, in his amended complaint, "what non-frivolous underlying legal claim was hindered by [Defendants'] actions and the precise nature of the relief he is seeking," Certified Order at 1, *Johnson v. Captain John Does,* No. 11–4664 (2d Cir. Mar. 1, 2012).

### d) *Telephone Calls and Family Correspondence*

Lastly, Plaintiff alleges he has been deprived of telephone calls and family correspondence, (Compl.¶ 16), although he again fails to plead any specifics of these allegations. Even though "[a] prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection," *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975), "[p]risoners do not have an absolute right to make phone calls." *Fair v. Weiburg,* No. 02 Civ. 9218, 2006 WL 2801999, at *7 (S.D.N.Y. Sept.28, 2006) (internal quotation marks omitted). Furthermore, "[t]he regulation of inmates' mail by state prison officials ... is a matter of internal prison administration with which this Court will not interfere, absent a showing of a resultant denial of access to the courts or of some other basic right retained by a prisoner." *Argentine v. McGinnis,* 311 F.Supp. 134, 137 (S.D.N.Y.1969). This is so because, as the Supreme Court has recognized, prison officials require sufficient discretion to ensure prison security:

> **\*6** [W]e have been sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the "outside" who seek to enter that environment, in person or through the written word. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

n light of these considerations, the Supreme Court has stated that regulations concerning incoming mail to inmates "are 'valid if [they are] reasonably related to legitimate penological interests.' " *Id.* at 413 (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)) (alteration in original). With respect to prison regulations concerning outgoing correspondence from inmates a "least restrictive analysis" applies because the implications of this type of correspondence "are of a categorically lesser magnitude than the implications of incoming materials." *See id* at 413–14.

In addition, the Supreme Court has held "[i]n a number of contexts ... that reasonable time, place and manner regulations (of communicative activity) may be necessary to further significant governmental interests, and are permitted." *Pell v. Procunier,* 417 U.S. 817, 826–27 (1974) (discussing the limitations prison officials may place on outsiders' face-to-face communication with inmates). Thus, it is clear that "[s]ome curtailment" of the right to visitation "must be expected in the prison context." *Overton v. Bazzetta,* 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003).

Here, Plaintiff neither clarifies exactly which type of family correspondence he has been denied nor point to any prison regulations regarding inmates' communication with outsiders and explain why they are unconstitutional. Plaintiff also does not plead any resulting injury. Because inmates do not have an absolute right to make telephone calls, and prison regulations may reasonably restrict mail and face-to-face communications between inmates and outsiders, without providing supporting factual allegations Plaintiff fails to plead an actionable claim under section 1983.

The Court will, however, provide Plaintiff the opportunity to amend his complaint with respect to these claims. Accordingly, Plaintiff must state with particularity exactly which types of family correspondence he was denied (*e.g.,* incoming mail, outgoing mail, or both), the precise scope and extent of his being denied telephone calls and correspondence (*i.e.,* whether he was denied these forms of communication on individual occasions or for the entire thirteen days he was confined in the mental observation box), why such denials were unreasonable, what specific injuries Plaintiff suffered as

a result of the denials, and the precise nature of the relief he seeks.[3]

**2.** *Section 1983's Personal Involvement Requirement*

**\*7** As the Court previously noted, "personal involvement of defendants ... is a prerequisite to an award of damages under § 1983."*Wright,* 21 F.3d at 501. The Court of Appeals has "construed personal involvement for these purposes to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."*Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Thus, "where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."*Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (internal quotation marks omitted).

Here, the complaint contains no allegations against Defendants that would suggest their personal involvement in Plaintiff's claimed deprivations. In fact, Defendant Argo is not mentioned anywhere in the complaint other than in the caption. Additionally, neither of the allegations against Defendant Rosenthal amount to the direct participation required under *Black.*Plaintiff alleges Rosenthal acts as Plaintiff's mental health counselor and that after consulting with Rosenthal Plaintiff became "schipopentic [sic], and paranoid, and mad with counselor Rosenthal."(Compl.¶¶ 9–10.) Additionally, Plaintiff alleges Rosenthal returned him to the "observation box ... without ... being seen by a mental health psych ward doctor."(*Id.* ¶ 13.) These bare allegations that Rosenthal was Plaintiff's mental health counselor and that at one point Plaintiff was mad at Rosenthal in no way show that Rosenthal did anything wrong and certainly do not implicate Rosenthal's participation in any of the claimed deprivations while Plaintiff was confined in the mental observation box.

As stated above, the Court grants as a matter of law Defendants' motion to dismiss Plaintiff's claims of being denied showers, a barber, and recreation time and dismisses these claims with prejudice. With respect to those claims the Court grants Plaintiff leave to amend-namely, the claims of being denied access to the law library and an attorney, telephone calls, and family correspondence-Plaintiff must state with particularity Defendants' personal involvement in

such deprivations. With respect to each Defendant, Plaintiff must indicate whether the Defendant directly participated in the alleged deprivations, failed to remedy the alleged wrongs after learning of them, created a policy or custom under which unconstitutional practices occurred, or acted with gross negligence in managing subordinates. *Black v. Coughlin,* 76 F.3d at 74.

**3.** *Relief Sought*

Finally, even were the Court to find merit in Plaintiff's claims, he is not entitled to the relief he seeks as the complaint is currently drafted. Plaintiff seeks five hundred thousand dollars in punitive damages. (Compl.§ V.) The Court of Appeals has stated that "evidence of the 'evil motive or intent' or 'callous indifference' [of a defendant's conduct] ... is essential to an award of punitive damages."*Ivani Contracting Corp. v. City of N .Y.,* 103 F.3d 257, 262 (2d Cir.1997) (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632, (1983)). But Plaintiff has not adequately alleged either Defendant's involvement in the claimed deprivations let alone pleaded particular facts that suggest they acted with an "evil motive" or with "callous indifference." Nor would Plaintiff be entitled to compensatory damages as he does not claim any physical injury resulted from the alleged prison deprivations. *See Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

**\*8** With respect to those claims Plaintiff is granted leave to amend, Plaintiff must either (1) plead particular facts from which the requisite culpable state of mind for the Defendants may be inferred so as to allow for the recovery of punitive damages, (2) request only nominal damages, or (3) request specific injunctive or declarative relief.[4] *See id.* at 418.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss [Dkt. Nos. 10, 13] is GRANTED IN PART and DENIED IN PART. Plaintiff's claims that he was denied showers, a barber, and recreation time are dismissed with prejudice.

Plaintiff is hereby granted leave to amend his complaint with respect to the claims that he was denied access to the law library and an attorney, telephone calls, and family correspondence. The amended complaint must (1) cure the deficiencies as detailed in this order, (2) be submitted to the Court within sixty days of the date of this order, (3) be captioned as an "Amended Complaint," and (4) bear the same docket number as this order. An Amended Civil Rights Complaint form, which Plaintiff should complete as specified

above, is attached to this order. If Plaintiff fails to comply with the Court's directive and cannot show good cause to excuse such failure, the Court will dismiss the case with prejudice for failure to state a claim upon which relief may be granted.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
_____
_____
_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

_____
_____
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**AMENDED COMPLAINT**
under the Civil Rights Act,
42 U.S.C. § 1983

Jury Trial: ☐ Yes    ☐ No
(check one)

___ Civ. _____ ( )

I.    **Parties in this complaint:**

A.    List your name, identification number, and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff's    Name_____
              ID#_____
              Current Institution_____
              Address_____
              _____

B.    List all defendants' names, positions, places of employment, and the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1    Name _____ Shield #_____
                  Where Currently Employed _____
                  Address _____
                  _____

*Rev. 01/2010*                    1

Defendant No. 2    Name _____ Shield #_____

Where Currently Employed _____

Address _____

_____


Defendant No. 3    Name _____ Shield #_____

Where Currently Employed _____

Address _____

_____


| Who did what? |

Defendant No. 4    Name _____ Shield #_____

Where Currently Employed _____

Address _____

_____


Defendant No. 5    Name _____ Shield #_____

Where Currently Employed _____

Address _____

_____


**II.    Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    In what institution did the events giving rise to your claim(s) occur?

_____

_____


B.    Where in the institution did the events giving rise to your claim(s) occur?

_____


C.    What date and approximate time did the events giving rise to your claim(s) occur?

_____

_____

_____


| What happened to you? |

D.    Facts: _____

_____

_____

_____

*Rev. 01/2010*          2

**Was anyone else involved?**

**Who else saw what happened?**

### III.  Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.

### IV.  Exhaustion of Administrative Remedies:

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Administrative remedies are also known as grievance procedures.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

Yes _____   No _____

*Rev. 01/2010*                          3

If YES, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

_____

_____

_____

B.  Does the jail, prison or other correctional facility where your claim(s) arose have a grievance procedure?

  Yes ____    No ____    Do Not Know ____

C.  Does the grievance procedure at the jail, prison or other correctional facility where your claim(s) arose cover some or all of your claim(s)?

  Yes ____    No ____    Do Not Know ____

  If YES, which claim(s)?

  _____

D.  Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose?

  Yes ____    No ____

  If NO, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

  Yes ____    No ____

E.  If you did file a grievance, about the events described in this complaint, where did you file the grievance? _____

  1.  Which claim(s) in this complaint did you grieve?

  _____

  _____

  2.  What was the result, if any?

  _____

  _____

  3.  What steps, if any, did you take to appeal that decision? Describe all efforts to appeal to the highest level of the grievance process.

  _____

  _____

  _____

F.  If you did not file a grievance:

  1.  If there are any reasons why you did not file a grievance, state them here:

  _____

  _____

*Rev. 01/2010*                    4

_____
_____
_____

2.    If you did not file a grievance but informed any officials of your claim, state who you informed, when and how, and their response, if any:

_____
_____
_____
_____
_____
_____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

_____
_____
_____
_____
_____
_____
_____

Note:    You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.

**V.    Relief:**

State what you want the Court to do for you (including the amount of monetary compensation, if any, that you are seeking and the basis for such amount). _____

_____
_____
_____
_____
_____
_____
_____
_____

_Rev. 01/2010_          5

_____

_____

_____

_____

**VI.   Previous lawsuits:**

On these claims

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

Yes _____   No _____

B.   If your answer to A is YES, describe each lawsuit by answering questions 1 through 7 below.  (If there is more than one lawsuit, describe the additional lawsuits on another sheet of paper, using the same format.)

　　　1.   Parties to the previous lawsuit:

Plaintiff _____
Defendants _____

2. Court (if federal court, name the district; if state court, name the county) _____
_____

_____   3.   Docket or Index number _____

_____   4.   Name of Judge assigned to your case_____

　　　5.   Approximate date of filing lawsuit _____

　　　6.   Is the case still pending?  Yes _____  No _____
　　　　　If NO, give the approximate date of disposition_____

　　　7.   What was the result of the case?  (For example:  Was the case dismissed?  Was there judgment in your favor?  Was the case appealed?) _____
_____
_____

On other claims

C.   Have you filed other lawsuits in state or federal court otherwise relating to your imprisonment?

Yes _____   No _____

D.   If your answer to C is YES, describe each lawsuit by answering questions 1 through 7 below.  (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same format.)

　　　1.   Parties to the previous lawsuit:

Plaintiff _____
Defendants _____

　　　2.   Court (if federal court, name the district; if state court, name the county) ___ _____
_____

_____   3.   Docket or Index number _____

_____   4.   Name of Judge assigned to your case_____

　　　5.   Approximate date of filing lawsuit _____

*Rev. 01/2010*　　　　　　　　　　　　　　6

6.  Is the case still pending? Yes _____ No _____
    If NO, give the approximate date of disposition_____

7.  What was the result of the case? (For example: Was the case dismissed? Was there
    judgment in your favor? Was the case appealed?) _____
    _____
    _____

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___ day of _____, 20__.

                        Signature of Plaintiff    _____

                        Inmate Number             _____

                        Institution Address       _____

                                                  _____

                                                  _____

                                                  _____

<u>Note</u>:  All plaintiffs named in the caption of the complaint must date and sign the complaint and provide
        their inmate numbers and addresses.

I declare under penalty of perjury that on this _____ day of _____, 20__, I am delivering
this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for
the Southern District of New York.

                        Signature of Plaintiff:  _____

*Rev. 01/2010*                              7

Footnotes

1   Defendants filed their motion to dismiss on December 8, 2011. On December 28, 2011, this case was referred to Magistrate Judge
    Maas for general pretrial case management, along with a number of other cases Plaintiff has initiated involving events that occurred
    while Plaintiff was incarcerated at Rikers Island. Following a June 18, 2012, telephone conference Judge Maas held with all parties
    in the referred cases, Plaintiff was ordered to respond to all pending motions to dismiss by July 9, 2012 [*see*Dkt. No. 21]. Despite the
    ample opportunity to respond, Plaintiff has failed to oppose the instant motion to dismiss.

2   Two of Plaintiff's alleged deprivations-telephone calls and family correspondence-also implicate Plaintiff's First Amendment free
    speech rights. *See infra* Part II.B.1(d). In addition, Plaintiff's allegations of being denied access to the law library and an attorney, *see
    infra* Part II.B.1(c), implicate his constitutional right of access to courts, however unsettled the law may be as to the precise source of
    such right. *See Christopher v. Harbury,* 536 U.S. 403, 415 & n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (noting the Supreme Court
    has, at different times, grounded the right of access to courts in the Privileges and Immunities Clause, the First Amendment Petition
    Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses).

3 The Court notes that Plaintiff presumably was placed in a mental observation unit because he posed a danger to himself and possibly to others. Thus, certain restrictions, such as barring personal visits with Plaintiff for the thirteen days Plaintiff was in the observation unit, might have been warranted under the circumstances. Indeed, all the alleged deprivations in the complaint might have been necessary to ensure Plaintiff's safety in light of his demonstrated ability to do serious harm to himself. Nevertheless, the Court is unable to make such a determination at this initial stage of the litigation.

4 Though the prospect of injunctive or declaratory relief may be slim at best given that Plaintiff presumably no longer is confined in the mental observation box, the Court at this stage will not foreclose all possibility that such relief properly may be requested in an amended complaint.

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 473481
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

William EDWARDS, Plaintiff,
v.
Martin HORN, et al., Defendants.

No. 10 Civ. 6194(RJS)(JLC). | Feb. 14, 2012.

Opinion

### REPORT & RECOMMENDATION

JAMES L. COTT, United States Magistrate Judge.

**\*1 To The Honorable Richard J. Sullivan, United States District Judge:**

Plaintiff William Edwards, proceeding *pro se,* brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 alleging that Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration in various facilities on Rikers Island. Edwards also alleges that he was discriminated against in violation of the Americans with Disabilities Act. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that the motion to dismiss be granted except as to Edwards' retaliatory termination claim against Defendant Rosa.

### I. BACKGROUND

#### A. Factual Background

The following facts are taken from the Complaint and are accepted as true for purposes of this motion. (*See* Complaint, dated June 23, 2010 ("Compl.") (Dkt. No. 2)). Edwards brings this suit pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* against 44 current and former New York City employees and two John Doe Defendants: Commissioner Martin Horn, Warden Bailey, Warden J. Davis, Warden E. Duffy, Warden Michael Hourihan, Warden Riordan, Warden Robert Shaw, Correctional Officer ("CO.") Dinolfo, CO. Grima, CO. Hernandez, CO. Holmes, CO. Lagos, CO. Lewis, CO. Maynard, CO. Morales, CO. Noon,

CO. Reyes, CO. Richardson, CO. Rosa, CO. Smalls, CO. Smith, CO. Sumpter, Captain Alleyve, Captain Bethacourt, Captain Calle, Captain G. Davis, Captain Polak, Marybeth Campfield, Ms. Carrera, Mrs. M. Cattafesta, Mr. K. Guerrant, Cook Hannah, Deputy Hill, Florence Hunter, Ms. Jenkins, Ms. K. Johnson [1], Ms. G. Lee, Ms. P. Mimms, Mr. R. Mulvena, Ms. B. Musmacher, Ms. R. Padmore, Karen Powell, James Robinson, and Ms. Steven (together, "Defendants"). (*See* Compl. at 1–5). [2]

Edwards alleges that Defendants deprived him of his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at several facilities on Rikers Island: the Anna M. Kross Center ("AMKC"), the Eric M. Taylor Center ("EMTC"), the George Motchan Detention Center ("GMDC"), the George R. Vierno Center ("GRVC"), and the Robert N. Davoren Complex ("RNDC"). At the time he filed his Complaint, Edwards was an inmate at the Clinton Correctional Facility, and he is currently on parole. (*See* Letter, dated Dec. 11, 2011 (Dkt. No. 135)).

Throughout his roughly 100 paragraph, single-spaced, 25–page Complaint, Edwards does not present his allegations by cause of action, nor does he clearly articulate exactly what causes of action he is asserting, as many allegations appear to overlap and lack clarity. [3] Several of Edwards' allegations deal with Defendants' actions in relation to a separate lawsuit Edwards brought in the Northern District of New York, *Edwards v. Selsky,* No. 04 Civ. 493(FJS)(DRH), 2008 WL 190385 (N.D.N.Y. Jan. 22, 2008) ("*Selsky*" or the "NDNY action"), which was dismissed for failure to prosecute. The Court has made every effort to identify and address all possible claims asserted in the Complaint. [4] The Court is able to identify 12 potential causes of action spanning separate dates from July 25, 2007 to April 5, 2010. Specifically, Edwards asserts the following claims: (1) verbal harassment; (2) deprivation of access to free telephone calls; (3) deprivation of access to legal services; (4) mail tampering; (5) denial of required food portions; (6) unconstitutional strip search; (7) violation of due process rights within the prison's disciplinary and grievance system; (8) excessive force and denial of medical treatment; (9) deprivation of access to the prison's grievance system; (10) retaliation; (11) conspiracy; and (12) disability discrimination under the ADA. Edwards seeks $75,000,000 in damages, attorneys' fees, a reimbursement of penalties incurred due to two allegedly false infractions, injunctive relief in the

form of expunging those false infractions, injunctive relief terminating Defendants from their positions in the New York City Department of Correction ("DOC") and permanently enjoining them from city, state, or federal employment, and a permanent restraining order to prevent Defendants from committing any future similar violations. (Compl.¶ V). Edwards does not present these allegations in a narrative fashion, but instead describes dozens of grievance letters that he has submitted to DOC staff at the various Rikers Island facilities over the course of nearly three years. To avoid repetition, the Court will describe the factual background relating to Edwards' specific allegations in the context of the relevant legal discussion below.

**B. Procedural Background**

**\*2** Edwards filed the Complaint on August 18, 2010. (Dkt. No. 2). On October 29, 2010, the United States Marshals executed service of the Summons and Complaint on 32 of the 44 named defendants. [5] Over the course of the next several months, with the assistance of the Office of Corporation Counsel, the United States Marshals, and the Court, Edwards has attempted to serve the remaining 12 named defendants. (*See* Dkt. Nos. 56, 62, 69, 70, 75, 119, 120, 129). To date, Edwards has successfully served nine additional Defendants and appears to have served a number of Defendants twice. [6] Accordingly, there are three named Defendants who have not been served—Bethacourt, Davis, and Johnson—and two John Doe Defendants who have not been identified. [7]

During the pendency of his lawsuit, Edwards has submitted several requests to the Court. By Order dated November 1, 2010, the Court denied Edwards' request for an order prohibiting certain employees at the Southport Correctional Facility, where Edwards was incarcerated at the time, from tampering with his legal and personal mail. (Dkt. No. 8). By Orders dated November 30, 2010 and April 14, 2011, the Court denied Edwards' motions for default judgment against certain Defendants (Dkt.Nos.56, 92), and Edwards' interlocutory appeal of the November 30 Order was denied by the Second Circuit on May 26, 2011. (Dkt. No. 118). By Orders dated February 9, 2011, I declined Edwards' request that I disqualify myself from this action and also denied his motion for the appointment of counsel. (Dkt.Nos.73–74). Lastly, on March 8, 2011, I denied Edwards' request for sanctions in connection with Corporation Counsel's providing Edwards with service addresses for Defendants. (Dkt. No. 81).

On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Apr. 4, 2011 ("Def.Mem.") (Dkt. No. 89)). [8] Defendants assert that Edwards has failed to state a claim as to his verbal harassment, deprivation of telephone access, unconstitutional strip search, mail tampering, denial of food, denial of legal services, due process, grievance processing and protocol, excessive force and medical treatment, conspiracy, and retaliation causes of action. (Def. Mem. at 16–45). In addition, Defendants argue that Edwards' claims against Defendants Bailey, Cattafesta, Davis, Hill, Horn, Hourihan, Powell, and Riordan fail for lack of personal involvement, all defendants are entitled to qualified immunity, and Edwards' claims are barred by the Prison Litigation Reform Act (the "PLRA") . [9] (*Id.* at 14–16, 45–48). Pursuant to the Court's Order dated March 3, 2011, Edwards' deadline to submit an opposition to Defendants' motion was May 4, 2011. (Dkt. No. 80). However, despite receiving several extensions—first to May 18 (Dkt. No. 90) then to June 8 (Dkt. No. 116) and June 29 (Dkt. No. 122)— Edwards has not submitted any opposition. Accordingly, the Court considers Defendants' motion fully submitted.

**II.** *DISCUSSION*

**A. Applicable Legal Standards**

**\*3** A plaintiff's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000)."[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal."*Id.* Consequently, as with all Rule 12(b)(6) motions, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles below. *Id.* at 322.

A complaint will not survive a 12(b)(6) motion to dismiss if it "fail[s] to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). Although "a complaint attacked by a 12(b) (6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citations omitted)."To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face."*Hollander v. Copacabana Nightclub,* 624 F.3d 30, 32 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009))."Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."*Iqbal,* 129 S.Ct. at 1950 (citation omitted). A complaint thus may only survive a 12(b)(6) motion to dismiss if it has "facial plausibility" and pleads enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."*Id.* at 1949.

Given that Edwards is proceeding *pro se,* the Court must "construe [his Amended Complaint] broadly and interpret it to raise the strongest arguments it suggests."*Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004) (citation omitted). Furthermore, "when the plaintiff proceeds *pro se*... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations."*McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citation omitted). Nevertheless, "a *pro se* litigant [is] bound by the same rules of law ... as those [litigants] represented by counsel."*Fertig v. HRA Med. Assistance Program,* No. 10 Civ. 8191(RPP), 2011 WL 1795235, at *4 (S.D.N.Y. May 6, 2011) (quotation marks and citation omitted).

**B. Verbal Harassment**

Edwards asserts that several Defendants, in violation of Section 1983, used harassing, threatening, and profane language towards him on 17 separate occasions taking place between July 25, 2007 and September 1, 2008. (Compl.¶¶ III, 2, 6, 8, 17, 19, 22, 24, 30, 33, 37, 38, 53, 55, 61, 83, 91(b)). In separate allegations, he claims that Defendants Campfield, Dinolfo, Grima, Hannah, Hernandez, Holmes, Lewis, Maynard, Morales, Noon, Reyes, Richardson, Smalls, and Smith, called him a "snitch" in front of other inmates, mocked his disability, falsely informed him that he had a visitor when in fact he did not have a visitor, and directed racial slurs and profane language toward him.(*Id.*). These claims should be dismissed. The Eighth Amendment prohibits the imposition of cruel and unusual punishment, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50

L.Ed.2d 251 (1976), but its protection does not extend to verbal harassment of an inmate by correction officers without any resulting "appreciable injury." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quoting *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

**\*4** Verbal harassment, by itself, is not a constitutional violation. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("[v]erbal harassment itself does not rise to the level of a constitutional violation [,]" and "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations") (quotation marks and citation omitted); *Davidson v. Bartholome,* 460 F.Supp.2d 436, 446 (S.D.N.Y.2006) (no relief to inmate "simply because [an officer] made a hostile or derogatory comment"); *Lunney v. Brureton,* No. 04 Civ. 2438(LAK)(GWG), 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) (no claim because merely "insulting" or "disrespectful" comments "do not give rise to a constitutional violation") (quotation marks and citations omitted) (Report and Recommendation), *adopted,* 2005 WL 433285 (S.D.N.Y. Feb.23, 2005). Absent any appreciable injury, courts routinely dismiss claims of verbal harassment brought under Section 1983. *See, e.g., Felder v. Filion,* 368 F. App'x 253, 256 (2d Cir.2010) (verbal harassment did not violate Eighth Amendment where plaintiff did not present evidence of resulting injury); *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a [Section] 1983 claim if no specific injury is alleged"). Because Edwards does not allege any injury whatsoever, let alone one that could be considered "appreciable," Defendants' alleged threats, verbal harassment, or profane language do not give rise to constitutional violations and should therefore be dismissed.

**C. Denial of Required Telephone Calls**

Edwards alleges that since his incarceration began on January 23, 2008, he has not been provided with a free telephone call as required by the "DOC Telephone System." (Compl.¶ 46). [10] Edwards further alleges that he submitted a grievance on June 3, 2008 regarding his deprivation of free telephone calls.(*Id.*). However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world."*Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases) (Report and Recommendation), *adopted,* 2011 WL 5006831 (S.D.N.Y. Oct.20, 2011). Because inmates "have no right to unlimited telephone calls[,]"*Bellamy v. McMickens,* 692 F.Supp. 205,

214 (S.D.N.Y.1998) (citation omitted), Edwards must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC) (KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction restoring phone privileges where inmate did not allege that alternate means of communication were inadequate). Edwards' claim regarding the denial of free telephone calls should therefore be dismissed.

### D. Deprivation of Access to Legal Services

**\*5** Edwards alleges numerous deprivations of access to legal services by Defendants Campfield, Musmacher, and Smalls. As to Campfield, Edwards alleges that in March 2008 she denied him a legal manila envelope, lost his legal documents pertaining to the NDNY action, and denied him legal services. (Compl. ¶¶ 31, 36). As to Musmacher, Edwards asserts that she denied him legal services for more than a month around August 2008 and discriminated against him by providing legal services to Latino detainees when Edwards was "next ... on line" to receive such services. (*Id.* ¶¶ 56–57). As to Smalls, Edwards claims that she denied him extra time in the prison facility's law library in August 2008. (*Id.* ¶ 61). Each of these claims should be dismissed.

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Accordingly, for a defendant's conduct to provide a basis for an inmate to invoke his right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *21 (S.D.N.Y. Sept. 1, 2010) (citations and quotation marks omitted) (Report and Recommendation), *adopted,* 2011 WL 9398 (S.D.N.Y. Jan.3, 2011).

Here, Edwards does not state sufficient facts to constitute any injury or material prejudice. He does not claim any injury suffered because of Defendants' alleged denials of legal services, legal supplies, extra time in the law library, or alleged discrimination in favor of Latino detainees. While he asserts that Campfield's losing his legal documents in connection with the NDNY action prevented him from "prosecuting" that action (Compl.¶ 36), he fails to provide any

specifics as to his purported inability to prosecute. He does not elaborate on, for example, what documents he believes were lost and what actions he was prevented from taking in his litigation, which is especially relevant since Edwards appears to have participated in the NDNY lawsuit in some capacity, but failed to keep the court apprised of his mailing address. *See Selsky,* 2008 WL 190385, at *1–3. Accordingly, because Edwards has not identified any injury or material prejudice as a result of his alleged deprivation of access to legal services, these claims should be dismissed.

### E. Mail Tampering

Edwards' mail tampering claims are based on allegations of interference with his outgoing non-legal mail and his incoming and outgoing legal mail at the EMTC and AMKC. Specifically, Edwards first alleges that on November 1, 2007 he wrote a letter to Michael Caruso at the DOC that was never sent from the EMTC. (Compl.¶ 16). Second, Edwards alleges that his "legal mail" addressed to Caruso never left the EMTC and was returned to him on November 27, 2007. (*Id.* ¶ 27). Next, Edwards submitted a grievance on September 8, 2008 alleging that his "personal and legal mail" addressed to a co-defendant never left the AMKC because it was returned for insufficient postage despite being marked with a postage stamp. (*Id.* ¶ 70). Edwards' fourth claim of mail tampering relates to the NDNY action. He asserts that Defendant Davis failed to forward his incoming legal mail to the correct address, despite Edwards' instruction for him to do so, and that as a result, his NDNY lawsuit was dismissed. (*Id.* ¶ 47). Lastly, Edwards alludes to an allegation of tampering with his outgoing "legal and personal mail" against unnamed AMKC staff, which he documented in a November 18, 2008 grievance letter. (*Id.* ¶ 94). None of these claims should withstand a motion to dismiss.

**\*6** Both legal and non-legal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (citation omitted). In addition, "the Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With these principles in mind, Edwards' allegations as to outgoing non-legal mail-non-legal mail being afforded less protection than legal mail, *Davis,* 320 F.3d at 351—fail to state a claim because he does not assert that Defendants actually tampered with his mail, only that his mail never left the facility. Moreover, instead of establishing plausible mail tampering claims for his outgoing non-legal mail, Edwards' alleged facts make mail tampering an unlikely possibility. For example, Edwards' allegation that his November 1, 2007 letter to Michael Caruso never left the EMTC is based solely on the fact that Caruso never answered the letter. (Compl.¶ 16). Caruso's failure to respond to Edwards' letter, of course, does not necessarily suggest that it was never sent by EMTC staff. Absent any allegations that Defendants opened the letter, withheld it from being sent, or otherwise took any adverse action to make it plausible that EMTC staff tampered with Edwards' outgoing mail, Edwards' claim is merely speculative. Similarly, Edwards' allegation in his September 8, 2008 grievance that a letter to a co-defendant was returned to him for insufficient postage despite having a postage stamp does not suggest mail tampering, but rather that Edwards had failed to affix sufficient postage. (*Id.* ¶ 70). In any event, an isolated failure to mail an inmate's letter does not state a constitutional violation. *See, e.g., Battice v. Phillip,* No. 04 Civ. 669(FB)(LB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) (defendant's failure to deliver plaintiff's mail, even if intentional, is "simply *de minimis* and therefore outside the ambit of constitutional protection") (citation and quotation marks omitted). Finally, Edwards' claim regarding mail tampering in November 2008 is devoid of any facts that could state a cause of action. (Compl.¶ 94).

As to Edwards' claims regarding interference with his incoming and outgoing legal mail, the Court notes that such interference "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."*Davis,* 320 F.3d at 351. To survive a motion to dismiss, a plaintiff must allege that correction officers "regularly and unjustifiably" interfered with his mail, depriving him of his constitutional rights. *Shepherd v. Fisher,* No. 08 Civ. 9297(LTS)(RLE), 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011) (citations and quotation marks omitted). To assert such a claim, a prisoner must allege that the defendant's actions (1) were "deliberate and malicious" and (2) "resulted in actual injury" to the plaintiff. *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). Actual injury exists where interference with legal mail results in "the dismissal of

an otherwise meritorious legal claim."*Id.* However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation."*Id.* at 352 (citations and quotation marks omitted).

 *7 None of Edwards' claims of interference with his legal mail—both those related to incoming and outgoing mail—sufficiently states an actual injury. Edwards fails to allege that he suffered any injury in connection with DOC staff's alleged failure to send his outgoing legal mail on November 27, 2007, September 8, 2008, or November 18, 2008, assuming that Edwards' "legal mail" is in fact legal mail. (Compl.¶¶ 27, 70, 94). For the same reason, Edwards' claim pertaining to incoming mail from the NDNY does not state a constitutional violation. This claim is based on Defendant Davis' alleged failure to adhere to Edwards' request to have his mail sent to a forwarding address. For support, Edwards appears to rely on language in Judge Scullin's order that the magistrate judge's report and recommendation was returned to the Court marked "unable to forward." (Compl.¶ 47). The NDNY action, however, was not dismissed solely because certain documents were returned to the Court. Rather, the case was dismissed for Edwards' failure, for more than one year, to prosecute the action, which included his failure to keep the court and defendants apprised of his address, appear for a deposition, or pay a sanction, despite being aware of the pending litigation. *See Selsky,* 2008 WL 190385, at *1–3. Even if Davis had complied with Edwards' forwarding request, the court's decision to dismiss the complaint for Edwards' "repeated and ongoing failures to fulfill his obligations to notify the [c]ourt and counsel of his address and to cooperate in discovery" would likely have remained unchanged. *Id.* at *3. The alleged failure to forward did not, therefore, cause "the dismissal of an otherwise meritorious legal claim."*Cancel,* 2001 WL 303713, at *4 (citation omitted).

Moreover, Edwards does not plead that Defendants blocked his outgoing legal mail in connection with the NDNY action. Indeed, Edwards could not assert such an argument, since, as Judge Scullin noted, he had previously mailed documents to the court during the pendency of his lawsuit. *See Selsky,* 2008 WL 190385, at *1–2. Accordingly, Edwards cannot establish the requisite injury needed to state a cause of action for the deprivation of his constitutional right of access to the courts. Edwards' mail tampering claims should therefore be dismissed.

### F. Denial of Required Food Portions

Edwards alleges that on several occasions Defendants Lagos, Lewis, and Richardson deprived him of required food portions, including "prescribed therapeutic diet 'soy milk' " on April 19, 2008 (Compl.¶ 38), a second chicken patty on or around May 2008 (*Id.* ¶ 43), a "morning meal" on July 31, 2008 (*Id.* ¶ 53), and an "afternoon meal" on or around October 2008. (*Id.* ¶ 90). Each of these claims should be dismissed. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curiam) (quotation marks and citation omitted). Courts have found the Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and continued deprivation of nutritionally adequate food. *See, e.g., Reeder v. Artus,* No. 09 Civ. 575(DNH)(DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days without meals constituted sufficient deprivation to survive motion to dismiss) (Report and Recommendation), *adopted,* 2010 WL 3636132 (N.D.N.Y. Sept.9, 2010).

**\*8** Edwards does not allege that the alleged denials of food placed his health and well being in any immediate danger. *See, e.g, Martinez v. Lape,* No. 09 Civ. 0665(TJM) (RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) (Report and Recommendation), *adopted,* 2011 WL 4528980 (N.D.N.Y. Sept.28, 2011) (no Eighth Amendment claim where inmate failed to allege how expired food and juice posed an immediate risk to health); *Bee v. Krupp,* No. 08 Civ. 10141(SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) ("visible globs of spit" in food did not violate Eighth Amendment). Nor do the allegations, which are alleged to have taken place on four separate dates over a span of six months, suggest that Edwards was in any danger. Accordingly, Edwards' claims regarding deprivation of meals should be dismissed.

### G. Unconstitutional Strip Search

Edwards alleges that an unspecified officer subjected him to an "institutional" strip search on an unspecified date in violation of the Fourth Amendment. (Compl.¶ 13). Edwards argues that this strip search was unconstitutional because he was convicted of a misdemeanor and not a felony. (*Id.*). While the Fourth Amendment prohibits "unreasonable searches," *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citation omitted), it is not unreasonable for prison officials to perform routine random strip searches on prison inmates. *See N.G. v. Connecticut,*

382 F.3d 225, 230–32 (2d Cir.2004). Edwards' reliance on the distinction between inmates convicted of misdemeanors and those convicted of felonies is misplaced, as that distinction is only relevant as to pre-trial detainees. *See Shain v. Ellison,* 356 F.3d 211, 214 (2d Cir.2004) ("clearly established Fourth Amendment precedent ... preclude[s] jails from strip searching misdemeanor arrestees absent a reasonable suspicion that weapons or other contraband were concealed"); *Walsh v. Franco,* 849 F.2d 66, 70 (2d Cir.1988) ("indiscriminate strip-searching of misdemeanor arrestees is unconstitutional"). Here, Edwards admits that he was convicted at the time of his strip search. (Compl.¶ 13).*See, e.g., Castro–Sanchez v. N.Y. State Dep't of Corr. Servs.,* No. 10 Civ. 8314(DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec.6, 2011) (strip search claim dismissed because routine random searches of inmates are constitutional). Accordingly, Edwards' claim should be dismissed.

### H. Deprivation of Due Process Rights Within Prison's Disciplinary System

Edwards alleges that he was denied certain rights during two disciplinary proceedings heard by Defendant Davis on September 30, 2008, which can be broadly construed as a claim asserting a deprivation of procedural due process under the Fourteenth Amendment. (Compl.¶¶ 86, 87b, 89, 95, 97–99). The disciplinary hearings appear to relate to Edwards' alleged violations of "numerous [ ] rules within the inmate misbehavior rule book" on September 20, 2008 and September 24, 2008. (*Id.* ¶¶ 86, 87). Edwards takes issue with several aspects of the disciplinary hearings, including that: (1) Davis found him guilty of the infraction without conducting an investigation into Edwards' claim that he never received a copy of the rule book (*Id.* ¶ 86); (2) Davis failed to provide him with certain documentary evidence that "could have help [ed]" Edwards defend himself, including Edwards' "orange detention card," his "injury report," and a video tape of the alleged infraction (*Id.* ¶¶ 86, 87b); (3) no witnesses to Edwards' violations "endor[s]e[d]" the infraction against him (*Id.* ¶ 87); and (4) Edwards never received responses to notices of appeal and letters submitted to Horn, Hourihan, Hunter, and Robinson regarding his fine and punitive segregation. (*Id.* ¶¶ 86, 87b, 89, 94–99). In addition, Edwards appears to challenge his resulting discipline, which included a $25.00 "surcharge" and 30 days of punitive segregation. (*Id.* ¶¶ 87, 87b).

**\*9** Edwards' cause of action for deprivation of his procedural due process rights fails because he does not allege sufficient facts to state an actionable claim. "In evaluating due

process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and quotation marks omitted). Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Luna v. Pico,* 356 F.3d 481, 487 n. 3 (2d Cir.2004) (quoting *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("[f]actors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what length of time in punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See id.* Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000). By contrast, 305 days or more of confinement has been deemed an atypical and a significant hardship. *Id.* at 231–32. Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions ... or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Palmer,* 364 F.3d at 65); *see also Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004). Indeed, " 'the conditions of confinement are a distinct and equally important consideration' in determining whether the prisoner has suffered a due process violation." *Sales v. Barizone,* No. 03 Civ. 6691(RJH), 2004 WL 2781752, at *6 (S.D.N.Y. Dec.2, 2004) (quoting *Palmer,* 364 F.3d at 64–65).

Here, Edwards claims that he was confined to punitive segregation for 30 days. Several courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin. See, e.g., Sandin,* 515 U.S. at 486 (30 days' disciplinary segregation not atypical and significant hardship); *Duncan v. Keane,* No. 95 Civ. 1090(SHS), 1997 WL 328070, at *2 (S.D.N.Y. June 13, 1997) (30 days in keeplock not atypical or significant hardship) (citation omitted); *Harris v. Keane,* 962 F.Supp. 397, 404 (S.D.N.Y.1997) (23 days in keeplock not atypical or significant hardship as "[t]he Second Circuit's post-*Sandin* decisions are unanimous that keeplock of 60 days or less in New York prisons is not an atypical hardship") (quotation marks and citations omitted); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days in confinement does not implicate liberty interest). Given the duration of his segregation and Edwards' failure to allege that the conditions of his confinement were atypical and significant, Edwards' punishment does not implicate a liberty interest. Similarly, Edwards' $25.00 "surcharge" was not an atypical hardship. *See, e.g., Byrd v. Cornell Corr., Inc,* 60 F. App'x 191, 193–94 (10th Cir.2003) ( $50 fine and 30 days' segregation not atypical and significant hardship). Thus, neither Edwards' punitive segregation nor his $25 fine implicates the requisite liberty interest to state a due process claim.[11] Because of the absence of any protected liberty interest—and because Edwards' allegations cannot be construed to allege a protected property interest —any failures by the hearing officer to conduct a thorough investigation of Edwards' claims, including the provision of certain documentary evidence and witnesses, do not support a cause of action for the denial of due process. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003) (inmate cannot claim due process violations at hearing where 12–day disciplinary confinement did not implicate protected liberty interest). Edwards' procedural due process claims should therefore be dismissed.

### I. Excessive Force and Denial of Required Medical Treatment

**\*10** Edwards asserts two allegations of physical injury, which the Court construes as excessive force claims, and a related allegation that he was denied medical treatment. (Compl.¶¶ 91, 91b). Edwards asserts that on November 1, 2008, Defendant Grima hit him in the head with a "pushdraw" and then refused Edwards' request for medical treatment. (*Id.* ¶ 91). He also argues that Grima inflicted "personal physical harm" upon him after Grima pressed the "emergency personal alarm device." (*Id.* ¶ 91b). Neither of these claims should survive Defendants' motion to dismiss.

The constitutional basis for Edwards' excessive force and deliberate indifference to medical needs claims is the Eighth Amendment's ban on cruel and unusual punishment. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam). Any actionable claim under the Eighth Amendment consists of a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect. *See, e.g., Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness ..."*Id.* (citations and quotation marks omitted). In the excessive force context, this means "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."*Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In the medical needs context, the defendant must act with a "sufficiently culpable state of mind[,]" *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), which means that he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's objective component "focuses on the harm done, in light of contemporary standards of decency" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation."*Wright,* 554 F.3d at 268 (citations and quotation marks omitted). For deliberate indifference claims, "the alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."*Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citations and quotation marks omitted).

Edwards' allegations of excessive force and denial of medical treatment fail to meet either the subjective or objective components under the Eighth Amendment. Both claims of excessive force are devoid of any specific information regarding the extent of a temporary or permanent injury, if any, and the level of pain that Edwards endured. The entirety of Edwards' first allegation of excessive force is that Grima "hit [him] in [the] head with the pushdraw that's part of the officers [sic] station" (Compl.¶ 91), which falls far short of what is needed to state a claim of excessive

force. As to his second allegation, Edwards states only that Grima "caused [him] personal physical harm" after Grima pressed his "emergency personal alarm device[,]" but he fails to elaborate on what exactly Grima did, how and where it harmed Edwards, and what injury Edwards suffered. (*Id.* ¶ 91b). Edwards' medical treatment claims are similarly deficient, as he alleges only that Grima "said 'no' " after Edwards requested medical assistance and then sent Edwards away to pack up his belongings. (*Id.* ¶ 91). These allegations do not shed light on whether any injury that Edwards suffered was sufficiently serious to warrant medical attention, whether Grima knew of and disregarded an excessive risk to Edwards' health, or even whether there was any risk to Edwards' health. Accordingly, Edwards has failed to state claims for excessive force and denial of medical treatment, and those claims should be dismissed.

## J. Deprivation of Access to Prison Grievance System

 **\*11** Throughout the Complaint, Edwards claims that he submitted several grievance letters and complaints to numerous Defendants, who he alleges denied, ignored, never answered, and/or improperly processed his grievances on various dates from July 2007 through February 2009. (Compl.¶¶ 1–15, 17–20, 21–33, 36–39, 41–45, 48–51, 54–85, 88, 90, 91b, 92–94, 96). As one example, Edwards states that on September 18, 2007, he wrote a complaint letter to Defendant Horn about Defendant Rosa's use of her cellular phone while on duty, which caused a "security breach." (*Id.* ¶ 7). Edwards alleges that he was denied access to the grievance system because Defendant Mulvena failed to file that grievance (or any of his other grievances) and Defendant Horn did not follow up regarding the complaint. (*Id.*).

While a plaintiff has a right "to meaningful access to the court and to petition the government for the redress of grievances" under the First Amendment, *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citation omitted), the failure to process a grievance does not rise to the level of a constitutional violation. *See, e.g., id.* at 370 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable [Section] 1983 claim") (citation omitted); *Torres,* 246 F.Supp.2d at 342 ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (citations omitted); *Cancel,* 2001 WL 303713, at \*3–4 (violation of grievance procedures does not give rise to claim under First Amendment). Courts

regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures. *See, e.g., id.;Muhammad v. McMickens,* No. 86 Civ. 7376(SWK), 1988 WL 7789, at *3 (S.D.N.Y. Jan.25, 1998). Accordingly, because Edwards' claims for alleged violations of the inmate grievance process have no constitutional basis, those claims should be dismissed. [12]

## K. Retaliation

Edwards alleges that on 17 separate occasions between July 2007 and November 2008, Defendants Campfield, Grima, Hannah, Holmes, John Doe # 1, John Doe # 2, Lagos, Lee, Maynard, Polak, Richardson, Rosa, Shaw, Smalls, and Sumpter retaliated against him in response to his submitting, or informing Defendants that he intended to submit, grievance letters. Edwards' allegations of retaliation include the use of verbal threats or harassment, issuance of infractions, transfers between prison facilities, denials of meals, loss of legal documents, and termination from part-time employment he had while on Rikers Island.

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."*Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For a retaliation claim to survive a motion to dismiss, it must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms."*Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (citation and quotation marks omitted). An "unsupported, speculative, and conclusory" allegation of retaliatory conduct may be dismissed on the pleadings. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citations and quotation marks omitted).

 **\*12** In reviewing Edwards' retaliation claims, the Court is mindful that "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes."*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Indeed, while the "First Amendment protects prisoners from retaliation for filing grievances[,]"*Quezada v. Ercole,* No. 09 Civ. 2832(DLC), 2011 WL 3251811, at *5 (S.D.N.Y. Jul.29, 2011) (citations omitted), the Court recognizes "the near inevitability of decisions and actions by prison officials

to which prisoners will take exception and the ease with which claims of retaliation may be fabricated."*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 13). Moreover, courts should carefully scrutinize an inmate's claims of retaliation because such allegations "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."*Hodges v. Wright,* No. 10 Civ. 0531(GLS)(GHL), 2011 WL 5554866, at *9 (N.D.N.Y. Sept. 29, 2011) (quoting *Dawes,* 239 F.3d at 491) (citations omitted) (Report and Recommendation), *adopted,* 2011 WL 5554880 (N.D.N.Y. Nov.15, 2011). Therefore, courts reviewing an inmate's retaliation claims should do so "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted).

Edwards' allegations, in chronological order, are as follows: (1) in retaliation for submitting a grievance against Defendant Morales on July 25, 2007, Morales called Edwards' housing unit on August 1, 2007 and informed other officers that Edwards had a visitor, when in fact he did not, which caused him to wait in the inmate visitor process area for two hours (*Id.* ¶¶ 2, 4); (2) in retaliation for an incident where Defendant Hannah said she was made to apologize to Edwards for "making fun of [his] phsical [sic] disability/and deformity[,]" Hannah threatened Edwards on September 5, 2007 by saying "I'm going to get you back for that" (*Id.* ¶ 6); (3) in retaliation for filing a grievance against Defendant Rosa on September 18, 2007, Rosa fired Edwards from his job as a Suicide Prevention Aide and issued an infraction against him on October 31, 2007 (*Id.* ¶¶ 14–16); (4) on or around November 1, 2007, after Edwards informed Defendant Holmes that he intended to submit a grievance against her, Holmes caused Edwards to be transferred to another housing facility (*Id.* ¶ 17); (5) in retaliation for filing a grievance against Holmes on November 2, 2007, Holmes came to Edwards' housing unit and verbally abused him by "ridicul[ing] and mak[ing] fun of [his] physical disability and deformity" (*Id.* ¶ 19); (6) on or around November 15, 2007, in retaliation for filing a grievance against Rosa, Rosa informed John Doe inform[ers] that Edwards "like[s] to utilize the grievance mechanism against staff [,]" subsequent to which Edwards was subjected to an unauthorized transfer from "6–Lower" to "7–Lower" in the EMTC (*Id.* ¶ 20); (7) on or around November 25, 2007, in retaliation for Edwards' filing a grievance against Rosa, Defendants Hernandez and Smith retaliated against Edwards by informing another inmate that Edwards was a "snitch," which "cause[d] [Edwards] physical harm by other inmate's [sic] within [the] housing unit"(*Id.* ¶¶ 24, 26); (8) in retaliation for submitting a grievance against

Defendants Campfield and Reyes on or around March 22, 2008, Defendant Shaw had Edwards transferred out of the GRVC on March 25, 2008 (*Id.* ¶ 34); (9) on or around April 1, 2008, in retaliation for submitting a grievance against her, Campfield intentionally lost Edwards' legal documents relating to the NDNY action (*Id.* ¶ 36); (10) after filing a grievance on June 27, 2008, Edwards was transferred out of the GMDC that same day, which he says was approved by Defendant Bailey (*Id.* ¶¶ 48, 52); (11) after Edwards informed Defendant Richardson that he planned to file a grievance against her because she refused to turn off the lights in his jail cell on July 30, 2008, Richardson retaliated by denying Edwards his "morning meal" on July 31, 2008 (*Id.* ¶ 53); (12) in retaliation for filing a grievance against him, Richardson put a "hit out" by offering 20 boxes of Frosted Flakes cereal to any inmate that physically assaulted Edwards, for which Edwards filed a grievance on August 7, 2008 (*Id.* ¶ 55); (13) on August 18, 2008, in retaliation for informing a supervisor that Defendant Smalls was "only providing certain detainees with options on the hour every hour" in the law library, Smalls verbally abused Edwards (*Id.* ¶ 61); (14) on or around August 25, 2008, in retaliation for Edwards' use of the grievance mechanism against her, Defendant Smalls retaliated against Edwards through verbal abuse, threatening to have Edwards transferred, and informing other inmates that Edwards uses the grievance process (*Id.* ¶ 66); (15) on or around September 24, 2008, in retaliation for filing numerous grievances against them, Defendants Maynard and Musmacher conspired to retaliate against Edwards by threatening physical violence and issuing an infraction, which resulted in a disciplinary hearing on September 30, 2008 (*Id.* ¶¶ 83, 87, 87b); (16) after Edwards informed Defendant Lagos on October 17, 2008 that he planned to file a grievance against her because of alleged racial discrimination, Lagos retaliated by denying Edwards his "afternoon meal" on October 18, 2008 (*Id.* ¶ 90); and (17) after Edwards informed Defendant Grima that he intended to submit a grievance about his alleged physical assault with a "pushdraw" on November 1, 2008, Grima retaliated by threatening physical harm, pressing his "emergency personal alarm device," issuing an infraction, and causing Edwards to be transferred to a new housing unit (*Id.* ¶¶ 91, 91b).

## 1. Protected Activity

**\*13** It is well-established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances" and is therefore actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted); *see, e.g., Mateo v. Fischer,* 682 F.Supp.2d 423, 433–34 (S.D.N.Y.2010)

(filing of a grievance is a protected activity). However, expressing an intent to engage in a constitutionally protected activity—in this case, filing a grievance—is not protected activity. *See Henry v. Dinelle,* No. 09 Civ. 0456(GTS) (DEP), 2011 WL 5975027, at \*7 n. 12 (citing cases) & n. 13 (N.D.N.Y. Nov. 29, 2011) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.") (citing *McKinnie v. Heisz,* No. 09 Civ. 0188(BBC), 2009 WL 1455489, at \*11 (W.D.Wis. May 7, 2009)). In light of these principles, Edwards' allegations of retaliation in response to his submitting grievance letters constitute protected activities. However, Edwards' allegations of retaliatory conduct arising from his expressing an intent to file a grievance—those allegations occurring on or about November 1, 2007 (Compl.¶ 17), July 31, 2008 (*Id.* ¶ 53), October 18, 2008 (*Id.* ¶ 90), and November 1, 2008 (*Id.* ¶¶ 91, 91b)—are not protected activities and therefore cannot form the basis of a claim for retaliation. [13]

## 2. Adverse Actions

Having determined that four of Edwards' allegations of retaliation fail because he was not engaged in a constitutionally protected activity, the Court now considers whether the remaining 13 allegations meet the adverse action requirement. "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations and quotation marks omitted). An inmate can meet this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes–Rhynders,* No. 07 Civ. 11241(PAC)(MHD), 2009 WL 874439, at \*4 (S.D.N.Y. Mar. 31, 2009). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493 (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. In applying this objective test to determine whether conduct is *de minimis,* the Court must consider that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is

considered adverse." *Davis,* 320 F.3d at 353 (citation and quotation marks omitted).

### a. Retaliatory Verbal Abuse

**\*14** Several of Edwards' allegations of retaliation are based on verbal harassment, abuse, or threats. (*See* Compl. ¶¶ 2, 4, 6 ("I'm going to get you back for that."), 19, 24 (calling Edwards a "snitch"), 26, 55 (putting a "hit out" on Edwards to any inmate that "fucks Edwards up"), 61 (calling Edwards a "crackhead" and "one arm faggot"), 66). While "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action[,]" *Mateo,* 682 F.Supp.2d at 434 (citations omitted), "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan.11, 2012). "[V]erbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Hofelich v. Ercole,* No. 06 Civ. 13697(PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr.8, 2010) (citation and quotation marks omitted).

Here, Edwards' claims of retaliatory verbal abuse do not include any allegations of harm, nor are they alleged with any specificity to suggest that they would deter others from exercising their constitutional rights. Several of his claims allege only that Edwards was forced to endure verbal abuse, but do not explain what was said and why that abuse was in any way adverse. And where Edwards has detailed the nature of the verbal abuse, his allegations are either *de minimis*—for example, in the case of being told he had a visitor when he in fact did not—amount to name-calling, or are insufficiently direct or specific to be adverse. *See, e.g., Dawes,* 239 F.3d at 492–93 (referring to plaintiff as an "informant" and "rat" in presence of other inmates not an adverse action); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (name-calling, without any appreciable injury, not a constitutional violation); *Kemp v. LeClaire,* No. 03 Civ. 844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar.12, 2007) (threats of "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions); *Battice,* 2006 WL 2190565, at *6–7 (defendant's making fun of plaintiff s disability does not constitute adverse action). Accordingly,

Edwards' charges of retaliation that allege only retaliatory verbal abuse—on August 1, 2007 (Compl.¶¶ 2, 4), September 5, 2007 (*Id.* ¶ 6), November 2, 2007 (*Id.* ¶ 19), November 25, 2007 (*Id.* ¶¶ 24, 26), August 7, 2008 (*Id* . ¶ 55), August 18, 2008 (*Id.* ¶ 61), and August 25, 2008 (*Id.* ¶ 66)—should be dismissed.

### b. Retaliatory Loss of Legal Documents

**\*15** Courts have held that theft, confiscation, or destruction of an inmate's legal documents may constitute an adverse action. *See, e .g., Smith,* 2009 WL 874439, at *5 (theft of legal papers is adverse action). However, "mere delays in the transfer of [an inmate's] legal papers, even if motivated by retaliation, is not the type of adverse action required to support a retaliation claim." *Ford v. Fischer,* No. 09 Civ. 723(DNH)(ATB), 2011 WL 856416, at *8 (N.D.N .Y. Jan. 31, 2011); *see, e.g., Rivera v. Pataki,* No. 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb.7, 2005) (several temporary incidents of interference with plaintiff's legal documents not an adverse action). Here, because Edwards has pled an injury in connection with this allegation—Defendant Campfield's allegedly retaliatory loss of his legal documents prevented him from prosecuting the NDNY action (Compl.¶ 36), which was subsequently dismissed for failure to prosecute, *see Selsky,* 2008 WL 190385, at *1—it contains sufficient facts to constitute an adverse action.

### c. Retaliatory Filing of Infractions

Edwards alleges that Defendants Maynard, Musmacher, and Rosa issued false infractions against him on or about October 31, 2007 (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18) and September 24, 2008 (*Id.* ¶¶ 83, 87, 87b) in retaliation for filing grievances. While an "inmate has no general constitutional right to be free from being falsely accused in a misbehavior report[,]" *Boddie,* 105 F.3d at 862, a misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983.") (citation omitted); *see, e.g., Gill,* 389 F.3d at 384 (false misbehavior report and placement in keeplock constitutes adverse action); *Mateo,* 682 F.Supp.2d at 434 (false misbehavior report constitutes adverse action). Accordingly, Edwards' allegations that these Defendants filed

false retaliatory infractions against him are sufficient to plead an adverse action.

### d. Retaliatory Transfers

Edwards' allegations that Defendants Bailey, Bethacourt, Hannah, John Doe # 1, John Doe # 2, Rosa, and Shaw transferred Edwards between prison facilities in retaliation for submitting grievances are also sufficient to establish an adverse action at the motion to dismiss stage. (*See* Compl. ¶¶ 20, 34, 48, 52). While a "prisoner has no liberty interest in remaining at a particular correctional facility ... prison authorities may not transfer [him] in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted); *see, e.g., Soto v. Iacavino,* No. 01 Civ. 5850(JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (prison housing transfer is adverse action for retaliation claim).

### e. Retaliatory Termination

 **\*16** Finally, Edwards' allegation that Defendant Rosa fired him from his position as a Suicide Prevention Aide states sufficient facts to constitute an adverse action. (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18)."[A] claim for relief may be stated under [S]ection 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citation omitted). More specifically, an inmate can bring a claim under Section 1983 for termination of employment in retaliation for his exercise of constitutionally protected rights. *See, e.g., Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). The termination of Edwards' job, if found to be retaliatory, could serve to "chill a person of ordinary firmness from continuing to engage" in a protected activity. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (quoted in *Davis,* 320 F.3d at 353).

### 3. Causal Connection

Of his six allegations of retaliation that meet the adverse action requirement—those dated October 31, 2007, November 15, 2007, March 25, 2008, April 1, 2008, June 27, 2008, and September 24, 2008—all but one should be dismissed. Edwards has not alleged any facts, as he must, that his filing of grievances was a "substantial or motivating factor" for Defendants' actions. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). In addressing the causal connection requirement, a court may consider: (1)

the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *See Colon,* 58 F.3d at 872–73. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13.

With the exception of his claim arising on October 31, 2007, Edwards' allegations of retaliation are wholly conclusory. Edwards does not set forth any specific facts, other than his repeated use of the word "retaliation," to support his suspicion of retaliation or to suggest that Defendants were motivated in any way by Edwards' filing grievance letters. On several occasions, Edwards appears to rely on the mere fact that the purported adverse actions took place after he filed a grievance. To infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent. Temporal proximity may serve as circumstantial evidence of retaliation, *see, e.g., Colon,* 58 F.3d at 872, and the Second Circuit has found that such proximity can establish causality. *See Espinal v. Goord,* 558 F.3d 119, 129–30 (2d Cir.2009) (causal connection present where six months passed between protected activity and retaliatory beating); *but see Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006) (temporal proximity insufficient by itself to prove causation) (citations omitted); *Nunez v. Goord,* 172 F.Supp.2d 417, 431–32 (S.D.N.Y.2001) (same). But in this case, Edwards' reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate any nexus between a specific grievance and a specific adverse action. *See, e.g., Andino v. Fischer,* 698 F.Supp.2d 362, 385 (S.D.N.Y.2010) (proximity between complaints and adverse actions the result of large number of grievances in short period of time).

 **\*17** In addition to Edwards' failure to plead any facts suggesting retaliation, the facts that Edwards chose to include in the Complaint suggest a relationship between protected activity and adverse action that is too attenuated to plausibly constitute causation. For example, Edwards theorizes that on November 15, 2007 he was transferred by Defendant John Doe # 2 in retaliation for filing a grievance against Rosa, after Rosa informed John Doe # 1, who then informed John Doe # 2, of Edwards' use of the grievance mechanism. (Compl.¶ 20). However, absent any additional information, such as

corroborating statements from other officers or inmates, it is simply not plausible to impute a retaliatory motive to John Doe # 2 by way of John Doe # 1 and Rosa. Edwards' allegations of March 25, 2008 suffer the same deficiency, as he aims to pin a retaliatory motive not on the target of his protected activity, but on an entirely different Defendant. (*Id.* ¶ 34). Apart from any apparent temporal proximity, therefore, Edwards' allegations are wholly conclusory and should be dismissed. *See, e .g., Sioleski v. McGrain,* No. 10 Civ. 0665S (WMS), 2012 WL 32423, at *4 (W.D.N.Y. Jan.5, 2012); *Douglas v. Smith,* No. 05 Civ. 1000(LEK)(DRH), 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008).

By contrast, Edwards is able to state an actionable claim of retaliatory termination against Rosa based on his allegations of October 31, 2007. Edwards states that on September 18, 2007, he submitted a grievance letter regarding Defendant Rosa's alleged use of her personal cell phone while on duty, which Edwards contends is a "security breach." (Compl.¶ 7). Then, on October 31, 2007, while he was working as a Suicide Prevention Aide, Edwards alleges that Rosa stated, "Watch your mouth boy before I write you. You like writing anyway."(Dkt. No. 2–6 at 18). Edwards asked another officer for a grievance form, intending to submit another grievance against Rosa, at which point Rosa stated: "What lies are you going to write on me now stupid nigger. The cellphone lie didn't work nigger. All you are nigger is a snitch don't worry, you're going to get yours. I'm going to make sure you get fuck up nigger."(*Id.*). Moments later, Rosa returned and asked for Edwards' identification card, stating, "I'm writing you up nigger. Two can play that game and also nigger you're fired. Morales get this nigger out of here now."(*Id.*).

These statements clearly suggest a retaliatory animus. *See, e.g., Baskerville v. Blot,* 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002) (defendant's comments during assault point to retaliatory animus). In mentioning the "cellphone lie," which likely refers to Edwards' September 18 grievance about Rosa's use of her personal cell phone, Rosa's comments establish a clear causal link between Edwards' protected activity and Rosa's decision to terminate Edwards from his job and issue an infraction against him. *See, e.g., Headley v. Fisher,* No. 06 Civ. 6331(PAC)(KNF), 2008 WL 1990771, at *18 (S.D.N.Y. May 7, 2008) (causal connection exists where officer referred to protected activity during retaliatory assault). Accordingly, Edwards has stated a plausible claim of retaliatory termination against Rosa, and Defendants' motion to dismiss that claim should be denied.

## L. Conspiracy

**\*18** Edwards alleges four conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, specifically that (1) on October 31 and November 1, 2007, Rosa and Polak conspired to fire Edwards from his job as a Suicide Prevention Aide and issue an infraction against him (Compl.¶¶ 14–16); (2) as described in a complaint letter dated July 10, 2008, Defendant Johnson conspired with "the security staff" to violate Edwards' constitutional rights by not filing his grievances (*Id.* ¶ 50); (3) as described in a complaint letter dated August 28, 2008, Defendants Johnson and Sumpter conspired to deny Edwards access to the prison's grievance system (*Id.* ¶ 69); and (4) as described in a September 24, 2008 grievance letter, Defendants Maynard and Musmacher conspired to issue threats of physical violence and submit a false infraction against Edwards. (*Id.* ¶ 83).

### 1. Conspiracy Under Section 1983

To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."*Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999))."[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts."*Bussev v. Phillips,* 419 F.Supp.2d 569, 586–87 (S.D.N.Y.2006) (quotation marks and citations omitted)."[C]omplaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."*Ciambriello,* 292 F.3d at 325 (citation and quotation marks omitted). Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right."*Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citation omitted). If a plaintiff fails to show an underlying constitutional violation on which to base a Section 1983 conspiracy claim, the conspiracy claim fails as a matter of law. *See, e.g., AK Tournament Play, Inc. v. Town of Wallkill,* No. 09 Civ. 10579(LAP), 2011 WL 197216, at *3–4 (S.D.N.Y. Jan.19, 2011), *aff'd,*444 F. App'x 475 (2d Cir.2011).

Each of Edwards' conspiracy claims should be dismissed because he has failed to state any underlying constitutional violations, with the exception of his retaliatory termination claim against Rosa. Moreover, even if the Court were to find that Edwards could state plausible constitutional claims as a predicate for conspiracy, he fails to state any non-conclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy. Edwards' statements that certain Defendants "conspired" with others is not, by itself, sufficient to state an actionable claim for conspiracy. *See Nealy v. Berger,* No. 08 Civ. 1322(JFB)(AKT), 2009 WL 704804, at *5 (E.D.N .Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' ... is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted). The only claim for which Edwards alleges any facts is that Rosa and Polak conspired to retaliate against him. However, the statements that he attributes to Polak—"my girl said you are fired" and "you are not getting your job back" (Compl.¶ 15)—do not suggest any understanding, agreement, or meeting of the minds between these two Defendants. Polak's reinforcement of Rosa's decision to fire Edwards, at best, suggests only that Polak sided with Rosa's decision, but it is not sufficient to state a conspiracy claim. Absent any actionable allegations of a conspiratorial understanding between Polak and Rosa, Edwards' conspiracy claims fail.

**2. Conspiracy Under Section 1985**

**\*19** 42 U.S.C. § 1985(2) and (3) also provide relief for claims of conspiracy. To plead a claim under Section 1985(2), a plaintiff must show "(1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of New York,* No. 05 Civ. 10682(PKC)(FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (citing 42 U.S.C. § 1985(2)). The elements of a claim under Section 1985(3) are: " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.' " *Id.* (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000)).

As with Section 1983 conspiracy claims, Section 1985 claims require a showing of an underlying constitutional violation. *See, e.g., Okoh v. Sullivan,* No. 10 Civ. 2547(SAS), 2011 WL 672420, at *4 (S.D.N.Y. Feb.24, 2011), *aff'd,* 441 F. App'x 813 (2d Cir.2011); *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *13 (S.D.N.Y. Oct.13, 2010). Because Edwards has not set forth sufficient facts to state any constitutional violations, with the exception of his retaliatory claim against Rosa, his Section 1985 claims should be dismissed as well. Even if the Court were to find any underlying constitutional violations, including the surviving retaliation claim, the Section 1985 claims should be dismissed because Edwards has failed to allege any facts, as he must, that Defendants' conspiracies were motivated not by any personal malice of the conspirators toward him, but rather by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' animus.' " *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (citation omitted); *accord Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam); *Okoh,* 2011 WL 672420, at *6.

**3. Conspiracy Under Section 1986**

To state a claim under Section 1986, a plaintiff must state a valid claim under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985, but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.,* No. 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). A Section 1986 claim "must be predicated upon a valid [Section] 1985 claim." *Brown,* 221 F.3d at 341 (citation and quotation marks omitted). Because Edwards fails to state a claim under Section 1985 and otherwise fails to make any allegations that certain Defendants had knowledge of a conspiracy but failed to prevent it, the Court should also dismiss his Section 1986 claim.

**M. Disability Discrimination Claim**

**\*20** Edwards asserts that on five occasions he was discriminated against on the basis of an alleged disability in violation of Title II of the ADA. (Compl. ¶¶ 6, 17, 19, 30, 61). To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: (1) "he is a 'qualified individual' with a disability"; (2) "he

was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and (3) "such exclusion or discrimination was due to his disability." *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Although Defendants have moved to dismiss the Complaint in its "entirety" (Def. Mem. at 49), they have failed to offer any specific arguments to dismiss Edwards' ADA claims. (*See* Def. Mem. at 3). Nevertheless, these claims should be dismissed. It appears from the Complaint that Edwards' alleged disability is that one of his arms is significantly shorter than the other, and his discrimination claims arise from Defendants' comments allegedly mocking this deformity. Leaving aside the question of whether Edwards' deformity falls under the ADA's definition of disability, Edwards fails to state that Defendants excluded him from participating in, or denied him the benefit of, any particular activity as a result of his alleged disability. Edwards' allegations of objectionable language are not sufficient to state a claim under the ADA.

### N. Edwards' Potential Recovery Is Limited to Nominal or Punitive Damages From Rosa

In his Complaint, Edwards seeks both money damages and injunctive relief. (Compl.¶ V). However, because of qualified immunity, Edwards can only obtain monetary damages from Defendant Rosa and, because of the PLRA, that recovery is limited to nominal or punitive damages. In addition, Edwards' request for injunctive relief is moot because he is no longer in prison.

### 1. Qualified Immunity Precludes Money Damages, Except From Rosa

Qualified immunity provides a basis to preclude monetary damages, but not injunctive relief. *See Morse v. Frederick,* 551 U.S. 393, 432, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (citation omitted)."Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A state actor is afforded qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to

believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (citations and quotation marks omitted). Because Edwards has failed to plead facts showing that Defendants violated any constitutional right, with the exception of his claim for retaliatory termination against Rosa, Defendants are entitled to qualified immunity for each of Edwards' claims.

**\*21** However, as to Edwards' surviving retaliation claim, Defendant Rosa is not entitled to qualified immunity. Courts have long recognized, well before the time of Edwards' allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see, e.g., Baskerville,* 224 F.Supp.2d at 737–38 (no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F.Supp.2d 154, 160 (S.D.N.Y.1999) (same). Here, Edwards has alleged intentional conduct by Rosa in response to a protected activity, adequately stating a cause of action for retaliation. Moreover, Defendants have offered no argument that Rosa's conduct was objectively reasonable. Accordingly, at the pleading stage, Rosa is not entitled to qualified immunity from monetary damages on Edwards' retaliatory termination claim against her.

### 2. Any Money Damages from Rosa Are Limited to Nominal or Punitive Damages

In light of the qualified immunity finding above, Edwards' recovery of monetary damages, if any, is limited to Rosa. Because of the PLRA's physical injury requirement, however, that recovery from Rosa cannot include compensatory damages. Defendants argue that all of Edwards' claims are barred by the PLRA because he does not allege that he has suffered any physical injury. (Def. Mem. at 46–48). Section 1997e(e) of the PLRA provides that " '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' " *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting 42 U.S.C. § 1997e(e)). The term "physical injury" is not statutorily defined; however, the injury complained of must be more than *de minimis* to meet the requirements of § 1997e(e). *See Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Therefore, in the absence of a showing of physical injury, a prisoner cannot recover compensatory damages for mental or emotional injury. *Thompson,* 284 F.3d at 417. To recover punitive or nominal damages, however, a prisoner need not allege

that he has sustained a physical injury. *Id.* at 418; *see also Abreu v. Nicholls,* No. 04 Civ. 7778(DAB)(GWG), 2011 WL 1044373, at *4 (S.D.N.Y. Mar. 22, 2011) (Report and Recommendation); *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at *15 (S.D.N.Y. June 23, 2010) (citing *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998)).

Edwards does not allege that he has suffered any physical injury as a result of his alleged constitutional violations, including his allegation of excessive force, which does not mention any temporary or permanent physical injury as a result of Defendants' actions. *See supra* Section II.I. The only injuries that Edwards complains about are the "loss of amenity" and "limited liberty" as a result of his segregated confinement, and emotional distress arising from the "embarrass[ment]" caused by Defendants' ridiculing his physical deformity. (Compl.¶ V). Neither of these injuries constitutes a physical injury under the PLRA. *See, e.g., Henry,* 2011 WL 3295986, at *4 (no physical injury where inmate complained of embarrassment); *Wilson v. Phoenix House,* No. 10 Civ. 7364(DLC), 2011 WL 3273179, at *3 (S.D.N.Y. Aug.1, 2011) (confinement not enough, by itself, to fulfill physical injury requirement). Accordingly, in the absence of any allegations of physical injury, Edwards' claims against Defendants (including his surviving retaliation claim against Rosa) should be dismissed insofar as he seeks compensatory damages, and he should be limited to seeking nominal or punitive damages from Rosa. *See, e.g., Brummell v. Stewart,* No. 09 Civ. 10326(PAC)(FM), 2011 WL 1306170, at *4 (S.D.N.Y. Mar. 24, 2011) (Report and Recommendation) (claims seeking compensatory damages dismissed because no allegation of physical injury suffered); *Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *10 (S.D.N.Y. Jan.18, 2011) (request for compensatory damages for emotional injuries stricken from complaint).

### 3. Edwards' Request for Injunctive Relief Is Moot

**\*22** By letter dated December 11, 2011, Edwards informed the Court that he has been released from prison. (Dkt. No. 135). This factual development renders moot Edwards' request for injunctive relief. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under that principle, an inmate's request for injunctive and declaratory relief against correctional staff at a particular correctional institution becomes moot when the inmate is discharged. *See Muhammad v. City of N.Y. Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997); *see, e.g., Khalil v. Laird,* 353 F. App'x 620, 621 (2d Cir.2009) (injunctive and

declaratory relief moot because inmate released from prison); *Sheppard v. Lee,* No. 10 Civ. 6696(GBD)(JLC), 2011 WL 5314450, at *4 n. 6 (S.D.N.Y. Nov. 7, 2011) (declaratory and injunctive relief claims moot because inmate no longer incarcerated) (Report and Recommendation), *adopted,* 2011 WL 6399516 (S.D.N.Y. Dec.20, 2011). Accordingly, because Edwards has been released from prison, his claims for injunctive relief should be dismissed. [14]

### III. *CONCLUSION*

For the foregoing reasons, I recommend that Defendants' motion to dismiss be granted as to Edwards' claims for verbal harassment, deprivation of access to free telephone calls, deprivation of access to legal services, mail tampering, denial of required food portions, unconstitutional strip search, violation of due process rights within the prison's disciplinary and grievance system, excessive force and denial of medical treatment, deprivation of access to the prison's grievance system, retaliation (against all Defendants except Rosa for Edwards' termination), conspiracy, and disability discrimination under the ADA. I further recommend that the motion to dismiss be denied only as to Edwards' retaliatory termination claim against Defendant Rosa to the extent Edwards seeks nominal or punitive damages against her.

### *PROCEDURE FOR FILING OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or

Westlaw, he should request copies from Defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

## Footnotes

1    In the case caption on the first page of the Complaint, Edwards mistakenly identifies Defendant Johnson as "Ms. K. Jonhson." (Compl. at 1).

2    In Section I.b of the Complaint, Edwards lists 38 Defendants. Six additional Defendants—Carrera, Cattafesta, Duffy, Grima, Powell, and Steven—do not appear on this list, but are named in the case caption on the first page of the Complaint.

3    Accordingly, while Defendants do not argue as much, the Complaint could also be dismissed under Rule 8(a)(2), which requires a pleading to contain "a short and plain statement" of the claims.

4    Edwards has attached more than 300 pages of documents to his Complaint, consisting of grievance letters, notices of infraction, and inmate grievance committee decisions. These materials can be properly considered in deciding Defendants' motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). However, while the Court will consider these materials in support of the claims asserted in the Complaint—indeed, nearly every paragraph advises the reader to "see attached exhibit" but fails to cite to a specific page—the Court will not attempt to identify the potentially innumerable causes of action that could be construed from the hundreds of allegations contained solely in the attachments.

5    This set of defendants consists of Sumpter (Dkt. No. 11), Horn (Dkt. No. 12), Cattafesta (Dkt. No. 13), Hunter (Dkt. No. 15), Guerrant (Dkt. No. 17), Lagos (Dkt. No. 18), Shaw (Dkt. No. 19), Campfield (Dkt. No. 20), Reyes (Dkt. No. 21), Davis (Dkt. No. 22), Hernandez (Dkt. No. 23), Holmes (Dkt. No. 24), Rosa (Dkt. No. 25), Smith (Dkt. No. 26), Mulvena (Dkt. No. 27), Polak (Dkt. No. 28), Noon (Dkt. No. 29), Duffy (Dkt. No. 31), Dinolfo (Dkt. No. 32), Mimms (Dkt. No. 34), Bailey (Dkt. No. 35), Lewis (Dkt. No. 36), Alleyve (Dkt. No. 37), Calle (Dkt. No. 39), Hannah (Dkt. No. 41), Hourihan (Dkt. No. 43), Jenkins (Dkt. No. 44), Maynard (Dkt. No. 45), Padmore (Dkt. No. 48), Richardson (Dkt. No. 49), Riordan (Dkt. No. 50), and Smalls (Dkt. No. 51).

6    Since October 29, 2010, Edwards has served the following Defendants: Lee (service executed on Dec. 2, 2010 (Dkt. No. 61)); Powell (service executed on Mar. 29, 2011 (Dkt. No. 98)); Steven (service executed on Feb. 24, 2011 (Dkt. No. 110); service executed on Mar. 31, 2011 (Dkt. No. 99)); Grima (service executed on Mar. 2, 2011 (Dkt. No. 107); service executed on Mar. 14, 2011 (Dkt. No. 100)); Robinson (service executed on Mar. 29, 2011 (Dkt. No. 101)); Musmacher (service executed on Mar. 14, 2011 (Dkt. No. 102)); Hill (service executed on Feb. 24, 2011 (Dkt. No. 112); service executed on Mar. 14, 2011 (Dkt. No. 103)); Horn (service executed on Mar. 31, 2011 (Dkt. No. 97)); and Carrera (service executed on Oct. 6, 2011 (Dkt. No. 131)).

7    As to Defendant Bethacourt, the Office of Corporation Counsel advised the Court by letter dated June 8, 2011 that it is unable to locate records that would assist in identifying Bethacourt. Accordingly, as stated in the Court's Order dated June 9, 2011 (Dkt. No. 120), it does not appear that any further action can be taken to identify this Defendant. As to Defendant Davis, the Office of Corporation Counsel advised the Court by letter dated February 16, 2011 that the Legal Bureau of the DOC would accept service on his behalf. By Order dated September 1, 2011, the Court directed Edwards to serve Davis by September 26, 2011 (Dkt. No. 129), but the docket sheet does not reflect any attempt to effect service. Lastly, on October 31, 2011, Edwards attempted to serve Defendant Johnson but was unsuccessful because she was not located at the address provided by the Office of Corporation Counsel. (*See* Order, dated Dec. 12, 2011 (Dkt. No. 134), at 1). Edwards was directed to again attempt to serve Johnson by January 27, 2012 (*Id .*), but no proof of service has been filed.

8    Although the motion to dismiss was not filed on behalf of any of the unserved Defendants (*see* Def. Mem. at 2–3 n. 2), Counsel has stated that the arguments raised apply equally to all Defendants. Accordingly, in light of my recommendation to dismiss all claims against all Defendants except the retaliatory termination claim against Defendant Rosa, *see infra* Section ILK, the Court should *sua sponte* dismiss the Complaint as to Defendants Bethacourt, Davis, John Doe # 1, John Doe # 2, and Johnson.

9    Defendants have not moved to dismiss any of Edwards' claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the PLRA. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). While exhaustion under Section 1997e(a) is mandatory, *see Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), non-exhaustion "is an affirmative defense that is waivable."*Handberry v. Thompson,* 446 F.3d 335, 342 (2d Cir.2006) (citations, alterations, and quotation marks omitted); *see also Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Here, because Defendants have not argued that Edwards failed to exhaust his administrative remedies, the non-exhaustion defense has been waived. *See, e.g., Ortiz v. Dep't of Corr. of the City of N.Y.,* No. 08 Civ. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes waiver) (Report and Recommendation), *adopted,* 2011 WL 2638140

(S.D.N.Y. Jul.5, 2011); *Hobson v. Fischer,* No. 10 Civ. 5512(SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar.14, 2011) (finding waiver even where grievance "appears not to have been fully exhausted" under PLRA).

10    In the context of his claim for the denial of free telephone calls, Edwards provides different dates for the start of his incarceration, stating January 23, 2008 in his Complaint and January 24, 2008 in an attached exhibit. (Compl. ¶ 46; Dkt. No. 2–3 at 4). These cited dates, however, appear to be inconsistent with the commencement of Edwards' incarceration, as his earliest allegation in this lawsuit takes place on July 25, 2007 while he was housed at the AMKC. (*Id.* ¶ III). In any event, regardless of whether Edwards has been denied free telephone calls since July 2007 or January 2008, his cause of action should be dismissed because he has failed to state an actionable claim.

11    Edwards also alleges a claim for the deprivation of his procedural due process rights in connection with a September 24, 2008 disciplinary hearing. This claim fails because Edwards cannot establish the requisite liberty interest, as he does not allege that he was subject to any discipline as a result of Davis' finding him guilty on September 24, 2008. (Compl.¶ 86).

> Even if Edwards had alleged disciplinary confinement resulting from the September 28 hearing, and assuming that that confinement implicated a liberty interest under the Fourteenth Amendment, Edwards still cannot state a claim for deprivation of due process. Citing to the Notice of Disciplinary Disposition Form # 6500D attached to the Complaint (Dkt. No. 2–7 at 1), Edwards alleges that he was "never called down" for the hearing and that the hearing officer, Defendant Davis, was biased in favor of finding him guilty of the underlying infraction. (Compl.¶ 86). While an inmate "has a right to a fair and impartial hearing officer [,]" *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citation omitted), and one who "does not prejudge the evidence[,]" *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990), Edwards fails to plead any specific facts, beyond his conclusory allegation of bias, to suggest that Davis was predisposed to finding him guilty. Moreover, despite Edwards' claim that he was never called down for a disciplinary hearing, Edwards' signature appears next to a notation on the Form # 6500D that the hearing was adjourned by Edwards himself.

12    Related to the allegations about the grievance system, Defendants also assert that Edwards' failure to allege personal involvement for Defendants Bailey (*Id.* ¶¶ 37, 41, 48, 52), Caruso (*Id.* ¶¶ 16, 27), Cattafesta (*Id.* ¶ 80), Davis (*Id.* ¶¶ 13, 26, 47), Hill (*Id.* ¶ 63), Horn (Compl.¶¶ 7, 9, 10, 12, 14–16, 21, 23, 25, 28, 29, 32–35, 39, 41–43, 45, 52, 59, 79, 97), Hourihan (*Id.* ¶¶ 50, 61, 66, 68, 77, 95, 98), Powell (*Id.* ¶¶ 57, 78), and Riordan (*Id.* ¶ 6) provide an independent basis for dismissal. (Def. Mem. at 14–16)."It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."*Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation and quotation marks omitted). An official's failure to respond to a prisoner's letter of protest and request for an investigation, as Edwards is alleging in his Complaint, "is insufficient to hold that official liable for the alleged violations."*Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citation and quotation marks omitted). Accordingly, Edwards' claims against these Defendants should be dismissed on this ground as well.

13    Moreover, of the four allegations of retaliation that are not based on protected activities, two cannot be considered adverse actions —concerning Defendant Richardson on July 31, 2008 (Compl.¶ 53) and Defendant Lagos on October 18, 2008 (*Id.* ¶ 90)—because both of these allege that these Defendants retaliated against Edwards by denying him a meal. The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable. *See, e.g., Snyder v. McGinnis,* No. 03 Civ. 0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (denial of food to plaintiff two times would not chill First Amendment activity).

14    In addition, Edwards cannot establish a likelihood of success on the merits or the possibility of irreparable injury as required for any injunctive relief. Even assuming he could however, and to the extent Edwards' claims for injunctive relief are not moot, the PLRA extends prospective relief "no further than necessary to correct the violation of the Federal right of a particular plaintiff[,]"18 U.S.C. § 3626(a)(1)(A), and the relief Edwards seeks—terminating Defendants from their positions and enjoining them from future government employment—is not "narrowly drawn." *Id.; see also Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y.2011) (proposed order directing installation of security cameras beyond narrow scope permitted by PLRA); *Easter v. CDC,* 694 F.Supp.2d 1177, 1188–90 (S.D.Cal.2010) (inmate not entitled to injunctive relief preventing officials from future supervision or control over him when inmate no longer in facility where attack took place, and no indication of imminent injury).

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3295986
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Christopher A. HENRY, Plaintiff,
v.
Larry DAVIS and Governor
Andrew M. Cuomo, Defendants.

No. 10 Civ. 7575(PAC)(JLC).    |    Aug. 1, 2011.

**Opinion**

### *REPORT AND RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.

**\*1 To the Honorable Paul A. Crotty, United States District Judge:**

Christopher A. Henry ("Henry"), proceeding pro se, brings this suit under the Civil Rights Act, 42 U.S.C. § 1983, alleging deprivation of his constitutional rights by Governor Andrew M. Cuomo ("Cuomo")[1] and New York City Department of Corrections ("DOC") Chief Larry Davis ("Davis") (collectively, "Defendants"). Henry, who is a prisoner at Rikers Island, alleges that the telephone time allotted to him in prison is too short and that the limits on his phone use deprive him of his constitutional rights. He seeks both compensatory damages and injunctive relief. Davis has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons stated below, I recommend that the Court grant Davis' motion to dismiss in its entirety and dismiss the claim against Cuomo *sua sponte.*

## I. BACKGROUND

In his complaint filed on October 1, 2010, Henry, a prisoner at Rikers Island, alleges that Cuomo and Davis are liable for violations of the Civil Rights Act, 42 U.S.C. § 1983, arising out of certain limitations on Henry's use of the telephone in prison. (Complaint ("Compl.") ¶ I.B, II (Dkt. No. 2)).

The following facts are taken from the complaint and are accepted as true for purposes of this motion. On September 1, 2010, around "12:00 HRD," Henry was talking to his "love[d] ones" in a long distance phone conversation when the call ended abruptly because he exceeded the time limit for telephone use.(Id. ¶ II.D). In another incident, Henry was unable to complete a business transaction that he was conducting over the phone because he again exceeded the time limit. (Id.).[2] Henry alleges that he suffered "embarrassment," "lost business," and "cruel and unusual punishment" as a result of the incidents and seeks expanded phone privileges and $99,999,000,000 in compensatory damages. (Id . ¶¶ III, V).[3]

On March 28, 2011, Davis moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, arguing that: (1) Henry fails to allege a cognizable federal claim; (2) Henry fails to allege the personal involvement of Davis; (3) Henry's claims for compensatory damages are barred in that he does not allege he suffered any physical harm; and (4) Davis is entitled to qualified immunity. (*See* Defendant Davis' Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") (Dkt. No. 12)).[4]

Henry filed an opposition on July 12, 2011, in which he restates the allegations he made in the Complaint. (Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Opp'n") (Dkt. No. 17)). Henry further contends that the Court should deny Davis' motion to dismiss "because [Davis] neglect[s] the social and emotional well-being of DOC[s] [inmates]." (*Id.* 4, ¶ 3). On July 25, 2011, Davis filed a reply, arguing, among other things, that his motion to dismiss should be granted because Henry failed to address any of Davis' substantive arguments for dismissing the complaint in his opposition. (Reply Memorandum of Law in Further Support of Motion to Dismiss 2–3 (Dkt. No. 19)).

## II. DISCUSSION

### A. Legal Standard

**\*2** A court ruling on a 12(b)(6) motion to dismiss must assume the truth of a pleading's factual allegations and test only its legal sufficiency. *See, e.g., McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000) (citation omitted). To survive a Rule 12(b)(6) motion, a plaintiff's pleading must contain "sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A court is to decide whether a plaintiff has presented more than mere legal conclusions to support "a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1940. In addition, a court is obligated to dismiss *sua sponte* an incarcerated plaintiff's complaint brought under Section 1983 where the complaint fails to state a claim upon which relief can be granted. 42 U.S.C. § 1997e(c); 28 U.S.C.1915(e)(2)(B)(ii); *see also, e.g., Giano v. Goord,* 250 F.3d 146, 149 (2d Cir.2001).

Davis' motion to dismiss should be granted and the claim against Cuomo should be dismissed *sua sponte* because, even when construed liberally, the complaint fails to allege that Henry was deprived of any constitutional right, that Defendants were personally involved in any alleged deprivation, or that he suffered physical harm as a result of the injury.[5] Moreover, the complaint should also be dismissed because Defendants are entitled to qualified immunity.[6]

## B. Henry Has No Constitutional Right to Phone Privileges Beyond the Minimum Allowed by the Prison

Henry has failed to allege that he was deprived of a constitutional right—a threshold requirement of a suit brought under Section 1983. *See, e.g., Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009). Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC) (KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (no injunction restoring phone privileges warranted where prisoner-plaintiff had available alternate means of communication and did not allege these means were inadequate); *Pitsley v. Ricks,* No. 96 Civ. 0372(NAM) (DRH), 2000 WL 362023, at *5 (N.D.N.Y. Mar. 31, 2000) (dismissing Section 1983 claim on qualified immunity grounds where prisoner had available alternate means of communication); *Fisher v. Dep't of Corr.,* No. 92 Civ. 6037(LAP), 1995 WL 608379, at *7 (S.D.N.Y. Oct. 16, 1995) (dismissing, on summary judgment, prisoner's Section 1983 claim regarding telephone access to counsel where prisoner had access by other means); *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) ("[R]estrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel."); *Pino v. Dalsheim,* 558 F.Supp. 673, 675 (S.D.N.Y.1983) (restrictions limiting telephone use to eight

minutes twice a month did not deprive prisoner of meaningful access to counsel where prisoner could communicate by alternate means). Moreover, an inmate such as Henry has no constitutional right to unrestricted telephone use. *See, e.g., Pitsley,* 2000 WL 362023, at *4; *Fisher,* 1995 WL 608379, at *7; *Bellamy,* 692 F.Supp. at 214.

**\*3** Here, Henry does not allege that he was stripped of alternate methods of communication. Accordingly, he has failed to demonstrate that the prison's imposed time limits on telephone use deprived him of a constitutional right, and his complaint should therefore be dismissed on this basis alone.

## C. Henry Has Failed to Allege the Personal Involvement of Defendants

Henry has also failed to assert that Defendants were personally involved in depriving him of his constitutional rights. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Schomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009) (citation and internal quotation marks omitted). Therefore, a complaint that fails to allege how a specific defendant violated the law or injured the plaintiff should be dismissed. *See, e.g., Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998). Because a defendant's conduct must be a proximate cause of the alleged Section 1983 violation, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *De Jesus v. Albright,* No. 08 Civ. 5804(DLC), 2011 WL 814838, at *5 (S.D.N.Y. Mar. 9, 2011) (quoting *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003)) (internal quotation marks omitted).

Here, Henry names Cuomo and Davis as Defendants, but his complaint contains no allegations as to how they participated in the alleged deprivation of his constitutional rights. Moreover, Henry does not allege any conduct that could plausibly state a claim that Defendants, as supervisory officers, failed to remedy the alleged violation or created or allowed the continuance of the phone policy that allegedly caused it. Accordingly, Henry's complaint should be dismissed on this ground as well. *See, e.g., Dargan v. Heath,* No. 10 Civ. 7360(PKC), 2011 WL 1795814, at *4 (S.D.N.Y. May 4, 2011) (plaintiff failed to allege personal involvement where complaint only referred to defendants in caption); *Abascal v. Jarkos,* 357 F. App'x 388, 390 (2d Cir.2009) (summary order) (affirming district court's *sua sponte* dismissal of Section 1983 claims in part because

plaintiff failed to allege defendants' personal involvement); *Wright v. Nunez,* 950 F.Supp. 610, 611 (S . D.N.Y.1997) (dismissing *sua sponte* Section 1983 claims because prisoner failed to allege personal involvement of warden of prison and commissioner of DOC).

### D. Henry Cannot Recover Compensatory Damages Because He Does Not Allege Physical Harm

Henry does not allege that he suffered any physical injury as a result of the incidents he complains about and therefore cannot recover compensatory damages. The Prison Litigation Reform Act (the "PLRA") bars prisoners from bringing a civil action "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Although "physical injury" is not statutorily defined, the injury an inmate claims must be more than *de minimis* to meet the requirements of the PLRA. *See, e.g., Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Accordingly, a prisoner cannot recover compensatory damages for mental or emotional injury without a showing of physical injury. *See, e.g., Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002).

**\*4** In this case, Henry contends that he suffered "embarrassment," "lost business," and "cruel and unusual punishment." (Compl.¶ III). His complaint makes no suggestion that he suffered any physical injury, however. [7] In the absence of such allegations, Henry's complaint should also be dismissed insofar as he seeks compensatory damages.

### E. Defendants are Entitled to Qualified Immunity Because Their Alleged Actions did Not Violate Clearly Established Constitutional Rights

The complaint should be dismissed on one additional ground: Defendants are entitled to qualified immunity from suit. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). An official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that 'every reasonable official would have understood that what he is doing violates that right.' " *Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Here, as discussed in Part II.B, *supra,* the contours of an inmate's constitutional right, if any, to use the telephone are not clearly established. Thus, even if Defendants were personally involved in an alleged violation of Henry's rights, there would be no way for them to know that their actions violated such rights. Indeed, any such acts on the part of Defendants were in compliance with the Board of Correction Minimum Standards mandating a six-minute minimum on inmate telephone calls. *See Rules of the City of New York, supra.* The complaint should therefore be dismissed because Defendants are entitled to qualified immunity. *See, e.g., Smart v. City of N.Y.,* No. 08 Civ. 2203(HB), 2009 WL 862281, at *8 (S.D.N.Y. Apr. 1, 2009) (granting summary judgment on inmate's use of telephone claim on qualified immunity grounds "[b]ecause the contours of an inmate's right to use of the telephone are not clearly established").

### F. The Complaint Should be Dismissed With Prejudice Because Repleading Would be Futile

The complaint should be dismissed with prejudice because repleading would not cure its substantive problems. A complaint should be dismissed without prejudice if the pleading, " 'liberal[ly] read[ ],' suggests that the plaintiff has a claim that [ ]he has inadequately or inartfully pleaded and that [ ]he should therefore be given a chance to reframe." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (alterations in original) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). If a complaint, however, has substantive problems and "a better pleading will not cure [them]," "[s]uch a futile request to replead should be denied." *Id.* (citing *Hunt v. Alliance N. Am. Gov't Income Trust,* 159 F.3d 723, 728 (2d Cir.1998)).

**\*5** As discussed in Parts II.B and II.C, *supra,* the prison's time limit on telephone access does not deprive Henry of his constitutional rights, and even assuming for argument's sake that it does, Henry has failed to allege that Defendants were personally involved in any deprivation. Therefore, because the complaint here is not simply "inadequately or inartfully pleaded," but contains substantive problems such that an amended pleading would be futile, it should be dismissed with prejudice. *See Cuoco,* 222 F.3d at 112; *see also Richardson v. Hillman,* 201 F.Supp.2d 222, 230–31 (S.D.N.Y.2002) (dismissing with prejudice Section 1983 claims where plaintiff failed to allege defendants' personal involvement); *Pollack v. Nash,* 58 F.Supp.2d 294, 300–01 (S.D.N.Y.1999) (same); *Hudson v. Clark,* 319 F.Supp.2d 347, 351 (N.D.N.Y.2004) (Section 1983 claim dismissed *sua*

*sponte* and with prejudice given that plaintiff failed to allege personal involvement).

### III. CONCLUSION

For all these reasons, I recommend that the Court grant Davis' motion to dismiss with prejudice and dismiss Henry's claim against Cuomo *sua sponte* with prejudice.

### *PROCEDURE FOR FILING OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Crotty. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

---

**Footnotes**

1    Pursuant to Fed.R.Civ.P. 25(d), Cuomo, who currently serves as governor of New York, has been substituted for former governor David Patterson, against whom this action was originally brought.

2    Henry does not specify the time limit for telephone use in these incidents that caused his phone calls to be cut short. The Board of Correction Minimum Standards, of which the Court can take judicial notice, *see, e.g., Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *Evans v. N.Y. Botanical Garden,* No. 02 Civ. 3591(RWS), 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002) ("A court may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment."), states that "[t]he Department [of Corrections] shall allow telephone calls of at least six minutes in duration." *Rules of the City of New York,* Title 40, Chapter 1, § 1–10(e), *available at* http:// www.nyc.gov/html/boc/downloads/pdf/minimum_standards.pdf.

3    With respect to his phone privileges, Henry seeks "10 minutes instead of six minutes and 20 minutes instead of 15 minutes and every two or three hours reactivated."(Compl.¶ V).

4    Cuomo did not formally respond to Henry's complaint. Instead, in response to the Court's order dated February 28, 2011, the Office of the Attorney General for the State of New York suggested in a letter to the Court dated March 4, 2011 that the Court dismiss the claims against the governor *sua sponte* pursuant to 28 U.S.C. § 1915 because "[n]o conduct or condition involving any State actor ... is alleged in the Complaint," and noting that service of the complaint had not been effected as to the governor. (Letter, dated March 4, 2011 (Dkt. No. 20)).

5    A court should construe pleadings brought by pro se litigants liberally. *See Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (citing *Weixel v. Bd. of Educ. of N.Y.,* 287 F.3d 138, 146 (2d Cir.2002)). However, a court should not hesitate to dismiss a *pro se* complaint if it fails altogether to satisfy the pleading standard. *See, e.g., Barmapov v. Barry,* No. 09 Civ. 03390(RRM) (RML), 2011 WL 32371, at *2 (E.D.N.Y. Jan. 5, 2011) (citing *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997)).

6    Davis has not moved to dismiss on exhaustion grounds. Henry alleges in his complaint that he filed a grievance before filing this action, and that his grievance resulted in a transfer. (Compl.¶ IV, E). He further alleges that he filed another grievance and "spoke to DOC supervisors to take [him] to [a] coordinator but they refused."(*Id.*). The Court assumes, without deciding, that Henry's claims are exhausted for purposes of resolving the pending motion. *See, e.g., Torres v. Carry,* 672 F.Supp.2d 338, 344–45 (S.D.N.Y.2009).

7    Henry appears to acknowledge in his opposition that he has not suffered any physical harm. He alleges only that Defendants "neglect the social and emotional well-being of DOC[s] [inmates]," without mentioning any physical harm. (Opp'n 4, ¶ 3).

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3439179
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric JOHNSON, also known
as Debah J. Smith, Plaintiff,

v.

Ayisha ENU, Physician, Hudson Correctional
Facility; Peter Bogarski; Reuntenaur, Jane Doe;
McCoy, John Doe; H.M. Miles; Joyce Duke; Wolff,
John Doe; Rother, Jane Doe; George, John Doe;
Testo, John Doe; Peter Behrle; M. Graziano;
Michael Ambrosino; Philip Heath; T. Mahar, Senior
Correction Counselor, Greene Correctional Facility;
T. Gaines; Caulfield, John Doe; John Doe # 1; John
Doe # 2; Karen Meicht, Nurse, Hudson Correctional
Facility; Winnie, Lieutenant, Hudson Correctional
Facility; and Coffey, John Doe, Defendants. [1]

No. 08–CV–158 (FJS/DRH).  |  July 13, 2011.

**Attorneys and Law Firms**

Eric Johnson, c/o Debah J. Smith, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Dean J. Higgins, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**Opinion**

### REPORT–RECOMMENDATION AND ORDER [2]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* Eric Johnson ("Johnson"), formerly an
inmate in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action pursuant
to 42 U.S.C. §§ 1983 and 1985 alleging that defendants,
twenty-one DOCS employees, violated his constitutional
rights. Am. Compl. (Dkt. No. 64). Presently pending is
defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. Dkt. No. 119.Johnson has not opposed this
motion. For the following reasons, it is recommended that
defendants' motion be granted in its entirety.

**I. Failure to Respond**

Johnson did not oppose defendants' motion. "Summary
judgment should not be entered by default against a pro se
plaintiff who has not been given any notice that failure to
respond will be deemed a default."*Champion v. Artuz,* 76 F.3d
483, 486 (2d Cir.1996). Defendants and the Court provided
such notice here. Dkt. Nos. 119–14, 120.Despite this notice,
Johnson failed to respond. "The fact that there has been no
response to a summary judgment motion does not ... mean
that the motion is to be granted automatically ."*Champion,* 76
F.3d at 436. Even in the absence of a response, a defendant
is entitled to summary judgment only if the material facts
demonstrate his or her entitlement to judgment as a matter of
law. *Id.;* Fed.R.Civ.P. 56(c).

Because Johnson has not responded to raise any question of
material fact, the facts-but not the legal conclusions-set forth
in defendants' Rule 7.1 Statement of Material Facts (Dkt. No.
119–1) [hereinafter "Defs.' 7.1 Statement"] are accepted as
true. *See, e.g., Onanuga v. Pfizer, Inc.,* 369 F.Supp.2d 491,
493 n. 1 (S.D.N .Y.2005) (citing *Holtz v. Rockefeller & Co.,
Inc.,* 258 F.3d 62, 72 (2d Cir.2001); *Lopez v. Reynolds,* 998
F.Supp. 252, 256 (W.D .N.Y.1997); *see also* N.D.N.Y.L.R.
7.1(a)(3) (*"The Court shall deem admitted any facts set forth
in the Statement of Material Facts that the opposing party
does not specifically controvert."*) (emphasis in original).

Finally, as to those facts not contained in defendants' 7.1
statement, the Court will assume for purposes of this motion
that plaintiff's version of those facts is true, as plaintiff is
entitled to the benefit of all inferences at this stage. *Wright v.
Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). To be sufficient
to create a factual issue for purposes of a summary judgment
motion, an affidavit (or verified complaint) must, among
other things, be based on "personal knowledge." Fed.R.Civ.P.
56(c)(4) ("An affidavit or declaration used to support or
oppose a motion must be made on personal knowledge, set
out facts that would be admissible in evidence, and
show that the affiant or declarant is competent to testify on
the matters stated."). While the amended complaint is not
notarized as was the original complaint (Dkt. No. 1), the
amended complaint contains a statement above Johnson's
signature stating, "I declare under penalty that the foregoing
is true and correct."Am. Compl. at 31; Compl. at 21. Both
verifications suffice to require that these documents be
considered in opposition to the pending motion as long as the
other requirements of Rule 56(c)(4) are satisfied, including

personal knowledge, admissibility, and competency. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

## II. Background

**\*2** In February 2005, while housed at Ulster Correctional Facility, Johnson was diagnosed with Hepatitis B. Defs.' 7.1. Statement ¶ 18. He was transferred to Hudson Correctional Facility ("Hudson") on March 15, 2006.*Id.* ¶ 19.Dr. Ayisha Enu, a defendant herein, reviewed Johnson's medical records upon his arrival at Hudson. *Id.* ¶ 22.On March 22, Hudson medical staff performed additional blood tests. *Id.* ¶ 24.Five days later, on March 27, Johnson informed Dr. Enu of his hepatitis diagnosis. *Id.* ¶ 23.

Dr. Enu received the results from Johnson's blood tests on September 1. *Id.* ¶ 25.The tests revealed that Johnson was HbeAg negative and anti-HBe positive, indicating that he had a variant of Hepatitis B and likely had it "for a very long time.".*Id.* ¶¶ 26–27.Dr. Enu then ordered liver function tests and counseled Johnson on the disease and treatment options. *Id.* ¶ 28.Johnson's liver function and Hepatitis B viral load tests were drawn on August 30. *Id.* ¶ 29.Those tests revealed elevated liver enzyme levels as compared to tests conducted earlier in the year. *Id.* ¶ 30.Dr. Enu and Johnson discussed the results on September 5. *Id.* ¶ 31.Johnson stated that he did not believe the results because his liver function tests were always normal. *Id.* Dr. Enu then ordered a repeat of the liver function and Hepatitis B viral load tests. *Id.* ¶ 32.

On September 11, 2006, the results from the Hepatitis viral load drawn on August 30, 2006, "revealed a very high [viral load] count."Defs.' 7.1 Statement ¶ 33. Four days later, on September 15, Dr. Enu made arrangements for Johnson to see Dr. Rodgers, a gastroenterology specialist at Albany Medical Center Hospital, to discuss Hepatitis treatment. *Id.* ¶ 34.Samples for liver function and Hepatitis B tests were drawn again on September 20, 2006.*Id.* ¶ 35.Those tests, once again, revealed elevated enzyme levels. *Id.* Dr. Enu saw Johnson again on October 26. *Id.* ¶ 36.Dr. Enu ordered Hepsera for Johnson, and they discussed the blood and liver function testing regiment that Johnson would undergo once he started treatment. *Id.*

After starting treatment on October 26, Johnson researched Hepsera and learned of the complications that could develop if he were to ever stop taking the drug. Am. Compl. at 9; *see*

*also* Defs.' Ex. B (Dkt. No. 119–4) at 263.Johnson returned to medical staff on November 3, 2006, because he had questions about the medication. Defs.' 7.1 Statement ¶ 37. Dr. Smith, who was covering for Dr. Enu, explained to Johnson the need for follow up and compliance because Hepatitis B is a chronic disease and that his liver function tests showed abnormal enzyme levels. *Id.* Johnson returned to the medical department on November 16 because he was concerned about Hepsera's side effects. Am. Compl. at 9; *see also* Defs.' Ex. B at 258. Nurse Peter Bogarski, a defendant herein, allegedly ignored Johnson's questions and asked that he be removed from the examination room. *Id.*

**\*3** Johnson requested permission from his instructor to file a grievance after returning to his work assignment. Am. Compl. at 9. He went to the library to file a grievance directly with Grievance Officer T. Testo, a defendant herein, but Testo was not present. *Id.* at 9–10.Johnson took a grievance form and attempted to return to his assignment but he was stopped by Correction Officer Rother, also a defendant herein. *Id.* at 10.Rother conducted a pat and frisk of Johnson and told him that he could not file a grievance in there and to return to his assignment. *Id.* Correction Sergeant John Doe Wolfe, [3] another defendant herein, escorted Johnson back to his assignment.*Id.* Wolfe then questioned Instructor Deer about Johnson's "movement." *Id.* Deer stated that he assumed that Johnson was returning to the medical unit.*Id.* Johnson received a misbehavior report. *Id.*

A CT scan was performed on Johnson at Albany Medical Center Hospital on November 25, 2006. Defs.' 7.1 Statement ¶ 38. On November 28, Dr. Enu learned that the scan revealed a mass on the tail of Johnson's pancreas. *Id.* ¶ 39.Johnson had an MRI on December 18. *Id.* ¶ 40.Consistent with the results of the earlier CT scan, the MRI also showed a mass on the tail of Johnson's pancreas. *Id.* ¶ 44.The differential diagnosis of the MRI "include[d] islet cell tumor, metatastic disease, or carcinoid."*Id.* ¶ 45;*see also* Defs.' Ex. B at 150.

Nurse Karen Meicht, a defendant herein, examined Johnson on December 13, 2006, after Johnson complained of stomach problems. Am. Compl. at 11; *see also* Defs.' Ex. B at 256. Johnson asked when he would see Dr. Rodgers again. Am. Compl. at 11. Meicht told Johnson that he would have to wait until the test results were ready for review. *Id.; see also* Defs.' Ex. B at 256. Johnson then received some stomach fiber and left the medical department. Am. Compl. at 11.

Dr. Enu referred Johnson to Dr. Nigam, a surgeon at Albany Medical College, for a consultation. Defs.' 7.1 Statement ¶ 46. Dr. Nigam's first examined Johnson on January 5, 2007, and Johnson agreed to remove the mass on the pancreas surgically. Nigam Aff. (Dkt. No. 94–2) ¶¶ 9–10. Four days later, Johnson claims to have written a letter to Bogarski, "requesting further clarity on the proposed surgery."Am. Compl. at 9. On January 30, 2007, the day of the scheduled surgery, Johnson expressed his reluctance to proceed with the surgery and wanted more information on other options, including waiting or a biopsy. Nigam Aff. ¶ 11. Dr. Nigam warned Johnson that there was a "small risk" that the mass could develop into cancer by waiting. Id. Johnson decided not to have the surgery, and on April 5, 2007, Dr. Nigam wrote an order for a biopsy of the pancreas with Dr. Sood. Id. ¶ 12; Defs.' 7.1 Statement ¶ 49.

Johnson met with defendants Enu, Bogarski, Meicht and Nurse Jane Doe Reuteneaur [4] on February 2, 2007, to discuss follow-up surgical treatment. Am. Compl. at 14; *see also* Defs.' Ex. B at 88. Johnson claims that Enu acted as if the surgery were an elective procedure and focused on the mass on the chest instead of the mass on the pancreas. Am. Compl. at 14. Reuteneaur allegedly told Johnson that there was nothing that medical staff could do because Johnson refused the surgery. Id. Following this meeting, Hudson Deputy Superintendent for Security H.M. Miles, a defendant herein, allegedly removed Johnson from the outside community work crew, "implying" that Johnson had caused a disturbance. Am. Compl. at 14.

 **\*4** On March 1, 2007, Johnson was brought to the medical building after complaining of a "spinning headache." Defs.' 7.1 Statement ¶ 61; Am. Compl. at 15. Dr. Enu recommended that Johnson be evaluated at Columbia Memorial Hospital because the Hudson emergency medical staff leaves at 10:00PM, and Johnson's "new symptom" might require emergency medical staff. Defs.' 7.1 Statement ¶¶ 62–64. Johnson refused to go to the private hospital. Id. ¶ 66.Johnson was then sent to Coxsackie Correctional Facility's Regional Medical Unit ("Coxsackie RMU") for observation. Id. ¶ 68.Before returning to Hudson on the next day, Coxsackie RMU medical staff allegedly told Johnson that there was no reason for the transfer. Am. Compl. at 16.

Upon Johnson's return to Hudson on March 2, Meicht issued Johnson a misbehavior report, accusing Johnson of lying, providing false information, and failing to report an illness. Am. Compl. at 16; *see also* Defs.' Ex. D (Dkt. No. 119–6) at

4. Correction Lieutenant Winnie, a defendant herein, found Johnson guilty. Defs.' Ex. D at 1. Johnson received thirty-days in keeplock, and he had recreation, package, commissary, and phone privileges suspended for fifteen days. Id.

Johnson learned on March 15, 2007, that Dr. Enu requested a change in Johnson's medical level so that he could be transferred. Id. at 17.Johnson claims that the real reason for the transfer was because he was "argumentative and problematic." Id. Johnson also wrote to Bogarski on March 15 to request a "reevaluation of the canceled pancreatic surgery."Am. Compl. at 17. Johnson did not receive a response. Id.

Johnson was transferred to Greene Correctional Facility ("Greene") on March 21, 2007. Defs.' 7.1 Statement ¶ 52. Upon arriving at Greene, Johnson wrote to Greene Superintendent Peter Behrle, a defendant herein, requesting information on the transfer. Am. Compl. at 18. Greene Deputy Superintendent for Security M. Graziona, also a defendant herein, responded on April 2, 2007, and told Johnson that he was transferred for unspecified medical reasons and that he would return to Hudson once his medical needs were met. Id. Also on April 2, Johnson spoke with Physician John Doe Caulfield, another defendant herein, about the reason for the transfer and biopsy. Id. Johnson claims that Caulfield "made it appear as if [Johnson] were requesting the needle biopsy as an elective procedure," and that it took Caulfield two months to order the biopsy despite the "urgency of [the] condition." Id.

Graziano allegedly wrote to Johnson on June 17, 2007, to inform Johnson that his medical condition was changed, permitting him to transfer out of Greene. Am. Compl. at 19. Three days later, Johnson claims to have received a letter from Correction Counselor T. Gaines, a defendant herein, stating that Johnson's transfer was awaiting approval from the central office in Albany. Id.

 **\*5** On June 6, 2007, while at Greene and under the care of Dr. Sood, Johnson underwent an upper endoscopy ultrasound in an attempt to biopsy the pancreatic mass. Defs.' 7.1 Statement ¶¶ 50–51. The pancreatic mass, however, could not be visualized. Id. ¶ 51.On September 7, 2007, under the care of Dr. Doreen Smith at Greene, Johnson had a CT scan. Id. ¶ 53.This scan showed a stable pancreatic tail mass that had been stable for at least ten months. Id. ¶ 53.Johnson also received a letter on September 7 from Behrle, stating that the transfer back to Hudson was now permissible. Am.

Compl. at 19. But two weeks later, on September 21, Johnson received a letter from Gaines, stating that the central office denied the transfer as Greene was the proper facility because of Johnson's medical condition. *Id.* at 20.Greene Deputy Superintendent Michael Ambrosino, also a defendant herein, allegedly sent Johnson a letter on September 24 to inform him that his "medical level" was changed due to a hold placed on Johnson by the parole board on March 15, 2007.*Id.*

While at Greene, Johnson filed two grievances on September 22, 2007. Am. Compl. at 23. One grievance was about the failure to honor his request to speak with Caulfield. *Id.* The other was related to the circumstances of Johnson's transfer to Greene in March 2007. *Id.* Johnson was allegedly told that transfers were not grievable and that the grievance would not be filed. *Id.* Johnson alleges that it was Defendants John Doe # 1 [5] and John Doe # 2 who refused to file these grievances. *Id.* On October 3, 2007, Senior Correction Counselor Tim Mahar, another defendant herein, wrote to Johnson to inform him that an "unscheduled transfer [has] been submitted." Am. Compl. at 20. Johnson received a letter on October 16 from Greene Deputy Superintendent for Programs Philip Heath, also a defendant herein, stating that Johnson was "to remain at Greene." *Id.*

Johnson returned to Hudson on February 2, 2008. Defs.' 7.1 Statement ¶ 56. Dr. Enu continued to work with Johnson in conjunction with Dr. Nigam and Dr. Rodgers. [6] *Id.* ¶ 52.Dr. Enu saw Johnson on March 28 and April 9, 2008, to discuss the elevated tumor markers. *Id.* ¶ 57.A CT of the liver was scheduled to be performed on May 12, 2008, because of an elevated tumor marker located next to the Hepatic Vein. *Id.* ¶ 58.Johnson, however, refused the procedure until he had an opportunity to discuss it with his family. *Id.*

On April 28, 2008, Johnson was transferred to Coxsackie RMU for a medical trip. Defs.' 7.1 Statement ¶ 5; Am. Compl. at 22. Medical Transport Officer John Doe Coffey, a defendant herein, secured Johnson into a transport vehicle with handcuffs, chains, and leg irons. Defs.' 7.1 Statement ¶ 5. Johnson alleges that he was fondled in the "groin area" by Coffey during this process. Am. Compl. at 22. Johnson claims that this was the third such incident. *Id.* Johnson and Correction Sergeant Wolfe discussed this incident several days later, and Wolfe said that he would conduct an investigation. *Id.* Johnson was scheduled for a medical trip on May 12, 2008. *Id.* He requested that Coffey not be the transport officer for that trip. *Id.* On May 12, however, Coffey was the transport officer, but Wolfe supervised the process.

*Id.* Johnson complained that the shackles around his ankles were too tight but Wolfe said that Johnson had enough room. *Id.*

**\*6** Dr. Enu had another appointment to discuss the liver biopsy with Johnson on July 30, 2008. *Id.* at ¶ 59.Johnson refused the procedure. *Id.* at 55.This appointment was the last time that Dr. Enu examined Johnson. *Id.* ¶ 54.Johnson was transferred to Greene on August 15, 2008. *Id.* ¶ 60.

### III. Discussion

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion. *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law.*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.. Zenith Radio Corp.,* 475 U.S. 574, 585–86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Id.* at 586.It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.*Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-moving party special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed "liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our

cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

*Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,...* a court is obliged to construe his pleadings liberally.") (citations omitted).

### B. Eleventh Amendment Immunity

**\*7** The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796 (S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Johnson has named defendants in their official capacities as DOCS employees. *See* Am. Compl. at 2–6. Although defendants have not moved to dismiss on Eleventh Amendment grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e) (2)(B)(iii).

### C. Personal Involvement

Personal involvement is an essential prerequisite for § 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only

if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7]

### 1. McCoy, Duke, and Testo

Besides naming McCoy, Duke, and Testo in the amended complaint, Johnson has made no allegations that those defendants engaged in the alleged unconstitutional conduct. Accordingly, those defendants should be granted summary judgment.

### 2. Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines

Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines either received letters from Johnson or responded to Johnson when he inquired as to why he was transferred to Greene from Hudson. *Id.* at 18–20. Without more, Johnson has not alleged the personal involvement of these defendants in any alleged unconstitutional conduct. Nor does Johnson allege that he notified these defendants of the alleged unconstitutional conduct. He merely inquired into reasons for the transfer. *See id.*

Further, even if Johnson alleged unconstitutional conduct in these letters, the "mere receipt of letters from an inmate by a [supervisory official] regarding [unconstitutional conduct] is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at \*28, 2010 WL 681323, at \*10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at \*22, 2008 WL 4527601, at \*7 (N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

**\*8** Accordingly, these defendants should be granted summary judgment.

### D. Pendent State Law Claims

To the extent that Johnson's claims may be construed as pendent state law claims alleging lack of informed consent prior to treatment, such claims must fail. Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended, herein, however, that defendants be granted summary judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims. Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations are accepted. *See* 28 U.S.C. § 1367(c)(3). Such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail. In order to state an actionable claim for failure to provide informed consent:

> plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

*Foote v. Rajadhyax,* 702 N.Y.S.2d 153, 153 (N.Y.2000) (citations omitted). In this case, there is nothing in the record to show that the medical treatment that any of the defendants provided were the proximate cause of Johnson's injuries. In fact, there is nothing to show that Johnson was injured at all.

### E. Deliberate Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*9** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. As such, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or

malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, defendants do not appear to challenge the fact that Hepatitis B and its potential complications or the resulting malignancies in Johnson's pancreas were serious medical needs. Rather, defendants contend that they were not deliberately indifferent.

### 1. Dr. Enu

Johnson contends that Dr. Enu was not receptive enough to a biopsy when the liver tumor was first discovered in 2006, refused to follow the advice of specialists who recommend a biopsy, and failed to refer Johnson to an oncologist. Am. Compl. at 25–26.

First, mere disagreements on treatment between a prison inmate and his doctor do not rise to the level of a constitutional violation. *Sonds,* 151 F.Supp.2d at 312. Likewise, even if other doctors, as Johnson argues, disagreed with Dr. Enu's prescribed treatment, Dr. Enu is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Dr. Enu's judgment was misguided or negligent. *See Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

Also, Johnson's refusal of the prescribed treatment further negates allegations of deliberate indifference. *See Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, M.J.) (citing *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003)). On May 14, 2008, Johnson refused a CT of his liver to evaluate whether a mass had become cancerous or spread. Defs.' Ex. B at 36–38. He refused the CT scan once again on June 19, 2008. *Id.* at 32–34.Finally, on July 30, 2008, Johnson refused a liver biopsy. *Id.* at 29.While Johnson might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice. *Chance,* 143 F.3d at 703.

Finally, a review of Johnson's medical records fails to reveal any indication or suggestion that Dr. Enu was deliberately indifferent to Johnson's serious medical needs. Upon Johnson's transfer to Hudson on March 15, 2006, Dr. Enu reviewed Johnson's medical records. Defs.' Ex. B at 273.

Dr. Enu conducted a physical examination of Johnson and learned of his Hepatitis B diagnosis approximately a week and a half later on March 27. *Id.* at 272.Dr. Enu ordered blood and liver function tests to evaluate Johnson's condition and repeated the tests after Johnson refused to believe the results. Defs.' Ex. B at 269–70. Dr. Enu also referred Johnson to outside specialists or other medical personnel when Hudson's facilities would be unable to provide assistance. *Id.* at 164 (consultation notes of Dr. Nigam reference referral from Dr. Enu), 176–80 (transfer to Coxsackie RMU because Johnson needed emergency care), 268 (ambulatory health record noting referral to a gastroenterology specialist). There is no indication that Dr. Enu was deliberately indifferent to Johnson's medical needs during the eighteen-month period that Johnson was under Dr. Enu's care.

**\*10** Accordingly, defendants' motion as to Dr. Enu should be granted on this ground.

### 2. Dr. Caulfield

Johnson asserts a delay in medical treatment claim against Dr. Caulfield. Am. Compl. at 18. A "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" "*Thomas v. Nassau County Corr. Ctr,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas,* 288 F.Supp.2d at 339 (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)). Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

The record is devoid of any facts demonstrating that Dr. Caulfield delayed the procedure as a form of punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery. Johnson accuses Dr. Caulfield of waiting two months before ordering a needle biopsy. Am. Compl. at 18. Johnson claims that Dr. Caulfield acted as if the procedure were elective, and he appeared to have no knowledge of Dr. Nigam's "order for a needle biopsy."

*Id.* Johnson also believed that the procedure was required immediately because of the "urgency of [his] condition." *Id.* There is no indication, however, that the needle biopsy was an urgent procedure. Dr. Nigam merely stated that delaying pancreatectomy and spleenectomy in favor of a biopsy would mean a "small risk of cancer." Defs.' Ex. A (Dkt. No. 119–3) at 38.Moreover, Johnson has failed to proffer any evidence that his condition deteriorated or became worse as a result of the delay.

Accordingly, Dr. Caulfield should be granted summary judgment on to this ground.

### 3. Bogarski

Bogarski, a nurse administrator, is accused of ignoring Johnson's questions and concerns about Hepsera, and removing Johnson from the examination room for no reason on November 17, 2006. Am. Compl. at 9. An ambulatory health record signed by Bogarski and dated November 17, 2006, indicates that Johnson became "verbally upset" and "uncooperative" as an "inquisition into [Johnson's] health history [was] attempted."Defs.' Ex. B at 258. Johnson "was asked to leave the medical office," and security was notified. *Id.* 6.

Johnson also accuses Bogarski of ignoring two letters where Johnson inquired about the need for pancreatic surgery and a reevaluation for the canceled pancreatic surgery. Am. Compl. at 9, 17. On January 9, 2007, four days after Johnson's surgical consultation with Dr. Nigam, Johnson sent a letter to Bogarski, "requesting further clarity on the proposed surgery."*Id.* at 9. Then on March 17, 2007, approximately a month and a half after the surgery was canceled, Johnson wrote to Bogarski to request a reevaluation of the canceled surgery. *Id.* at 17.It does not appear that Bogarski responded to either of these letters. *See id* .

 **\*11** These allegations fail to establish deliberate indifference on the part of Bogarski. There is no indication that Johnson failed to receive medical care and treatment for his conditions after Bogarski asked him to leave the medical department on November 17, 2006, or after Bogarski allegedly ignored Johnson's letters. Johnson continued to receive medical evaluations and monitoring of his liver conditions by medical staff. *See generally* Defs.' Ex. B.

Accordingly, defendants should be granted summary judgment on this ground.

### 4. Reuteneaur

Reuteneaur, a nurse, was allegedly present at a February 2, 2007, medical appointment that Johnson had with Dr. Enu. Am. Compl. at 14; see also Defs.' Ex. B at 88 (ambulatory health record signed by Dr. Enu showing a medical consult on February 2, 2007). After Dr. Enu told Johnson that he would receive a biopsy when the need for one arose, Johnson asked what his treatment would be should his condition become serious. Am. Compl. at 14. Reuteneaur allegedly told Johnson that "there would be nothing [that medical staff] could do" because Johnson refused the surgery.

While Johnson may contend that this amounted to deliberate indifference, Johnson has proffered no facts to support this conclusory statement. Moreover, a review of the record further belies a deliberate indifference claim as Johnson continued to receive medical evaluations to monitor the progression of his disorders. *See generally* Defs.' Ex. B. Accordingly, summary judgment as to Reuteneaur should be granted.

### 5. Meicht

Nurse Meicht examined Johnson on December 13, 2006, because Johnson was experiencing stomach discomfort. Am. Compl. at 11; Defs .' Ex. B at 256. Johnson received stomach fiber before leaving. Am. Compl. at 11. Meicht also made an appointment for Johnson to see Dr. Enu. Defs.' Ex. B at 256. Without more, there is nothing to show that Meicht acted with deliberate indifference to Johnson's medical needs. Accordingly, Meicht should be granted summary judgment on this ground.

### F. Misbehavior Report and Keeplock Confinement

The amended complaint alleges that Meicht issued a false misbehavior report against Johnson on March 2, 2007. Am. Compl. at 16. Johnson possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," but he is still entitled "not to be deprived of a protected liberty interest without due process of law."*Freeman v. Rideout,* 808

F.2d 949, 951 (2d Cir.1986). Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted ..., an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections ....").

**\*12** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. See *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Also, due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F .3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with confinement in keeplock [8] or a special housing unit [9] alone is insufficient to establish an atypical and significant deprivation.

Hearing Officer Winnie sentenced Johnson to thirty-days in keeplock confinement. Defs.' Ex. D at 1. Winnie also suspended Johnson's recreation, package, commissary, and phone privileges for fifteen days. *Id.* District courts have noted that "decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin."Auleta v. LaFrance,* 233 F.Supp.2d 396, 398 (N.D.N.Y.2010) (citing *Williams v. Keane,* No. Civ. 95–0379(AJP)(JGK), 1997 WL 527677, at \*6–8 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (citing cases)). Moreover, "the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law."*Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) (citing *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998), citing in turn *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Thus, Johnson did not have a protected liberty interest.

Even if Johnson had a protected liberty interest, he received a fair and impartial hearing. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are .... " *Wolff,* 418 U.S. at 564 (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges ...."*Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. *Id.* at 193.

**\*13** Here, the misbehavior report was delivered on March 2, 2007, and the hearing was held on March 8, 2006, giving Johnson six days to prepare a defense. Defs.' Ex. D at 1. Johnson also had the opportunity to present a defense, and he declined to call any witnesses. *Id.* at 2–3.Accordingly, defendants should be granted summary judgment 0n this claim.

### G. Interference with Grievance Process

Johnson accuses Rother, John Doe # 1, and John Doe # 2 of interfering with grievances that he had filed. Am. Compl. at 10, 23. The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. See *370 Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can

directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F. Su pp.2d 385, 390 (W.D.N.Y.1998).

Accordingly, it is recommended that defendants be granted summary judgment on this ground.

### H. Sexual Harassment

Johnson claims that he was fondled in the "groin area" by Coffey on three separate occasions. Am. Compl. at 22. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. It is well settled that the "unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie,* 105 F.3d 857, 861 (2d Cir.1997) (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In order to prove a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective inquiry. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). A prison official violates the standards of the Eighth Amendment when (1) the alleged punishment is "objectively, sufficiently serious" and (2) he or she acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because sexual abuse by a prison official with a culpable state of mind may constitute a violation of contemporary standards of decency and cause severe harm to the prisoner, such allegations may be cognizable under the Eighth Amendment. *Boddie,* 105 F.3d at 861 ("[S]evere or repetitive sexual abuse of an inmate ... can be 'objectively, sufficiently serious.' "); *see also Farmer,* 511 U.S. at 834–35 ("[The] rape of one prisoner ... serves no legitimate penological objective, any more than it squares with evolving standards of decency.") (internal quotation marks and citations omitted).

*14 On the other hand, sexual harassment violates the Eighth Amendment only if the harm is "objectively, sufficiently serious." *Boddie,* 105 F.3d at 861. The Second Circuit has held that a small number of isolated incidents of alleged sexual abuse, including verbal harassment, may not suffice to meet the objective prong of the test or involve a harm of a federal constitutional level. *Id.* Further, a plaintiff

must demonstrate that an incident or series of incidents were sufficiently egregious to be "objectively, sufficiently serious" to the point where such actions resulted in the denial of "the minimal civilized measure of life's necessities" and posed a substantial risk of serious harm. *Id.*; *Trammell,* 338 F.3d at 161. The Supreme Court has also held that a plaintiff must prove that a defendant used force "maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995 (1992).

Coffey is a corrections officer, and his responsibility includes serving as a "transport officer for prisoners being taken to various places away from Hudson." Coffey Decl. (Dkt. No. 119–11) ¶¶ 1, 5. While securing a prisoner for transport, departmental policy requires securing the prisoner in a particular way, including placing a chain around the prisoner's waist. *Id.* ¶ 9. Occasionally, an "extra length chain is positioned so that it comes in contact with the prisoner's groin and waist area." *Id.* ¶ 10. Coffey states that his hands never came in contact with Johnson's groin area on the day in question. *Id.* ¶ 15. A DOCS investigation concluded that Johnson's allegations against Coffey were without merit. *See* Defs.' Ex. E (Dkt. No. 119–7) at 11–21.

Even if Coffey's hands had come into contact with Johnson's groin area while securing Johnson for transport, Johnson's allegations are insufficient to articulate a claim of constitutional dimensions. In *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touches his called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d at 859–61. The Second Circuit concluded that no single incident was "severe enough to be 'objectively, sufficiently serious,' [n]or were the incidents cumulatively egregious in the harm they inflicted" to "involve harm of federal constitutional proportions as defined by the Supreme Court." *Id.* at 861; *see also Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002) (allegations that staff member asked plaintiff to have sex with her and to masturbate in front of her and other staff members "do not even rise to the level of those made by the plaintiff in *Boddie,* [and] do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); *Excell v. Fischer,* 08–CV–945, 2009 WL 3111711, at *6–7 (N.D.N.Y. Sep. 24, 2009) (Hurd, J., adopting Report–Recommendation on de novo review) (claim that officer grabbed and squeezed plaintiff's penis during strip search for contraband relates

a "quick, isolated incident of inappropriate touching" but not an Eighth Amendment violation); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct).

**\*15** Accordingly, Coffey should be granted summary judgment as on this claim.

### I. Excessive Force

On May 12, 2008, while securing Johnson for transport, Coffey allegedly placed the leg irons "extremely tight."[10] The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.*Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."*Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."*Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing,

503 U.S. at 9)."The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."*Hudson,* 503 U.S. at 9–10 (citations omitted)." 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."*Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

In this case, Johnson fails both prongs of the Eighth Amendment analysis. The alleged exertion of force resulted in no medically determinable injury to Johnson as a medical examination following the incident revealed "no bruises, no open areas, [and] no swelling" around Johnson's ankles. Defs.' Ex. B at 39–41. Moreover, an investigation concluded that Johnson was not shackled too tightly at all. Defs.' Ex. E (Dkt. No. 119–7) at 29.Johnson has proffered no evidence to raise an issue of material fact as to whether excessive force was used in this instance.

**\*16** Accordingly, defendants should be granted summary judgment on this claim.

### J. Verbal Harassment

Johnson claims that he was verbally harassed. Am. Compl. at 29. Verbal harassment alone, however, is not actionable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("The claim that a prison guard called [plaintiff] names ... did not allege any appreciable injury and was

properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under ...§ 1983 ."). Accordingly, defendants' should be granted summary judgment as to this claim.

### K. Retaliation

Johnson alleges defendants' engaged in unconstitutional conduct in retaliation for Johnson's filing of grievances. Am. Compl. at 29–30. To state an actionable claim for retaliation, a plaintiff must first allege that his conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Mt. Healthy Cit. Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Courts view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient.*Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

The filing of grievances is a constitutionally protected activity. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Johnson, however, has failed to allege facts sufficient to support a retaliation claim. Johnson has only stated in conclusory terms that defendants were retaliating against him for filing grievances. Johnson offers no evidence to support his allegations, either through documentation or witness testimony. Thus, he has failed to allege specific facts from which one could conclude that defendants' actions were motivated by Johnson's constitutionally protected activities.

### L. Conspiracy

Johnson alleges that defendants conspired together to deprive him of his constitutional rights. Am. Compl. at 30. "Section 1985 prohibits conspiracies to interfere with civil rights."*Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> **\*17** (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007)."In addition, the conspiracy must be motivated by some class-based animus."*Hasty,* 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy. First, Johnson vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights." Second, there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.

### M. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 119–13) at 12.Qualified immunity generally protects governmental

officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Helmer's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*18** Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED** in its entirety and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation."N.D.N.Y.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).*

### Footnotes

1    Ankesh Nigam and John Rodgers were also named as defendants in the amended complaint. Dkt. No. 64.On September 18, 2010, their motion for summary judgment was granted. Dkt. No. 115.Further, John Doe George was named as a defendant in the original complaint (Dkt. No. 1) but he was not named as a defendant in the amended complaint (Dkt. No. 64). The amended complaint also fails to allege that George engaged in any of the alleged unconstitutional conduct. Accordingly, the Clerk is directed to terminate him as a party to this action.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    Defendant Wolfe's name is incorrectly spelled in the amended complaint. *See*Dkt. No. 64.The correct spelling is Wolfe. *See* Defs.' Answer to Am. Compl. (Dkt. No. 79) ¶ 2.

4    Both the original complaint and the amended complaint name "Jane Doe Reuteneaur" as a defendant. Johnson believes that this defendant is female. *See* Am. Compl. at 5, 18. Terry Reuteneaur accepted service of the original complaint. *See*Dkt. No. 49.In support of the present motion, Terry Reuteneaur submitted an affidavit stating that he is male and that the allegations made against Jane Doe Reuteneaur do not refer to him. Reuteneaur Decl. (Dkt. No. 119–12) ¶¶ 4–5. Even if the pleadings were served on the incorrect person, no further identification or service upon Jane Doe Reuteneaur is necessary because doing so would be futile as Johnson has failed to state a claim against Jane Doe Reuteneaur. *See* discussion infra Point III(D)(4).

5    Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b) (service of process must be made within sixty days of the filing of the complaint). Because these defendants have not been identified by Johnson or served with process, it is recommended that the complaint be dismissed without prejudice as to John Doe # 1 and John Doe # 2. No further identification or service upon John Doe # 1 or John Doe # 2 are necessary because doing so would be futile as Johnson has failed to state a claim against these defendants. *See* discussion *infra* Point III(F).

6    A detailed discussion of Dr. Nigam's and Dr. Rodgers's involvement in Johnson's medical treatment can be found in the report and recommendation that recommended their dismissal. *See*Dkt. No. 114.

7  The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), casts doubt in the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

8  "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

9  SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

10  Although Johnson characterized this incident as a form of harassment (Dep. Tr. at 23), it is more appropriately analyzed as an excessive force claim.

2000 WL 362023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marvin Joseph PITSLEY, Plaintiff,

v.

R. RICKS, First Deputy Superintendent,
Clinton Correctional Facility; and J.
Wood, Deputy Superintendent of Security,
Clinton Correctional Facility, Defendants.

No. 96–CV–0372NAMDRH.  |  March 31, **2000**.

**Attorneys and Law Firms**

Marvin Joseph Pitsley, Attica Correctional Facility, Attica,
for Plaintiff, pro se.

**Opinion**

**MEMORANDUM–DECISION AND ORDER**

MORDUE, District J.

### Introduction

**\*1** *Pro se* plaintiff, Marvin Joseph Pitsley ("plaintiff"
or "Pitsley"), an inmate in the custody of the New York
State Department of Correctional Services, commenced this
action on February 29, 1996, alleging a violation of various
constitutional rights. By decision and order dated April 10,
1998, then District Judge Rosemary Pooler dismissed all
of plaintiff's claims except his claim against defendants
Ricks and Wood concerning an alleged violation of Pitsley's
First Amendment right to communicate with his family
and friends. Thereafter, defendants Ricks and Wood moved
for summary judgment. In a Report–Recommendation dated
September 2, 1999, Magistrate Judge David Homer states
that "[w]hile the general right of inmates to reasonable
access to communications is well established, the contours
of the right with respect to telephones in particular are
uncertain." Dkt. no. 63, p. 6. Observing that the Supreme
Court and Second Circuit have not yet directly addressed the
topic of the constitutionality of restricted telephone access,
the Magistrate Judge, quoting *Carter v. O'Sullivan*, 924
F.Supp. 903, 909 (C.D.Ill.1996), recommends that summary
judgment be granted defendants on the grounds of qualified
immunity. [1]

Plaintiff filed timely objections to the Report–
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C), a
district court must make a *de novo* determination of the
portions of a Report–Recommendation that are objected to.
This Court will therefore consider plaintiff's arguments as set
forth in his Objections.

### Factual Background

At the time in question, Pitsley was an inmate at the Clinton
Correctional Facility. He alleges that, on October 9, 1995, he
lost his job at Clinton's tailor shop. As a result, on October
16, 1995, Pitsley appeared before Clinton's facility program
committee where he was offered a position in either the
laundry or bath house. Dkt. no. 52, Ex. H. He states that
he refused to accept either of the new positions offered to
him because "he was not going to take a job which could
cause health problems." [2] Dkt. no. 1., p. 4. As a result of
plaintiff's refusal, on October 16, 1995, Pitsley was assigned
to Limited Privileges Status ("L. P. Status") at Clinton. L.P.
Status circumscribes access to various services and amenities
available to inmates. Among other items, inmates receive no
pay and are not allowed to participate in the Family Reunion
Program, the Home Phone Program, the Cell Study Program,
the Regular Library Program, special events, movies and all
evening programs. [3] Under Clinton policy, full privileges are
restored once the inmate recommences participation in prison
programs.

Pitsley states that while confined on L.P. Status, he was
denied his First Amendment right to communicate with
family and friends. [4] Specifically, Pitsley maintains that
while he was on L.P. Status, he was denied permission to
call his step daughter after she telephoned the facility to
advise that her son was in the hospital for major surgery.
Pitsley claims that he was also unable to correspond with his
family because he was earning no wages and had no money
available to purchase stamps. Dkt. no. 54, pp. 2, 4, 5, 11. He
also alleges that he was denied permission to telephone his
attorney regarding important legal business which resulted in
his action being "denied by the trial court." *Id.* at p. 5; *see also*
dkt. no. 52, Pl. Int. Resp. No. 08 and attachments 04 and 05. [5]

**\*2** Financial records show that from November 7, 1995
to February 14, 1996, Pitsley had a balance of $.04 in
his inmate account. On February 14, 1996, a deposit of

$8.25 was made into Pitsley's inmate account (an apparent refund from the State Comptroller). From that amount, Pitsley made commissary purchases and also purchased $.79 worth of postage. As of March 28, 1996, however, Pitsley had a negative balance of $2.46 in his inmate account. [6] Pitsley claims that afterwards, no other funds came into his possession while he was confined to L.P. Status at Clinton. Pitsley was eventually transferred to Auburn Correctional Facility on January 27, 1997. [7]

On February 22, 1996, Pitsley filed a grievance wherein he stated the following: "The facility can not purposely try to prevent an inmate access to his family without being liable in court. I want to be able to make a call to my family and attorney, or else the facility provide postage to write my family." Dkt. no. 52, Ex. A. Pitsley maintains that defendant Ricks denied the grievance. On appeal, the Department of Correctional Services' Central Office Review Committee sustained the decision made at the facility level and stated the following in relevant part: "Grievant is advised of FOMP # 324 which states in part, ... 'Limited Privilege Program will restrict your yard, movies, commissary, pay, phone home program, regular library, etc.' Free postage is available for legal mail only."

It is with this background that the Court reviews defendants' motion for summary judgment. [8]

## DISCUSSION

### 1. Standards

#### A. SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers indicate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 247 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). To defeat a motion for summary judgment the opposing party must do more than present evidence that is merely colorable, conclusory, or speculative. *Anderson,* 477 U.S. at 249–50 but rather, must demonstrate that there are issues of fact that must be decided by a fact finder, because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see Webber v. Hammack,* 973 F.Supp. 116, 121–23 (N.D.N.Y.1997).

#### B. SECTION 1983

In order to obtain relief under 42 U.S.C. § 1983 a plaintiff must establish that he was deprived of a right, privilege or immunity protected under the United States Constitution or by a federal statute by a person acting under state authority. *Parratt v. Taylor,* 451 U.S. 527, 535, (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986) (more than negligence required); *Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). The Fourteenth Amendment to the United States Constitution prohibits the depriving of an individual of a protected liberty interest without due process. *Hewitt v. Helms,* 459 U.S. 460, 466 (1983). The issues to be determined are, first, whether the plaintiff possessed a constitutionally protected liberty interest which was interfered with and second, whether the procedures followed were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, (1989); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which exceed his sentence in an unexpected manner or which impose a grievous or "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482 (1995). Plaintiff has the burden of demonstrating the existence of a protected liberty interest and the infringement thereupon. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*3** So as to ensure that courts afford appropriate deference to prison officials in their management of correctional facilities and in their efforts to secure order, the Supreme Court has determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test. *See e.g., Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128 (1977). The Supreme Court has stated the standard as follows: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89; *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995).

In order to state a claim for deprivation of a constitutional right to communication, an inmate must make some showing of prejudice or actual injury as a result of the prison officials' conduct. *See, e.g., Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989)(deprivation of telephone access). In a legal deprivation claim, an inmate must proffer specific instances of prejudice to his legal rights, such as missed filing deadlines

or the denial of legal assistance to which he was entitled. *See Martin v. Davies,* 917 F .2d 336, 340 (7th Cir.1990).

## C. QUALIFIED IMMUNITY

Qualified immunity is an affirmative defense which "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1995). Even if an inmate's federal rights have long been recognized, "qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

## 2. The Reasonableness of Restrictions on Pitsley's Ability to Communicate

The Court notes that plaintiff's claim regarding inability to communicate through the mail is one alleging a constructive deprivation. That is, plaintiff does not allege that L.P. Status, by its terms, deprived him of the ability to communicate through the mail. To the contrary, defendants state that under the L.P. Status, "[i]nmates are still permitted to contact their family and friends by mail." Ricks Aff. at ¶ 7.

Plaintiff alleges that he had no money and, because of his L.P. Status, was incapable of earning any money. As such, plaintiff alleges that his indigence resulted from, or was perpetuated by, his L.P. Status. This, according to plaintiff, resulted in his inability to purchase stamps and communicate through the mail. As such, there is no evidence to suggest that plaintiff was deprived of all forms of communication as a result of his L.P. Status. There is support, however, for the argument that the *effect* of defendants' policies was to deprive him of all means of communication.

**\*4** The Supreme Court has recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84 (1987), "nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.' " *Thornburgh v. Abbott,* 490 U.S. 401, 407 (1989). Accordingly, federal courts have held that "[a] prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection." *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975). However, because of security concerns which are inherent

in correctional facilities, the First Amendment's protection of communication is not without restriction. *Martin v. Tyson,* 845 F .2d 1451, 1457 (7th Cir.1988), citing *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir.1987). For example, "[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–64 (D.Kan.1993), *aff'd,* 17 F.3d 1436 (10th Cir.1994).

The right to communication, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment, and, as such, it is protected from arbitrary governmental invasion. *Procunier v. Martinez,* 416 U.S. 396, 413 (1971), overruled on other grounds by *Thornburgh v. Abbott,* 490 U.S. 401 (1989). Under this umbrella, a hierarchy has developed amongst the type of protection afforded to the various modes of communication. For example, while inmates have a constitutionally protected interest in conducting non-legal correspondence, *Thornburgh v. Abbott,* 490 U.S. 401 (1989), such correspondence is not afforded the same degree of protection as legal correspondence. *See Todaro v. Bowman,* 872 F.2d 43, 49 (3rd Cir.1989) (requiring substantial governmental interest in censorship of legal mail). Similarly, telephone calls to and from attorneys have received a higher degree of protection from the courts than telephone privileges generally. *See Ramos v. Vaughn,* 1995 WL 386573 at \*8 (E.D.Pa. June 27, 1995), *aff'd* 85 F.3d 612 (3rd Cir.1996).

Courts considering prison telephone restrictions have agreed that an inmate has no right to unlimited telephone use. *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir.1994); *Benzel v. Grammar,* 869 F.2d 1105, 1108 (8th Cir.1989); *Lopez v. Reyes,* 692 F.2d 15, 17 (5th Cir.1982); *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–64 (D.Kan.1993), aff'd. 17 F.3d 1436 (10th Cir.1994); *see also Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir.1986); *Gilday v. Dubois,* 124 F.3d 277, 293 (1st Cir.1997); *Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.1988).[9] Courts have likewise recognized reasonable restrictions on personal correspondence to and from inmates so as to effectuate the safety and security of particular correctional facilities. *See Turner,* 482 U.S. 78 (1987).

**\*5** Prison regulations imposing restrictions on inmate phone calls have generally been upheld because the restrictions have been interpreted as furthering a legitimate penological

interest. However, in those circumstances where telephone restrictions have been upheld, the Courts have usually noted that the affected inmates have alternate means of communicating with the outside world, most often by use of the mail. *See, e.g., Rivera v. Senkowski,* 62 F.3d 80 (2d Cir.1995); *Acosta v. Brady,* 1999 WL 158471, *7 (E.D .Pa. March 22, 1999).* In this instance, and as stated, Pitsley has alleged not only that he was not able to place telephone calls to family and friends, but that he was also unable to write to them because he was indigent and received no pay or other money while on L.P. Status. [10]

While inmates have a constitutionally protected interest in conducting non-legal correspondence, *see Thornburgh v. Abbott,* 490 U.S. 401 (1989) and *Procunier v. Martinez,* 416 U.S. 396 (1974), the Constitution does not require the State to subsidize inmates to permit such correspondence to be conducted by mail "when other means of communication are available to the general prison population." *Dawes v. Carpenter,* 899 F.Supp. 892, 899 (N.D.N.Y.1995) (citing *Hershberger v. Scaletta,* 33 F.3d 955, 956 (8th Cir.1994)). In this case, however, Pitsley has offered evidence that he had no alternative means of communication because his confinement to L.P. Status prevents him from using the telephone and buying stamps. He therefore claims that the State must make available some means for him to communicate with the outside.

While the foregoing case law holds that prison officials may not terminate all forms of communication with the outside world, there is no case law addressing the unique factual circumstances of the present case. The Court has previously characterized plaintiff's complaint as one stating absolute prohibition of telephone communication coupled with an *effective* prohibition of communication through the mail. The fact remains that L.P. Status, by its terms, allows inmates to communicate through the mail. It cannot, therefore, be accurately stated that the policy directly terminates all forms of communication in violation of clearly established law.

Thus, because L.P. Status does not directly curtail all forms of communication, and because the law does not clearly address plaintiff's argument of indirect infringement, the Court concludes that the law is not clearly established and that prison officials were objectively reasonable for believing that their acts did not violate established rights. [11]

This Court also finds unpersuasive Pitsley complaints that he was not provided with a misbehavior report or disciplinary hearing prior to his assignment to L.P. Status. Assignment to L.P. Status, on the basis of procedures set forth in the Clinton Facility Operations Manual, without benefit of a misbehavior report or a hearing, but with notice and the opportunity to present one's views to the prison official who was charged with transferring an inmate to L.P. Status, has previously been determined not to violate due process. *Dixon v. Leonardo,* 866 F.Supp. 987 (N.D.N.Y.1995) (McAvoy, C.J .).

## CONCLUSION

**\*6** After careful review of the record, including the Report–Recommendation, I conclude that Pitsley's objections to the Report–Recommendation lack merit and I find that the remainder of the report-recommendation was not clearly erroneous. It is therefore,

ORDERED that the Report–Recommendation dated September 2, 1999, is approved, and it is further

ORDERED, that the Motion for Summary Judgment filed by Defendants Ricks and Woods is GRANTED, and it is further

ORDERED, that Plaintiff's action, No. 96–CV–0372 is DISMISSED.

IT IS SO ORDERED.

Footnotes

1    As Magistrate Judge Homer commented, a public official is entitled to qualified immunity when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to have known that his conduct violated the right. *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1988). In assessing whether the right was clearly established at the time defendants acted, courts "examine whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995).

2    Pitsley asserts that a previous decision to place him in the laundry had been reversed for medical reasons. From documentation submitted by defendants regarding Pitsley's job performance in September, 1995, it appears that Pitsley did suffer from health problems, though the extent of those problems is unclear from the record. Dkt. no.52, Ex. H.

3    According to a memorandum from defendant Woods, dated September 7, 1995, keeplock inmates, with the exception of those inmates like Pitsley who had their telephone privileges restricted, could make two phone calls per month. Dkt. no. 52, Pl. Int. Resp., attachment 08.

4    Pitsley claims that in June of 1996, he attempted to obtain release from L.P. Status by requesting other programming but that he was unsuccessful in his efforts.

5    The facility claims that permission to contact his attorney was not denied. Instead, Pitsley was required to have his attorney first write a letter to the facility and request permission to make a legal telephone call. Pitsley was also advised that, in any such request, his attorney should advise as to why a telephone call was necessary as opposed to communicating through the mail.

     Dkt. no. 52, Pl. Int. Resp. No. 08 and attachments 04 and 05.

6    The inmate correspondence program directive attached to defendants' motion papers, dkt. no. 52, Ex. G, provides for advances for personal postage to various categories of inmates who might not otherwise be able to purchase postage. Specifically, the Directive states that:

     Funds may be advanced to an inmate for postage for one first class one-ounce letter per month in the following circumstances:
     a. the inmate has been confined to SHU for discipline or administrative segregation for 30 days or more, and has a zero or negative account balance; or

     b. the inmate has been in keeplock status for 30 days or more, has lost telephone privileges, and has a zero or negative account balance; or

     c. the inmate has lost telephone privileges, has a zero or negative account balance, and has not refused to accept available programming assignments.

7    The Second Circuit has previously characterized the restrictions imposed by L.P. Status as minimal and not sufficiently serious to provide a basis for an Eighth Amendment claim based on deliberate indifference for deprivation of life's necessities, particularly in view of the fact that an inmate can remove himself from the status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

8    Shortly after filing his grievance, Pitsley filed his complaint in this action. In his complaint Pitsley alleged that "[t]he facility is refusing to allow a call home and the facility does not provide for free postage except for legal mail so plaintiff has no way of contacting his family." Dkt. no. 1, p. 5. Judge Rosemary Pooler, presently sitting on the Second Circuit Court of Appeals, had previously been assigned to this case in her prior capacity as District Court Judge. While Judge Pooler characterized Pitsley's First Amendment claim as an alleged violation of Pitsley's right "to communicate with family and friends," Magistrate Judge Homer, in his Report–Recommendation on the instant motion for summary judgment, states that all claims apart from Pitsley's claim "concerning telephone privileges" have been dismissed. This interpretation by Magistrate Judge Homer of Pitsley's claim, as limited to telephone restrictions only, as opposed to Judge Pooler's prior characterization of Pitsley's First Amendment claim as a more comprehensive right to communicate with family and friends, is important as it obviously impacts the analysis to be accorded to defendants' motion for summary judgment. Furthermore, Pitsley's complaint and papers in opposition to defendants' motion are clearly not limited to restrictions on telephone access. This Court considers plaintiff's complaint in light of both alleged denial of telephone privileges and the right to communicate through use of the mail.

9    Moreover, the loss of various privileges, including telephone access, has not been viewed as resulting in the type of deprivation which could reasonably be viewed as imposing atypical and significant hardship on a prison inmate under the analysis set forth in *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny. *Frazier v. Coughlin,* 81 F.3d 313, 315–17 (loss of commissary, recreation, packages and telephone privileges while in SHU and later in Close Supervision Unit did not amount to atypical and significant deprivation); *DeMaio v. Kelly,* No. 95–CV–0329E(H), 1996 WL 685729, at * 2 (W.D.N.Y. Nov. 22, 1996) *Nogueras v. Coughlin,* No. 94 Civ. 4094(JSM), 1996 WL 487951, at *5 (S.D.N.Y.Aug.27, 1996); *Guzman v. Kelly,* No. 88–CV–1391E, 1996 WL 291985, *3 (W.D.N.Y. May 28, 1996); *Brooks v. DiFasi,* 1997 WL 436750, *2 (W.D.N.Y. July 30, 1997).

10   As stated, Pitsley claims that he was unable to contact his stepdaughter when she contacted the facility to advise her that her son was about to undergo a serious operation. He also claims that obstacles in placing a telephone call to his attorney resulted in a legal action being dismissed. He argues that his attempts to have these matters rectified at the facility level went for naught as his grievance requesting permission to contact family and friends through the telephone or mail was denied.

11   The Court notes that plaintiff's inability to communicate with friends and family as a result of his indigence is, arguably, self imposed. That is, plaintiff maintained an $8.25 balance in his prisoner account shortly before filing the present action. Plaintiff spent only . $79 of this money on postage. Had plaintiff spent his money more wisely, he would have been able to communicate through the mail. Likewise, plaintiff could have used a single stamp to request someone from outside the prison to provide him with postage.

Similarly, plaintiff may well have been able to obtain postage from his attorney, as plaintiff was able to communicate through the mail with his attorney.

Furthermore, the Court notes that plaintiff's indigence was exacerbated as a result of his refusal to accept one of two jobs offered him by prison officials. As noted by the Second Circuit, an inmate can remove himself from L.P. Status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2716355
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Jerome RIDDICK, Plaintiff,

v.

Leo ARNONE, et al., Defendants.

No. 3:11cv631 (SRU).   |   July 9, 2012.

**Attorneys and Law Firms**

Jerome Riddick, Somers, CT, pro se.

Michael A. Martone, Office of the Attorney General, Hartford, CT, for Defendants.

**Opinion**

### *RULING ON DEFENDANT KOCIENDA'S MOTION TO DISMISS [Doc. # 14] AND PLAINTIFF'S MOTION TO AMEND [Doc. # 15]*

STEFAN R. UNDERHILL, District Judge.

**\*1** Plaintiff Jerome Riddick filed this action *pro se* under 42 U.S.C. § 1983 (2000). He named six defendants: Leo Arnone, Lynn Milling, Scott Semple, Thomas Kocienda, Richard Bush and Suzanne Ducate. In his original complaint, Riddick challenged the hearing for his placement on Special Needs Status in the Behavioral Engagement Unit. On May 2, 2011, the court filed an Initial Review Order dismissing the claims against all of the defendants except Thomas Kocienda. The court determined that Riddick failed to allege how any of the other defendants were involved in the incidents underlying his claims. The court also concluded that Riddick failed to state a cognizable Fourteenth Amendment claim for denial of due process. The court instructed the plaintiff to file an amended complaint to clarify his retaliation claim by including specific allegations of how each defendant was involved in his claims and directed him to demonstrate how he exhausted his administrative remedies before commencing this action. *See* Doc. # 4.

On May 24, 2011, Riddick filed an amended complaint including only Thomas Kocienda as a defendant. Riddick now alleges that Kocienda issued him five disciplinary reports in an eight-day period, processed the reports himself and

sanctioned Riddick with confinement to quarters for ten days, during which time Riddick was denied showers, recreation, telephone access and hygiene items. Riddick identifies his claims as denial of equal protection, cruel and unusual punishment, and retaliation. *See* Doc. # 5. The court ordered service on defendant Kocienda in his individual capacity. *See* Doc. # 6.

### I. *Plaintiff's Motion for to Amend [Doc. # 15]*
In addition to filing a memorandum in opposition to the motion to dismiss, Riddick moves to file a second amended complaint. He states only that amendment is necessary for him to pursue his conditions of confinement claim. He has neither provided a proposed second amended complaint for the court's review nor explained why he waited eight months to file his motion. The court notes that Riddick did not seek leave to amend until defendant Kocienda filed his motion to dismiss arguing, *inter alia,* that the Eighth Amendment claim was not cognizable.

Amendment is governed by Rule 15(a), Fed.R.Civ.P. "[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility."*Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). For example, with regard to the "undue delay" factor, the Second Circuit has held that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."*Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000).

The most important factor in considering whether to allow amendment under Rule 15(a) is whether the opposing party would be prejudiced by the proposed amendment. *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008). This inquiry is "often intertwined" with the consideration of whether there was undue delay on the part of the movant because a long delay is more likely to be prejudicial. *Evans v. Syracuse City School Dist.,* 704 F.2d 44, 47 (2d Cir.1983). Where a party seeks to amend his complaint to avoid an adverse ruling, the court may deny leave to amend. *See Ansam Assoc., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (holding that trial court did not abuse discretion in denying leave to amend where plaintiff already had amended once, discovery period had concluded and defendant had filed motion for summary judgment). In addition, when the plaintiff attempts to add an additional claim, evaluation of prejudice requires the court to consider whether the new

claim would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993).

**\*2** RIDDICK states that the amendment relates to his Eighth Amendment claim. Because he has not attached a proposed amended complaint, the court cannot determine whether the amendment would simply clarify the existing claim or expand the claim so that further discovery would be required. If additional discovery is needed, the court will be required to extend the deadlines in the scheduling order and resolution of this matter will be delayed. Riddick makes no showing of good cause to warrant such action and fails to show that he has been acting diligently in prosecuting this case. Accordingly, Riddick's motion to amend is denied.

## II. *Kocienda's Motion to Dismiss [Doc. # 14]*

Kocienda moves to dismiss the amended complaint on the grounds that the amended complaint fails to state cognizable claim for violation of the Equal Protection Clause or the Eighth Amendment, Riddick's allegations do no constitute retaliation, the Eleventh Amendment protects the defendant from claims for damages in his official capacity, and the defendant is protected by qualified immunity.

### A. *Standard of Review*

When considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003). The court considers not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted so that he should be entitled to offer evidence to support his claim. *See York v. Association of Bar of City of New York,* 286 F.3d 122, 125 (2d Cir.), *cert. denied,* 537 U.S. 1089 (2002).

Although the court does not usually consider documents submitted by the defense in support of a motion to dismiss, the court may take judicial notice of decisions and filings in related litigation between the parties without converting the motion to a motion for summary judgment. *See Staehr v. Hartford Financial Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir.2008) (when considering a motion to dismiss, courts routinely take judicial notice of documents filed in other cases).

### B. *Facts*

Kocienda is a psychologist who was working at Garner Correctional Institution during the relevant time period. On March 18, 22, 23, 24 and 25, 2011, Kocienda issued Riddick disciplinary reports, processed the disciplinary reports himself, and did not afford Riddick the procedural protections provided in the Code of Penal Discipline, Administrative Directive 9.6.

Riddick alleges that Kocienda took those actions because Riddick told him that he could not punish Riddick because he was not a custodial officer. Kocienda placed Riddick on modified confined-to-quarters status for ten days, from March 18, 2011, until March 28, 2011. During that time, Riddick was denied showers, recreation, phone usage and hygiene items.

**\*3** In the original complaint, however, Riddick alleged that he was confined for the same ten-day period as a result of his placement on Behavioral Engagement Unit status. He attached to the original complaint a copy of the notification for the March 23, 2011 hearing for placement on Special Needs (Behavioral Engagement Unit) management status. On March 29, 2011, Riddick received notification of the approval of his placement on Special Needs Management status. *See* Doc. # 1 at 10–15.

### C. *Discussion*

Kocienda moves to dismiss all claims in the amended complaint on the grounds that Riddick fails to state cognizable claims for retaliation or violation of his Fourteenth and Eighth Amendment rights, all damages claims against him in his official capacity are barred by the Eleventh Amendment, and he is protected by qualified immunity.

### 1. *Equal Protection*

Riddick argues that the failure to provide procedural protections at the disciplinary hearing deprived him of equal protection in that Kocienda did not treat him equally under the administrative directive.

The Equal Protection Clause protects prisoners from invidious discrimination. The provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. *See*

*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439–40 (1985). To prevail on an equal protection claim, Riddick must prove that he was treated differently from other similarly situated individuals and the reason for the different treatment was based on " 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)). Although Riddick alleges that defendant Kocienda acted with intent to punish him, he fails to allege any facts showing that he was treated differently from similarly situated inmates. He only references general procedural rules. He does not allege facts showing that other similarly classified inmates were treated in a different manner.

Riddick also could assert an equal protection claim on a "class of one" theory. To state a valid equal protection "class of one" claim, Riddick must allege (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). To prevail on a "class of one" claim, Riddick must allege an "extremely high" level of similarity with the person to whom he is comparing himself. *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005). Riddick's circumstances must be "prima facie identical" to the other person's. *Id.* at 105.Riddick has identified and presented evidence of no other inmates with similar disciplinary history pending classification for special needs management who were treated differently under the same circumstances. Thus, he fails to state an equal protection claim. *See Page v. Lantz,* No. 3:03cv1271(MRK), 2007 WL 1834519, at *6 (D. Conn. June 25, 2007) (holding that class of one equal protection claim failed as a matter of law where plaintiff did not allege that similarly situated inmates were treated differently under similar circumstances). Defendant Kocienda's motion to dismiss is granted as to any equal protection claim.

**\*4** Although couched in equal protection terms, Riddick actually is arguing that he was not provided various procedural protections following issuance of the disciplinary reports. Liberally construing the allegations in the amended complaint, the court concludes that Riddick is attempting to reassert the due process claim set forth in the original complaint and dismissed in the Initial Review Order.

In *Sandin v. Connor,* 515 U.S. 472 (1995), the Supreme Court considered the requirements to state a claim for denial of procedural due process. The Supreme Court held that the plaintiff must demonstrate both a protected liberty or property interest and that he had been deprived of that interest without being afforded due process of law. To establish a protected liberty or property interest, the plaintiff must show that the state created a liberty interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields,* 280 F.3d 69, 81 (2d Cir.2000).

*Sandin* held that confinement in the restrictive housing unit for thirty days for disciplinary reasons did not implicate a constitutional liberty interest. *Sandin,* 515 U.S. at 485–86.Further, the Second Circuit has held that confinement in restrictive housing for less that 101 days does not constitute an atypical and significant hardship sufficient to state a claim under *Sandin.See Lewis v. Sieminski,* No. 3:08–CV–728(JCH), 2010 WL 3827991, at *6 (D.Conn. Sept. 22, 2010) (noting that "the decisions in the Second Circuit are unanimous that keeplock or [segregated housing unit] confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin* "); *see also Frazier v. Coughlin,* 81 F.3d 313, 317–18 (2d Cir.1996) (holding that 120–day confinement in segregation followed by 30–day loss of recreation, commissary privileges, packages and telephone use did not state a cognizable claim for denial of due process); *Nicholson v. Murphy,* No. 3:02cv1815(MRK), 2003 WL 22909876, at *10–11 (D.Conn. Sept. 19, 2003) (holding that confinement in segregation under thirty days is not an atypical and significant hardship).

Riddick alleges that he was held on confined to quarters status for ten days. He also alleges that he was denied showers, telephone usage and hygiene products during that time. The court determines below that the conditions of his confinement are not of constitutional magnitude. The court concludes that a ten-day confinement under the conditions alleges does not constitute an atypical and significant hardship to support a due process claim. Accordingly, any due process claim is dismissed pursuant to 28 U.S.C. § 1915A.

**2.** *Eighth Amendment*

Riddick next argues that the denial of recreation, showers, telephone usage and hygiene items for ten days constitutes cruel and unusual punishment in violation of the Eighth Amendment. It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney,* 509 U.S. 25, 31 (1993); *see also Rhodes v. Chapman,* 452 U.S. 337, 351 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating failure of prison officials to provide for inmates' "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety."*DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 200 (1989).

**\*5** An inmate may prevail on an Eighth Amendment claim "only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, *i.e.,* that his confinement under the alleged conditions violates contemporary standards of decency. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. *See id.* at 185–86.Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw that inference." *Farmer,* 511 U.S. at 837.

**a.** *Recreation*
Both the Supreme Court and the Court of Appeals for the Second Circuit recognize that exercise is a basic human need that must be provided for inmates. *See Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991); *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Sostre v. McGinnis,* 442 F.2d 178, 193 & n. 25 (2d Cir.1971) (en banc), *cert. denied,*404 U.S. 1049 (1972). However, the courts have held that deprivations of exercise for relatively short periods are permitted. *See, e.g., Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (finding that keeping inmate on full restraint status without outdoor recreation for twenty-two days does not state Eighth Amendment claim); *Houston v. Goord,* No. 9:03–CV–1412(GTS/DEP), 2009 WL 890658 (N.D.N.Y. Mar. 31, 2009) (Eighth Amendment claim not cognizable because denial of opportunity for outdoor exercise for less than two weeks was *de minimis* ); *Shakur v. Sieminski,* 3:07–cv–1239(CFD), 2007 WL 2151174 (D.Conn. July 15, 2007) (one hour of outdoor recreation per day is not a constitutional minimum). Riddick alleges only that he was denied out-of-cell recreation for ten days. The court concludes that the

denial of exercise for ten days is *de minimis* and does not rise to the level of an Eighth Amendment violation.

**b.** *Conditions of Confinement*
Riddick also contends that the denial of showers, telephone access and hygiene products for ten days constitutes unconstitutional conditions of confinement in violation of the Eighth Amendment. Courts considering this issue have held that temporary denial of showers and hygiene products is not unconstitutional. *See, e.g., Silber v. Pallito,* No. 1:09–CV–73, 2011 WL 1225594, at \*10 (D.Vt. Feb. 7, 2011) (temporary denial of basic toiletries does not violate the Eighth Amendment (citing cases)), *recommended ruling adopted as modified in other respects,*2011 WL 1225588 (D.Vt. Mar. 31, 2011); *Fernandez v. Armstrong,* No. 3:02CV2252, 2005 WL 733664, at \*5 (D.Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted)); *McCoy v.. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "); *Briggs v. Heidlebaugh,* No. CIV. 96–3884, 1997 WL 318081, at \*3 (E.D.Pa. May 21, 1997) (denial of showers for two weeks not a constitutional violation). Riddick does not identify the hygiene products in his amended complaint. In opposition to the motion to dismiss, he states that he was denied a toothbrush, toothpaste, deodorant and soap. *See* Doc. # 19 at 10. The denial of those items for ten days does not constitute an Eighth Amendment violation.

**\*6** Finally, Riddick alleges that he was denied telephone access for ten days. Prisoners have no constitutional right to unrestricted telephone use. *See Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 5006831, st \*2 (S.D.N.Y. Oct. 20, 2011); *Pitsley v. Ricks,* No. 96–CV–0372, 2000 WL 362023, at \*4 (N.D.N.Y. Mar. 31, 2000). Riddick does not allege that he was unable to communicate through the mail during that ten-day period. Thus, he fails to state a cognizable claim. *See Pitsley,* 2000 WL 362023, at \*5 (dismissing prisoner's section 1983 suit alleging improper denial of telephone access where inmate had alternate means of communication with the outside world by mail).

**3.** *Retaliation*
Riddick argues that Kocienda sanctioned him with modified confined-to-quarters status in retaliation for Riddick's statement that Kocienda could not punish Riddick because he

was not a custodial officer. Kocienda contends that Riddick fails to state a cognizable retaliation claim.

Prison officials may not retaliate against inmates for exercising their constitutional rights. To state a retaliation claim, Riddick must show that his actions were protected by the Constitution or federal law and that his protected conduct was a "substantial or motivating factor" in the alleged retaliatory conduct. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.2003). To support a claim of retaliation, the allegedly retaliatory conduct must be sufficiently harsh to deter a similarly situated inmate of ordinary resolve from exercising his constitutional rights. It is not necessary that the plaintiff himself be deterred. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Any lesser conduct is *de minimis* and does not support a retaliation claim. Prisoners are required to tolerate more serious conduct than public employees or private citizens before stating a retaliation claim.

To state a claim for retaliation regarding the filing of a false misbehavior report, the plaintiff must allege both that a defendant filed the report and that his motivation to do so relates to the plaintiff having engaged in protected activity. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see also Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."). With regard to false misbehavior reports, the type of evidence required to establish a causal connection between the plaintiff's protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing and statements from the defendants regarding their motives. *See Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007).

*7 Cases supporting retaliation claims for inmate statements concern actions taken in response to the inmate filing a grievance, instituting a lawsuit or making a complaint to prison officials regarding the conduct of correctional staff. *See, e.g., Ramsey v. Goord,* 661 F.Supp.2d 370 (W.D.N.Y.2009) (retaliation in response to inmate providing statements to counselor against correctional officers); *Sprau v. Coughlin,* 997 F.Supp. 390 (W.D.N.Y.1998) (retaliation in response to inmate's threat to file grievance against correctional officer).

The court concludes that Riddick fails to state a cognizable retaliation claim. Riddick alleges that the retaliatory actions were taken because Riddick told Kocienda that he could not issue a disciplinary report. That statement appears more like a schoolyard taunt than an attempt to petition the government for redress of grievances. Such comments are not considered protected speech to support a retaliation claim. *See, e.g., Smith v. Mosley,* 532 F.3d 1270, 1277 (11th Cir.2008) (inmate's "false and insubordinate remarks" not protected speech); *Riggs v. Miller,* 480 F.Supp. 799, 804 (E.D.Va.1979) ("bickering argumentative conversation" does not rise to the "lofty position of constitutionally protected speech"). In addition, Riddick does not indicate when he made the statement to Kocienda, thereby failing to allege facts showing a temporal relationship between his statement and the allegedly retaliatory actions. Kocienda's motion to dismiss is granted with respect to the retaliation claim.

### 4. *Eleventh Amendment*

Kocienda argues that the Eleventh Amendment protects him from suit for damages in his official capacity. He also states that he cannot discern why the court ordered the complaint served in his individual capacity.

In his original complaint, Riddick named all defendants in their individual and official capacities. *See* Doc. # 1 at 1. In his amended complaint, Riddick seeks damages. The court is aware of the Eleventh Amendment prohibition. Therefore, because Riddick did not specify that capacity in which defendant Kocienda was named in the amended complaint, the court construed the amended complaint to assert individual capacity claims and ordered service on Kocienda only in his individual capacity.

Accordingly, to the extent that the defendant addresses this argument to claims asserted against him in his official capacity, the motion to dismiss is denied.

### III. *Conclusion*

The defendant's Motion to Dismiss [**Doc. # 14**] is **GRANTED** and any due process claim is **DISMISSED** pursuant to 28 U.S.C. § 1915A. Riddick's motion to amend [**Doc. # 15**] is **DENIED.** The Clerk is directed to enter judgment in favor of the defendants and close this case.

It is so ordered.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 983819
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Willie James YELDON, Plaintiff,

v.

Michael HOGAN, PhD; Donald Sawyer, PhD;
Jeffrey Amodon, MD; Barbara Stapholz, RN;
Maureen Adams, RN; Charmaine Bill, RN;
Sam Lilly, RN; Terrimax Millian, [1] MD; Jeffrey
Norwicki, Chs; Mary Bullivant, RN, Defendants.

No. 9:08-CV-769 (NAM/
RFT).    |    March 15, 2010.

**Attorneys and Law Firms**

Willie James Yeldon, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adam Sil Verman, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendats.

**Opinion**

### MEMORANDUM-DECISION AND ORDER

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff brought this action under 42 U.S.C. § 1983.
The complaint (Dkt. No. 1) alleges violations of his
First, Fourth, Eighth, and Fourteenth Amendment rights
stemming from several policies that were enforced during
his civil confinement at the Central New York Psychiatric
Center ("CNYPC") located in Marcy, New York, in 2008.
Defendants moved for summary judgment dismissing the
action (Dkt. No. 30). Upon referral pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge Randolph F. Treece issued a thorough
Report and Recommendation (Dkt. No. 37) recommending
that summary judgment be granted and the complaint be
dismissed.

Plaintiff has submitted an objection (Dkt. No. 38) to
the Report and Recommendation. In view of plaintiff's
objections, pursuant to 28 U.S.C. § 636(b)(1)(C), this Court
conducts a *de novo* review. Upon *de novo* review, the Court
adopts and accepts the Report and Recommendation in all
respects.

It is therefore

ORDERED that United States Magistrate Judge Randolph
F. Treece's Report and Recommendation (Dkt. No. 37) is
accepted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment
(Dkt. No. 30) is granted the complaint (Dkt. No. 1) is
dismissed in its entirety, and it is further

ORDERED that the Clerk enter judgment accordingly.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

Presently before the Court is Defendants' Motion for
Summary Judgment. Dkt. No. 30.By his Complaint, brought
pursuant to 42 U.S .C. § 1983, Plaintiff alleges violations of
his First, Fourth, Eighth, and Fourteenth Amendment rights
stemming from several policies that were enforced during his
civil confinement at the Central New York Psychiatric Center
("CNYPC") located in Marcy, New York, in 2008. Dkt. No.
1, Compl.

Plaintiff's Response in Opposition to the Defendants' Motion
consists only of a Response to Defendants' Statement of
Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1.
*See* Dkt. No. 31, Pl.'s Resp. Plaintiff has provided no
memorandum of law nor any affidavit or other evidence
in support of his Opposition. *Id.* In a letter, dated August
12, 2009, which was attached to Plaintiff's Response in
Opposition to Defendants' Motion, Plaintiff asserted that he
did not have in his possession certain documents relevant
to the case, but stated that as soon as he received the
documents he would "be more than happy to send them
to [Defendants' attorney] and the Court."Dkt. No. 31, Pl.'s
Lt., dated Aug. 12, 2009. Since the filing of that letter, the
Court has received no additional documents from Plaintiff

in support of his Opposition, nor has Plaintiff submitted any request to extend the deadline in order to supplement his Response to Defendants' Motion. As such, we consider the matter fully briefed and will render a recommendation based upon the documents provided by the parties.

**\*2** For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **granted.**

## I. BACKGROUND

In 2007, the New York State Legislature enacted the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007. Dkt. No. 30, Adam W. Silverman, Esq., Affirm., dated July 15, 2009, Ex. A, Office of Mental Health ("OMH") Rep., dated Jan. 28, 2008, at p. 1. The centerpiece of SOMTA is Article 10 of New York's Mental Health Law. *Id.* at p. 1. Article 10

> establishes an elaborate process for evaluating the mental condition of certain sex offenders who are scheduled to be released from the custody of "agencies with jurisdiction" to determine whether the individual is a "sex offender requiring civil management." A sex offender requiring civil management can be either (1) a dangerous sex offender requiring civil confinement (who would be confined to a secure treatment facility operated by OMH), or (2) a sex offender requiring strict and intensive supervision and treatment (who would be supervised by a Parole Officer in the community).

*Id.*

The process begins when an agency with jurisdiction, such as the Department of Correctional Services ("DOCS"), refers a detained sex offender to OMH for evaluation. *Id.* at p. 3. Next, OMH determines, through a procedure that includes psychiatric interviews and evaluations, whether the referred sex offender "suffers from a mental abnormality which predisposes him or her to sexual offending."*Id.* If that inquiry is answered affirmatively, OMH provides a psychiatric report and notifies the Office of the Attorney General ("OAG"), who has the discretion to file a petition for civil management

in the courts. *Id.* Article 10 provides that a probable cause hearing must commence within thirty (30) days of the filing of the civil management petition, wherein a determination is made as to whether probable cause exists to believe that the respondent is a sex offender who poses a danger to the community, thereby necessitating his secured confinement pending a civil commitment determination in a jury trial. N.Y. MENTAL HYG. LAW § 10.06(g) & (k).

On February 25, 1997, Plaintiff was convicted in New York State Supreme Court of, *inter alia,* rape, sexual abuse, and sodomy. Silverman Affirm., Ex. C, Pl.'s Inpatient & Med. Records [2] at p. 2 of 41.On August 7, 2007, prior to his release from jail and pursuant to SOMTA, a psychological report was issued concluding that, to a reasonable degree of professional certainty, Plaintiff suffered from a mental abnormality affecting his "emotional, cognitive, or volitional capacity in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in his having serious difficulty in controlling such conduct."*Id.* at p. 11 of 41.Thereafter, the OAG filed a petition for civil management against Plaintiff and from August 7, 2007, through March 3, 2008, probable cause proceedings took place in order to determine whether Plaintiff would be civilly confined and placed in the Sex Offender Treatment Program ("SOTP"), a program designed to "treat sexual deviance and personality disorders."OMH Rep. at p. 7; Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41.On March 3, 2008, the Honorable John L. Michalski concluded that probable cause existed to detain Plaintiff in a secure treatment facility pending his civil commitment trial. [3] *Id.* at p. 13 of 41.On March 10, 2008, Plaintiff was transferred from DOCS' custody to CNYPC, where he began the SOTP. Plaintiff remained at CNYPC until January 13, 2009. [4] Silverman Affirm., Ex. B, Pl.'s Dep., dated Mar. 9, 2009, at p. 72.

**\*3** The claims alleged in Plaintiff's Complaint concern policies enforced during his residency at CNYPC from March 10, 2008, through January 13, 2009. *See* Compl. Specifically, Plaintiff alleges that during his stay at CNYPC he was denied access to the courts, legal materials, his medical records, and local news television broadcasts and newspapers, and was subjected to restricted telephone use, improper censoring of his incoming and outgoing mail, and illegal searches of his personal effects. *Id.* Plaintiff also alleges he was forced into a test program called "Motivation on Deck" without his consent, where he was denied treatment, recreation, and interaction with the general resident population at CNYPC.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law."The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is ]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant.FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.*Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998)."[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest."*Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Due Process Claims

**\*4** Plaintiff alleges that he was forced to participate in a test program called "Motivation on Deck," ("MOD"), without his consent, thereby violating his constitutional rights. In *Youngberg v. Romeo,* 457 U.S. 307 (1982), the Supreme Court made clear that civilly committed persons retain various constitutional rights. *See also DeShaney v. Winnebago County Dept. of Soc. Servs .,* 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The plaintiff in *Youngberg,* who was involuntarily civilly confined, brought a § 1983 claim alleging that the administrators of a mental institution violated his substantive due process rights by restraining him in shackles for prolonged periods of time and failing to provide adequate habilitation. The Supreme Court held that the plaintiff retained protected liberty interests in freedom of movement and adequate training under the Fourteenth Amendment, and that "whether [a civilly committed person's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."457 U.S. at 319 & 321.In considering such claims, courts must "show deference to the judgment exercised by qualified professional[s]," whose decisions are entitled to a "presumption of correctness." *Id.* at 322-24.

In this case, the record shows that on April 19, 2008, Plaintiff punched another resident in the face during an altercation. Pl.'s Dep. at p. 32.Thereafter, Plaintiff was escorted into a "side room," where he was seen by Dr. Brown,[5] a facility physician, who encountered Plaintiff in an agitated and

threatening posture, and decided that Plaintiff was in need of medication. *Id.;* Silverman Affirm., Ex. C, Assessment and Order for Restrictive Intervention, dated Apr. 19, 2008, at p. 18 of 41.Plaintiff refused the medication and was forcibly placed in a "five point restraint" by staff members, and thereafter injected with Thorazine and Benadryl in two separate shots. Silverman Affirm., Ex. C, Progress Notes, dated Apr. 19, 2008, at pp. 22 & 26 of 41;*see also* Pl.'s Dep. at p. 32 (stating that staff gave him two shots). After Plaintiff calmed down, he was released from the restraints and allowed to return to his room. Progress Notes at p. 26 of 41.CNYPC Staff closely monitored Plaintiff throughout the night and made behavioral observations every fifteen (15) minutes from 7:30 p.m. on April 19th through 9:00 a.m. the next day. Silverman Affirm ., Ex. C, Observation Log, dated Apr. 19-20, 2008, at pp. 28-30 of 41.

On April 21, 2009, Plaintiff was informed by his treatment team that he was going to be transferred from Unit 405, located on the fourth floor of CNYPC and used for incoming residents entering Phase I of SOTP, to the MOD Unit, also known as Ward 304. Dkt. No. 30, Terri Maxymillian, Psy. D., Decl., dated July 14, 2009, at ¶ 22; Silverman Affirm., Ex. C, Progress Notes, dated Apr. 21, 2008, at p. 38 of 41.The MOD unit is a self-contained residential and treatment floor for residents who have "engaged in violence, threats of violence, or other chronic treatment interfering behaviors and as a result were treated in a setting that allowed for more containment and observation."Maxymillian Decl. at ¶ 33. While the physical layout of the MOD floor was the same as on the other floors, MOD residents, as opposed to residents in other units, did not leave the floor for treatment or therapy and were only given twenty (20) minutes of outside recreation time each day. Pl.'s Dep. at pp. 30-31.As MOD residents progress in their treatment, they begin to attend treatment groups off the MOD unit, followed by recreation and other activities off the unit; successful completion of those stages leads to transfer out of the MOD unit. Maxymillian Decl. at ¶ 34. Plaintiff stayed in the MOD unit for approximately three months before moving to another unit. Pl.'s Dep. at p. 33.Plaintiff alleges that the restrictions placed on him while in the MOD unit denied him access to the treatments outlined in his treatment plan and that he was unable to associate with residents in other units. Compl. at ¶¶ 25(2) [6] & 27.

**\*5** As previously stated, when considering a due process claim arising out of liberty restrictions placed on persons who are civilly committed, a court must balance the resident's liberty interests against the relevant state interests.

*Youngberg v. Romeo,* 457 U.S. at 319.In this case, as described above, the MOD program entails greater liberty restrictions than those imposed upon the general SOTP population. However, these additional restrictions are not arbitrary nor are they arbitrarily applied. Terri Maxymillian, Psy.D., is a licensed doctoral psychologist and has been the Director of the Sex Offender Treatment Program at CNYPC since March 2007. Maxymillian Decl. at ¶ 1. According to Maxymillian, the MOD unit is for residents who have engaged in violent behavior or "other chronic treatment interfering behaviors," and it provides CNYPC staff with greater observation of residents in a contained environment. *Id.* at ¶¶ 33-34.MOD residents are given increasing access to the normal SOTP program as they progress in their treatment. *Id.* at ¶ 34.Therefore, we cannot say that these liberty restrictions constituted "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."*Youngberg v. Romeo,* 457 U.S. at 323.

The record before us shows that the MOD program was implemented for legitimate reasons made by qualified professionals. Plaintiff has offered no evidence to rebut the presumption of correctness that must be afforded such a decision.*Id.* at 324.Courts are bound to show deference to the judgment of qualified professionals and should be circumspect in interfering "with the internal operations of these institutions."*Id.* at 322.

For these reasons, we recommend **dismissal** of Plaintiff's substantive due process claims.

### C. Equal Protection Claims

Plaintiff brings two claims under the Equal Protection Clause of the Fourteenth Amendment: (1) residents in the MOD program are treated differently from residents in the regular SOTP program; and (2) residents in the SOTP at CNYPC are treated differently than those at St. Lawrence Psychiatric Center, located in Ogdensburg, New York. Compl. at ¶ 31(III).

The Equal Protection Clause of the Fourteenth Amendment states "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly situated ... be treated alike."*Lisa's Party City, Inc. v. Town of*

*Henrietta,* 185 F.3d 12, 16 (2d Cir.1999) (internal citations and quotation marks omitted). As a general rule, the Equal Protection Clause protects "suspect classes and fundamental interests against inequitable treatment, but other types of inequities and classifications may be justified by a showing of mere rationality." *LeClair v. Saunders,* 627 F.2d 606, 611 (2d Cir.1980) (citing *Dandridge v. Williams,* 397 U.S. 471, 487 (1970)). However, an equal protection claim may be brought "by a 'class of one' where a plaintiff alleges that she has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362-63 (2d Cir.2002) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).

**\*6** To establish a valid equal protection claim based on selective enforcement, a plaintiff must demonstrate that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d at 609-10.

### 1. *Transfer to MOD Unit*

Plaintiff alleges his forced relocation to the MOD unit violated his equal protection rights. However, in order to establish a valid Fourteenth Amendment equal protection claim, Plaintiff must demonstrate that his selective treatment was based on impermissible considerations such as race, religion, or intent to punish. In this case, by Plaintiff's own admission, the reason for his transfer to the MOD unit was his physical altercation with another resident that occurred on April 19, 2008. Pl.'s Dep. at p. 32.Plaintiff has offered no evidence to oppose Defendant Maxmillian's sworn statement that the reason for his transfer was to "allow[ ] for more containment and observation" of violent residents. Maxmillian Decl. at ¶ 34. As such, Plaintiff's equal protection claim based on the conditions imposed on him during his residence in the MOD unit is without merit and should be **dismissed.**

### 2. *CNYPC vs. St. Lawrence Psychiatric Center*

Plaintiff's second equal protection claim is based on his allegation that residents in the SOTP at CNYPC are treated

differently than those at St. Lawrence Psychiatric Center. Specifically, Plaintiff states that his equal protection rights were violated, along with all the other CNYPC residents,[7] because residents at the St. Lawrence Psychiatric Center are given a $200 personal clothing allowance and are allowed to choose their own clothing, while CNYPC residents are issued uniforms consisting of black and tan pants, sweatshirts, polo shirts, velcro sneakers, L.L. Bean boots, and a coat. Compl. at ¶ 26.

The record shows that CNYPC residents were issued articles of clothing totaling over $200 per patient. Maxmillian Decl. at ¶ 5. Thus, although Plaintiff was not afforded the opportunity to choose his own clothing, he was given a wardrobe of equal value to that allegedly received by residents of the St. Lawrence Psychiatric Center, and therefore, was not treated differently from others similarly situated in any constitutionally significant respect. Nor is there any evidence that such selective treatment was based on impermissible considerations such as race, religion, or intent to punish.

Therefore, we recommend that this equal protection claim also be **dismissed.**

### D. First Amendment Claims

Plaintiff alleges his First Amendment rights were violated because he was denied (1) the right to "freely communicate with those on the outside of the facility because of Defendants['] blanket censorship of phone and [incoming and outgoing] mail;" (2) access to the courts and legal materials; (3) access to his own medical records; and finally, that he was (4) retaliated against for seeking redress of his grievances from the government. Compl. at ¶ 31.

### 1. *Phone, Mail, and other Restrictions*

**\*7** Plaintiff takes issue with several policies in place during his stay at CNYPC, including restrictions on phone use, mail and stamps, visitations, and access to news media. In the prison context, the Supreme Court has held that an "inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Thus, there can be little doubt that civilly committed persons also retain certain First

Amendment rights, especially given the Supreme Court's declaration that involuntarily committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S. at 322.

Less clear is the appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds, an issue the Second Circuit has yet to address. In *Turner v. Safely,* 482 U.S. 78, 89-91 (1987), the Supreme Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. 482 U.S. at 89-91.Courts in other circuits have applied the *Turner* test in order to analyze First Amendment claims brought by civilly confined persons. *See Ivey v. Mooney,* 2008 WL 4527792, at *4 n. 7 (D.Minn. Sept. 30, 2008) (applying *Turner,* but noting that a civil confinement is significantly different from a criminal confinement); *Francis v. Watson,* 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006) (citing cases that have applied *Turner* in cases involving civilly confined persons); *Marsh v. Liberty Behavioral Health Care, Inc.,* 2008 WL 821623, at *5 (M.D.Fla. Mar. 27, 2008) (applying *Turner* and citing *Hydrick v.. Hunter,* 500 F.3d 978, 991 (9th Cir.2007)); *Beaulieu v. Ludeman,* 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

We agree that the *Turner* test is appropriately applied to First Amendment claims brought by civilly committed individuals alleging that they have been precluded from exercising their First Amendment rights. Essentially, the First Amendment analysis under *Turner* mirrors the due process analysis under *Youngberg;* in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside. *See Beaulieu v. Ludeman,* 2008 WL 2498241, at *20 n. 15 (finding *Turner* to be consistent with *Youngberg* because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so"). Therefore, we will apply the *Turner* test in order to analyze these First Amendment claims.

### a. *Phone Use*

**\*8** Plaintiff makes the following allegations regarding phone use at CNYPC: (1) staff are two to three feet away when residents make legal calls; (2) residents must use a phone card in order to call private attorneys, state agencies, and all other outside persons/organizations; (3) residents cannot call 1-800 numbers; (4) phone cards are restricted to $20 per month; and (5) personal calls are limited to ten (10) minutes. Compl. at ¶¶ 25(1) & 28.

According to Maxymillian,

> residents were required to fill out disbursement forms to purchase phone cards in order to make phone calls to anyone other than legal entities, the Commission on Quality of Care, accrediting agencies, and patients' rights organizations. As of February 2009, calling cards were also needed to make calls to legal entities. Also, because there were a limited number of telephones available for the residents on each unit, time on the telephones was limited to approximately ten minutes per resident when another resident was waiting. In order to make free legal calls, residents were required to receive pre-approval before using the legal telephone. The pre-approval process entailed the resident providing the facility with the name and telephone number of the attorney he would like to call so that the number could be verified prior to the call being authorized. After the request was approved, a member of the staff was required to watch the resident dial the telephone so that no free calls were being used to call a nonapproved telephone number.

Maxymillian Decl. at ¶¶ 17-21.

In his deposition, Plaintiff affirmed Maxymillian's breakdown of the phone policy, and clarified that there

were four phones made available to residents, three for personal calls and one exclusively for legal calls; calls to Mental Hygiene Legal Services were free, but calls to private attorneys had to be paid for with a phone card. Pl.'s Dep. at pp. 42-47.

Based on the above descriptions of CNYPC's phone policy, it does not appear that Plaintiff was prohibited from exercising his First Amendment rights. Plaintiff was not prevented from making phone calls, rather, he was simply required to pay for certain calls. Moreover, the other restrictions on phone use are rational, common sense policies reasonably related to issues that arise in an institutional setting. Finally, Plaintiff was free to communicate with the outside world through the post, which is discussed below. [8]

**b. Mail**

Plaintiff alleges that at CNYPC, stamps are considered contraband and that outgoing mail is censored, requiring pre-approval by the treatment team. Compl. at ¶¶ 25(1) & 31. CNYPC residents were not permitted to have stamps "because they are often used as a commodity, leading to counter-therapeutic behaviors."Maxymillian Decl. at ¶ 16. As such, in order to send out a piece of mail, Plaintiff was required to fill out a disbursement form to be approved by staff. Pl.'s Dep. at p. 53.Other than being required to fill out a disbursement form for stamps, Plaintiff does not allege that his outgoing mail was intentionally interfered with in any other way. [9] As such, Plaintiff again does not allege that he was prevented from exercising his First Amendment rights, just that CNYPC's policies inconvenienced him.

**\*9** In terms of incoming mail, Plaintiff testified that on two occasions, pictures were removed from his incoming personal mail, one a picture of his sixteen-year-old niece and a picture of his eight or nine-year-old grandson. [10] Id. at p. 54.CNYPC did not permit residents to have pictures of children under the age of 18 because many residents have committed sexual offenses against children and/or have deviant sexual arousal towards children. Maxymillian Decl. at ¶¶ 14-15. For the same reasons, CNYPC residents are not permitted to have visitors under the age of 18 who are not also their children. Maxymillian Decl. at ¶ 14. Thus, Plaintiff's request to allow his five to seven-year-old nephew visit was denied. Compl. at ¶ 20; Pl.'s Dep. at p. 41.

Restrictions on incoming mail containing pictures of minors in a group home where many residents have committed sexual offenses against children is a policy that is rationally related to legitimate government interests. In addition, there is no way to permit certain individuals to possess such photos without potentially negatively affecting the treatment of other SOTP residents. As such, there are no less-restrictive means to ensure the safety of the public and the treatment of SOTP residents.

**c. News Media**

Plaintiff complains that CNYCP residents were denied access to local news channels and local newspapers. Compl. at ¶ 25(1). Maxymillian states that "[r]esidents are restricted from reading the local paper and magazines and are also restricted from viewing local television programming because of the potential risk to staff members and their families if residents were to have access to personal information about them."Maxymillian Decl. at ¶ 12. CNYPC has a valid interest in protecting its staff members and their families. Allowing residents access to local news media could provide them with information about staff members and their families, thereby undermining the safety of those persons. In addition, Plaintiff does not allege that he was denied access to all newspapers and news broadcasts, just local ones. Compl. at ¶ 25(1). These restrictions are rationally related to legitimate government interests and are not overly broad in their scope.

For the foregoing reasons, we find Plaintiff's First Amendment claims based on his freedom of speech should be **dismissed.**

**2. Access to the Courts**

Plaintiff alleges he was denied access to the courts through the aforementioned phone policy, restrictions placed on the ordering of legal materials and the number of books residents were allowed, and the unavailability of a typewriter, "full sized writing instruments," and carbon paper. Compl. at ¶¶ 18, 25(1), 28-29, & 31. To state a claim for denial of access to the courts, a plaintiff must allege that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury.Lewis v. Casey, 518 U.S. 343, 354 (1996); Cusamano v. Sobek, 604 f. supp.2d 416, 498 (N.D.N.Y.2009). Defendants assert that Plaintiff's claim must fail because he has not demonstrated that the Defendants caused him an

actual injury, i.e., that prison officials frustrated or impeded his efforts to pursue a non-frivolous legal claim. *Lewis v. Casey,* 518 U.S. at 354.We agree. Nowhere in his Complaint does Plaintiff identify a lawsuit that was impeded or frustrated by Defendants. Although Plaintiff stated in his deposition that he had another federal lawsuit pending during his time at CNYPC in 2008, Pl.'s Dep. at pp. 66-68, in his Response to Defendants' Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1, Plaintiff admits that, apart from the instant lawsuit, he has only been a party to one other federal lawsuit, a case that was closed on February 2, 2005, well before Plaintiff arrived at CNYPC. Dkt. No. 30-6, Defs.' 7.1 Statement at ¶ 37; Pl.'s Resp. at ¶ 25.

**\*10** There being no evidence or allegation before the Court that Plaintiff has actually been impeded from pursuing a legal action, we recommend that this claim be **dismissed.**

### 3. *Access to Medical Records*

Plaintiff alleges Defendants Bill and Maxymillian denied his requests to see his clinical records in order to find out the medication he was forcibly given during the incident on April 19, 2008, and by whom. Compl. at ¶¶ 21-24. However, Plaintiff made clear in his deposition that he received the clinical records he requested just before he left CNYPC. Pl.'s Dep. at p. 76.Also, the Second Circuit has held that there is "no basis for the proposition that mental patients have a constitutionally protected property interest in the direct and unrestricted access to their [psychiatric] records."*Gotkin v. Miller,* 514 F.2d 125, 128 (2d Cir.1975). Plaintiff does not assert any injury stemming from the delay in the provision of those records and, as such, that claim is now moot. Thus, we recommend **dismissal** of this claim. [11]

### 4. *Retaliation*

Reading his Complaint liberally, Plaintiff alleges Defendants Sawyer, Norwicki, Maxymillian, Bill, and other CNYPC staff members punished him for exercising his right to seek redress from the government by writing negative clinical notes and placing him in the MOD unit, thereby precluding his association with other CNYPC residents. Compl. at ¶ 31.

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) officials took an adverse action against

him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff has failed to show that he was engaged in constitutionally protected conduct. Although he states that he sought "[t]o petition [ ] the government for redress of grievance[s]," Plaintiff does not state which government actor he petitioned, nor in what form. Plaintiff attached to his Complaint copies of petitions he sent to various OMH employees seeking to gain access to his medical records. *See* Compl., Attach. Exs. However, he does not state that such petitions and appeals were the motivating factor behind the alleged retaliatory acts taken against him. Nor does he explain why such petitions would have inured adverse sentiment among CNYPC staff members. Moreover, to the extent Plaintiff asserts that his transfer to the MOD unit constituted an adverse action against him, the record is clear that he was transferred because he was involved in a physical altercation with another resident, not as a reprisal for his engagement in constitutionally protected activity. Pl.'s Dep. at p. 32; Maxymillian Decl. at ¶ 33.

In sum, this retaliation claim is conclusory and finds absolutely no evidentiary support in the record. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007) (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). For those reasons, we recommend **dismissal** of Plaintiff's retaliation claim.

### E. Fourth Amendment Claims

**\*11** Plaintiff alleges Defendants violated his Fourth Amendment right against unreasonable searches and seizures when they searched his property without probable cause. Compl. at ¶¶ 25(2) & 31(II). Like several of his other claims, this claim is stated in wholly conclusory terms and could be properly dismissed on that basis alone. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545.Though unexplained in the Complaint, Plaintiff stated at his deposition that on one occasion he left CNYPC for a court appearance and returned to find his room in disarray. Pl.'s Dep. at pp. 73-74.Plaintiff stated he inquired of Defendant Bill and other staff members, but no one provided any information about who was in his room or why his room was searched. [12] *Id.*

While the Complaint accuses Defendants Sawyer, Norwicki, Bill, and Maxmillian of harassing residents by "repeatedly searching [their] personal property," Compl. at ¶ 25(2), Plaintiff does not allege any facts in his Complaint or deposition implicating those Defendants in an improper search. Thus, Plaintiff has not alleged any personal involvement on the part of a Defendant that could lead to liability under § 1983 for alleged violations of the Fourth Amendment. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983") (citations omitted).

Plaintiff also states in his Fourth Amendment claim that "a clinician should be physically present whenever a staff member has to put his hands on a [resident's] physical being."Compl. at ¶ 31(II). This statement is also conclusory and, to the extent it is a veiled reference to the incident that occurred on April 19, 2008, the record shows that a physician was present and ordered Plaintiff's physical restraint and medication. *See supra* Part II.B.

Because these claims are conclusory and fail to implicate personal involvement on the part of any Defendant, it is recommended that they be **dismissed.**

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 30) be **GRANTED** and the Complaint (Dkt. No. 1)**DISMISSED;** and it is further

**ORDERED,** that the Clerk place under seal Plaintiff's Medical Records (filed traditionally with the Court as Exhibit C to the Affirmation of Adam W. Silverman, Esq.); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

Footnotes

1    Defendant Terrimax Millian's actual name is Terri Maxymillian. *See*Dkt. No. 30, Terri Maxymillian, Psy. D., Decl., dated July 14, 2009. We will use the correct spelling of this Defendant's name.

2    On July 15, 2009, the Court granted Defendants' motion to file Plaintiff's medical records traditionally with the Court because of their confidential nature. Dkt. No. 29, Order, dated July 15, 2009. Those records include a summary of Plaintiff's criminal history, which contains un-redacted names of certain victims of sexual offenses committed by Plaintiff. Therefore, the Clerk is ordered to place this file under seal in order to protect the identity of the victims. *See Brown v. Duncan,* 2003 WL 21294476, at * 1 n. 1 (N.D.N.Y. June 4, 2003); *see also*New York Civil Right's Law § 50-b ("[T]he identity of any victim of a sex offense ... shall be confidential. No report, paper, picture, photograph, court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection.").

3    The probable cause determination was delayed by Plaintiff's August 30, 2007 motion to remove the trial to Erie County and the parties' consent to adjourn the proceedings that same date. Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41.Probable cause hearings were thereafter held on December 6 and 13, 2007, January 22, 2008, and March 3, 2008. *Id.*

4    After his release on January 13, 2009, Plaintiff was subsequently returned to CNYPC because he violated the terms of his release. Dkt. No. 30, Terri Maxymillian, Psy.D., Decl., dated July 14, 2009, at ¶ 35.

5    Dr. Brown is not a named Defendant in this lawsuit.

6    Plaintiff included two consecutive paragraphs numbered "25." We will refer to them as "25(1)" and "25(2)," respectively.

7    Plaintiff asks the Court to consider his Complaint a class action and at various points in his Complaint, makes allegations on behalf of other CNYPC residents regarding alleged constitutional violations that did not involve him. *See* Compl. at ¶¶ 28-30. However, a *pro se* plaintiff cannot represent other individuals in a class action. *See, e.g., Gorelik v. Lippman,* 2006 WL 941800, at *4 (S.D.N.Y. Apr. 12, 2006). Therefore, only Plaintiff's claims regarding constitutional violations that *he* allegedly suffered are considered by the Court.

8    To the extent Plaintiff seeks to bring an access to the courts claim based on the phone use policy at CNYPC, that claim is addressed in Part II.C.2 below.

9    Plaintiff stated at his deposition that he had two "minor" incidents wherein correspondences were returned to him due to clerical errors, one of which was his own fault. Pl.'s Dep. at pp. 56-58.

10    Plaintiff was given the pictures back upon his release from CNYPC. Pl.'s Dep. at p. 55.

11    To the extent Plaintiff seeks to bring a cause of action under New York State Mental Hygiene Law based on the alleged failure to timely disclose medical records, because we recommend dismissal of all of Plaintiff's federal claims, we recommend that the district court not exercise supplemental jurisdiction over such state claim.

12    Plaintiff does not allege in his Complaint nor did he testify at his deposition that any of his property was stolen during his stay at CNYCP.

---